## Page 268 / Page 1 (left column)

```
 1   DATE:      March 27, 2007
 2   TO:        DIANA IBARRIA
                c/o JACKSON LEWIS LLP
 3              ATTN:  CHRIS WILSON, ESQ.
                One Biscayne Tower, Suite 3500
 4              Two South Biscayne Boulevard
                Miami, Florida 33131
 5
     IN RE:  Leonard Chernys v. Standard Pacific
 6
     CASE NO.: 06-25162 CA 21
 7
 8        Please take notice that on Friday, the 16th of
     March, 2007, you gave your deposition in the
 9   above-referred to matter.  At that time, you did not
     waive signature.  It is now necessary that you sign
10   your deposition.
11        Please call our office at the below-listed number
     to schedule an appointment between the hours of 9:00
12   a.m. to 4:30 p.m., Monday through Friday.
13        If you do not read and sign the deposition within
     a reasonable time, the original, which has already
14   been forwarded to the ordering attorney, may be filed
     with the Clerk of the Court.  If you wish to waive
15   your signature, sign your name in the blank at the
     bottom of this letter and return it to us.
16
                             Very truly yours,
17                           NETWORK REPORTING
18
                             _____
19                           MICHELE ANZIVINO, Court Reporter
                             305-358-8188
20
     I do hereby waive my signature:
21
22
     _____
23   DIANA IBARRIA
24
     Cc via transcript:  Gary Carman, Esq.
25
```

## Page 1 (right column)

```
 1        IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
             IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2
                 CASE NO. 06-25162-CA-21
 3
     - - - - - - - - - - - -
 4   LEONARD CHERNYS,
 5             Plaintiff,          CERTIFIED COPY
 6   vs.
 7   STANDARD PACIFIC OF SOUTH
     FLORIDA, G.P. INC., and
 8   STANDARD PACIFIC CORP.,
 9             Defendant.
10   - - - - - - - - - - - -
     VOLUME I
11
12          DEPOSITION OF DIANA IBARRIA
13
14          Friday, March 16, 2007
15          10:13 a.m. - 5:11 p.m.
16
17          1111 Brickell Avenue
18             Miami, Florida
19
20
21
22
     Reported By:
23   Michele Anzivino, RPR
     Notary Public, State of Florida
24   Network Reporting
     305.358.8188
25
```

## Page 2

```
 1   APPEARANCES:
 2        On Behalf of the Plaintiff:
          GARY M. CARMAN, P.A.
 3        BY: GARY M. CARMAN, ESQ.
          1111 Brickell Avenue, Suite 2050
 4        Miami, Florida 33131
          305.379.8300
 5
 6        On Behalf of the Defendant:
          JACKSON LEWIS LLP
 7        BY:  CHRIS WILSON, ESQ.
          One Biscayne Tower, Suite 3500
 8        Two South Biscayne Boulevard
          Miami, Florida 33131
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                    I N D E X
 3   WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS
 4   DIANA IBARRIA
 5   By Mr. Carman        3
 6
 7                  E X H I B I T S
 8   NUMBER    DESCRIPTION                        PAGE
 9     1       Standard Pacific 2006 Income        85
             Statement
10     2       2005 Westbrooke Division Bonus      86
             and Salary Worksheet
11
12     3       2006 Westbrooke Division Bonus      97
             and Salary Worksheet
13     4       Len Chernys Bonus Calculation,     122
             December 31, 2005 year end
14
15     5       Letter dated June 8, 2006 from     130
             Diana Ibarria
16     6       Complaint                          150
17     7       Consulting Agreement               176
18     8       2004 Annual Performance Review     196
             for Leonard Chernys
19
20     9       2005 Annual Performance Review     196
             for Leonard Chernys
21
22
23
24
25
```

1  Thereupon:
2               DIANA IBARRIA,
3  having been first duly sworn or affirmed, was
4  examined, and testified as follows:
5  DIRECT EXAMINATION BY MR. CARMAN:
6      Q.    Good morning.
7      A.    Good morning.
8      Q.    Could you please state your name and
9  address?
10     A.    Sure.  Diana Ibarria, I-B-A-R-R-I-A.  The
11 address is REDACTED          Miami 33183.
12     Q.    Have you ever had your deposition taken
13 before?
14     A.    Yes.
15     Q.    How many times?
16     A.    I can't recall.  Several.
17     Q.    And in what type of cases?
18     A.    Pertaining to the company.
19     Q.    Would they be pertaining to sales of
20 property?
21     A.    Yes.
22     Q.    Have you ever had your deposition taken in
23 cases involving employment disputes?
24     A.    No.
25     Q.    I'm going to give you some instructions, and

1  if you would follow them that would be fine.
2          First off, if I ask you a question that you
3  don't understand or would like me to repeat it, if
4  you'll tell me I'll be happy to do so.
5      A.    Okay.
6      Q.    If I speak too fast, sometimes I do, and if
7  I should speak too quickly and you missed what I said
8  I'll be happy to repeat it or I'll have the court
9  reporter read it back for you.  I'm not here to see
10 which one of us can out dual the other or whether this
11 is an endurance issue.  So if I do, that please tell
12 me and we'll stop and repeat or rephrase the question,
13 all right?
14     A.    Okay.
15     Q.    The other thing is I don't want you to
16 guess, and if you don't know the answer it's perfectly
17 acceptable to say to me that you don't know.  Further,
18 if you'd like to see a document, if we have it we'll
19 produce it for you, and if you do have a document that
20 you review, tell me when you are done reading it.
21 Sometimes people speed read, and other times I don't
22 give you enough time.  In this situation, I give you a
23 document to read or you need to see a document, tell
24 me.
25          Also, please tell me if you need a break.

1  This is not torture.  If you need to go to the
2  restroom, go outside, you are welcome to it.  If you
3  need a drink or -- there's things behind you, bathroom
4  breaks, as many as you need.  That's not a problem.
5  That's about all I'm going to do.  You have to answer
6  the questions audibly.  She can't take down shrugs.
7  With that in mind, let me proceed.
8          Are you currently employed?
9      A.    Yes.
10     Q.    By whom are you employed?
11     A.    Standard Pacific Homes.
12     Q.    Now, Standard Pacific Homes, is that the
13 employer, the actual name of the company you work for?
14 Is there a different name?
15     A.    The precise name is Standard Pacific Homes
16 of South Florida, Inc.
17     Q.    And what is that?  Is it a Florida
18 corporation?
19     A.    Yes.
20     Q.    And do you know who the officers are the
21 Standard Pacific Homes of South Florida, Inc.?
22     A.    I don't know all of them.  I can tell you
23 the ones that I know.
24     Q.    Again, to the best of your knowledge.
25     A.    Myself of course.

1      Q.    And what position do you occupy?
2      A.    President.
3      Q.    Okay.
4      A.    Claudia Feldman, controller.  I don't know
5  what her position is in the corporation.  Maybe it's
6  vice president or --
7      Q.    That's fine.
8      A.    And I believe Casey.
9      Q.    Is Casey a man or a woman?
10     A.    A woman.  She's vice president of sales and
11 marketing.
12     Q.    And is there a parent corporation that you
13 report to?
14     A.    Yes.
15     Q.    And what would the name of that entity be?
16     A.    Standard Pacific Homes.
17     Q.    Is it -- again, I apologize.  Is it Standard
18 Pacific Homes Corporation?
19     A.    It is a corporation.  I don't know if that's
20 how it's worded.
21     Q.    What I'm trying to get at is I want to make
22 sure I have all the entities here.
23     A.    Okay.
24     Q.    And I believe -- I'm not going to testify.
25 I think it's Standard Pacific Corp.  Is that what it

1  is?

2        MS. WILSON:  If you know.

3        THE WITNESS:  I'm not sure.  I don't know.

4  BY MR. CARMAN:

5     Q.    Okay.  Let me ask another question.  Do you

6  get a paycheck?

7     A.    Yes.

8     Q.    And do you know on which bank account or

9  which corporate entity pays you?

10    A.    No, I don't believe it or not.  I don't even

11  look at it.  It's direct deposit.

12    Q.    Well, that's a fair statement.  Let me ask

13  it another way.  When the corporation of which you are

14  president has to write a check, do you write a check

15  locally on a bank account or do you have to go to a

16  parent to write the check?

17    A.    We do have -- both.

18    Q.    Do you have a bank account here in Miami,

19  Dade County, Florida?

20    A.    Yes.

21    Q.    And do you know, is it in the name of

22  Standard Pacific Homes of South Florida, Inc.?

23    A.    Yes.

24    Q.    And is there a treasurer or controller or

25  someone at Standard Pacific Homes of South Florida,

---

1  Inc. that signs those checks?

2     A.    Yes.

3     Q.    And who would that person be?

4     A.    Claudia Feldman.

5     Q.    Now, you say some checks are written by

6  Standard Pacific Corp.

7     A.    Yes.

8     Q.    Is that the corporation?  Is that based in

9  California?

10    A.    Yes.

11    Q.    Is that based in Irvine, California?

12    A.    Yes.

13    Q.    As president are you president of a

14  subsidiary corporation?  Do you know the corporate

15  structure by chance?

16    A.    I do not.

17    Q.    And I'm going to ask you a couple of

18  questions that may be a little technical, so I

19  apologize.  You are the first one so you get the

20  brunt.

21    A.    That's fine.

22    Q.    As president of Standard Pacific Homes of

23  South Florida, let's just say South Florida, do you

24  have direct reporting responsibility to someone else?

25    A.    Yes.

---

1     Q.    Okay.  Who do you report to?

2     A.    I report to Bruce Dickson.

3     Q.    Who is he?

4     A.    His title is regional vice president --

5  sorry, regional president.  Not vice president.  Take

6  that back.  Regional president.

7     Q.    Diana, who is Mr. Dickson?  I mean, who does

8  he work for?

9     A.    He works for Steven Scarborough, the

10  president of Standard Pacific.

11    Q.    So Mr. Dickson then is a regional president

12  of Standard Pacific corporation or the California

13  parent; is that correct?

14    A.    That is correct.

15    Q.    And Mr. Scarborough is president or is he

16  chairman of the board, do you know?

17    A.    I'm sorry.  He is chairman of the board.

18    Q.    So would be chairman of the board of

19  Standard Pacific Corp.; is that a fair statement?

20    A.    Yes.

21    Q.    When did Mr. Dickson take over as regional

22  president of Standard Pacific Corp.?

23    A.    I don't know.

24    Q.    Was he always regional president of Standard

25  Pacific Corp. for the year -- between the years and

---

1  2005 and 2007?

2     A.    Yes.

3     Q.    Where is Mr. Dickson based?

4     A.    Austin, Texas.

5     Q.    Austin, Texas.  Is there another Standard

6  Pacific Company there in Austin?

7     A.    Yes.

8     Q.    And what is the name of that entity in

9  Austin, do you know?

10    A.    I know it's Standard Pacific.  I don't know

11  if it's of Austin.  Don't know.

12    Q.    Now, with respect to Mr. Dickson, you have

13  reported to him since you became president of the

14  company; is that correct?

15    A.    That is correct.

16    Q.    And what year was that, Diana?

17    A.    December of 2004.

18    Q.    All right.  And Mr. Dickson is based in

19  Austin.  Does he travel to Miami?

20    A.    Yes.

21    Q.    How often does Mr. Dickson come to Miami?

22    A.    Approximately once a quarter.

23    Q.    And during his trips to Miami, is he here

24  for any alongated period of time, more than a couple

25  of hours?

1    A.    Yes.

2    Q.    Does he ever come here for a period of days?

3    A.    Yes.

4    Q.    When was the last time that Mr. Dickson was

5  in Miami?

6    A.    Sometime in January.

7    Q.    And can we expect him back sometime in this

8  year?

9         MS. WILSON:  Object to form.

10 BY MR. CARMAN:

11   Q.    Is there scheduled times when he comes?

12   A.    There is no scheduled times.

13   Q.    Do you know in advance when he comes?

14   A.    Yes.

15   Q.    Do you know if he's coming any time in the

16 next month or two?

17   A.    No, I do not.

18   Q.    Now, what is Mr. Dickson's role with respect

19 to you?  What does he oversee?  What are his

20 responsibilities?

21   A.    He oversees the southeast region.

22   Q.    Okay.

23   A.    And his responsibilities is he's my boss.  I

24 don't know what you want me to say.

25   Q.    That's fine.  I'll try and ask the

1  questions.  I don't want you to guess, and that's a

2  perfectly good example.  Let me go back and see if I

3  can break it down this way.

4         Standard Pacific Corporation is based in

5  Irvine, California.  That's where the parent is; is

6  that a fair statement?

7    A.    Yes.

8    Q.    And that's where Mr. Scarborough is?

9    A.    Yes.

10   Q.    And is there another president of the

11 overall company that is resigning in a few days?  Do

12 you know who that is?

13   A.    Yes.

14   Q.    Who is that?

15   A.    Michael Courtney.

16   Q.    And that would be where Mr. Courtney is

17 based; is that a fair statement?

18   A.    Yes.

19   Q.    And most of the executive management of

20 Standard Pacific Corp. is based in Irvine; is that a

21 fair statement?

22   A.    Yes.

23   Q.    Do you report to Mr. Courtney at all?

24   A.    I report directly to Bruce Dickson.

25   Q.    Have you ever as president of the company

1  from 2004 December through the present date ever met

2  with Mr. Courtney in your role as president of the

3  South Florida?

4    A.    Do you mean meet him individually or in a

5  group setting or meetings?

6    Q.    Good question.  You are asking me the

7  questions today.

8    A.    I'm trying to ask you to clarify.

9    Q.    No, no, no.  You are doing it right.

10        As president of South Florida, do you have

11 regularly scheduled meetings with Mr. Courtney or have

12 you had?

13   A.    No.

14   Q.    Does Mr. Courtney have telephonic meetings

15 with you and your company?

16   A.    No.

17   Q.    Is there an annual meeting or get-together

18 in which regional presidents such as yourself get

19 together with Mr. Courtney?

20   A.    Yes.

21   Q.    How often do those regional meetings take

22 place?

23   A.    Once or twice a year.

24   Q.    And when they take place once or twice a

25 year, where do they take place?

1    A.    In Las Vegas or Orlando, Florida.

2    Q.    During the years 2005 and 2006, how many

3  meetings have you as president of the company attended

4  in which Mr. Courtney was the presiding officer of

5  those meetings?

6    A.    You said 2005 and 2006?

7    Q.    Yes.

8    A.    Approximately four.

9    Q.    And for each of those meetings, do you know

10 in advance when they are going to occur?

11   A.    Yes.

12   Q.    Is there a particular time period during the

13 year in which they occur such as summer, fall?

14   A.    I'm trying to think.

15   Q.    Okay.

16   A.    I'm not quite sure.

17   Q.    Okay.  Not a problem.

18        Do you know when the last one was?

19   A.    Yes.

20   Q.    Could you please tell me?

21   A.    I believe it was February.

22   Q.    Of '07?

23   A.    Or end of January.

24   Q.    Of this year?

25   A.    Yes.

1    Q.    And do you know where it took place?

2    A.    Yes, Orlando.

3    Q.    Going back to 2006, and if you don't

4  remember it's fine, do you remember how many meetings

5  there were in which Mr. Dickson presided and where

6  they were?

7    A.    I don't remember.

8    Q.    Not a problem.  All right.  Now, have you

9  had any communications with Mr. Courtney about

10 Mr. Chernys for the years 2005, 2006 and 2007?

11         MS. WILSON:  Objection to form.

12         MR. CARMAN:  I'm sorry?

13         MS. WILSON:  I said objection to form.

14         MR. CARMAN:  I apologize.

15 BY MR. CARMAN:

16   Q.    The answer is yes.  Let's start with 2005.

17   A.    Okay.

18   Q.    Can you tell me whether you had any

19 conversations with Mr. Courtney regarding Len we'll

20 call him?  I have a hard time with names.

21   A.    Lenny.

22   Q.    Do you remember such conversations?

23   A.    Yes.

24   Q.    And when you have these conversations with

25 Mr. Courtney, is it your practice to take notes of

1  what you and Mr. Courtney discuss?

2    A.    No.

3    Q.    Do you scribble?  As you see, you may not be

4  able to read what I write, but I write when I'm

5  talking.  Do you do the same?

6    A.    Yes, always.

7    Q.    Do you ever save those notes or scribbles

8  when you have such communications?

9    A.    No.

10   Q.    Do you ever communicate or have you

11 communicated in 2005 with Mr. Courtney by e-mail

12 regarding Lenny?

13   A.    No.  Mr. Courtney doesn't use e-mail.

14   Q.    Okay.

15   A.    I know.  Believe it or not.

16   Q.    Let's go back and talk about Mr. Courtney's

17 skills.  Mr. Courtney send you faxes or memos?  Is

18 that how he would operate?

19   A.    No.

20   Q.    Does Mr. Courtney write things out and send

21 it by fax or mail?

22   A.    No.

23   Q.    Has Mr. Courtney ever communicated to you in

24 writing about Len or Lenny?

25   A.    Not in writing.

1    Q.    Your communications with Mr. Courtney would

2  all be verbal?

3    A.    Yes.

4    Q.    Does Mr. Courtney have somebody in the room

5  when you talk with him taking notes and having that

6  person type up the notes and send to you about Len or

7  any other conversations you might have?

8         MS. WILSON:  Objection.  Calls for

9         speculation.

10 BY MR. CARMAN:

11   Q.    If you know.

12   A.    No, I don't know.

13   Q.    Probably a dumb question.  Do you e-mail

14 Mr. Courtney about discussions or business issues you

15 have as president of the company?

16   A.    No, because I know he would never get it.

17   Q.    So would it be a fair statement to say that

18 all of your communications between Mr. Courtney and

19 yourself regarding Len were verbal?

20   A.    Yes.

21   Q.    Have you received any written material from

22 Mr. Courtney to yourself as president of the company

23 for the years 2005, 2006 or 2007 regarding Lenny?

24   A.    No.

25   Q.    The conversations you had with Mr. Courtney

1  in 2005, would you be kind enough, if you remember, to

2  tell me what they were about, please?

3    A.    They were about a mis -- a -- at the end of

4  2005 I was told by Mr. Dickson that according to

5  Mr. Courtney that this would be his last year to get

6  the profit sharing.

7         MS. WILSON:  For the record, do you want to

8         say who he is?

9         THE WITNESS:  Who who is?

10        MS. WILSON:  She said he.

11        THE WITNESS:  Sorry.  I forgot what I said.

12 BY MR. CARMAN:

13   Q.    Wait.  Okay.  Let me start again.  I think

14 what you were saying is that at the end of 2005 you

15 had a telephone conversation with Mr. Courtney because

16 Bruce Dickson had told you that Mr. Chernys would not

17 be able to share in profit sharing at the end of --

18 I'm going to be quiet.

19   A.    That '05 would be the --

20        MS. WILSON:  Sorry for interrupting.  I

21        shouldn't have done that.

22 BY MR. CARMAN:

23   Q.    We'll all relax.

24   A.    That 2005 would be the last profit.

25        MS. WILSON:  Try to use names instead of he

```
 1   or she.
 2        THE WITNESS:  Sorry.
 3  BY MR. CARMAN:
 4    Q.    So you were told by Bruce Dickson that Lenny
 5  would not participate in profit sharing in the years
 6  going forward, that his last year would be '05?
 7    A.    That is correct.
 8    Q.    And you called Mr. Courtney; is that
 9  correct?
10    A.    Yes.
11    Q.    And you called Mr. Courtney because you
12  believed that that was incorrect?
13    A.    No, because Len believed it was incorrect,
14  he asked me to find out for him.
15    Q.    Okay.  And when did he ask you to find out?
16    A.    When I told him this would be his last year.
17    Q.    Do you know when that was approximately?
18    A.    Sometime at the end of the year, sometime in
19  December.
20    Q.    Of 2005?
21    A.    Yes.
22    Q.    And who did you call?
23    A.    Who did I call?
24    Q.    You called Mr. Courtney?
25    A.    Yes, yes.
```

```
 1    Q.    Did you get him on the phone?
 2    A.    Eventually.
 3    Q.    Do you know approximately when you spoke
 4  with him?
 5    A.    Around the same time.
 6    Q.    Would you have any notes of your
 7  conversation with him?
 8    A.    No.
 9    Q.    Was anybody present in the room when you had
10  the conversation with him besides yourself?
11    A.    No.
12    Q.    What did you and he discuss?
13    A.    What the agreement was so I can relay it to
14  Lenny.
15    Q.    Okay.
16    A.    He said that the only reason he had agreed
17  to -- that this would be the last year for Len's
18  profit sharing is because Len was retiring and he had
19  agreed with Jim and Hal to give him a soft landing.
20    Q.    Throughout this deposition and throughout
21  others the words "soft landing" may come up.  And let
22  me deal with it now and then we'll come back to where
23  we just were.
24        What was your understanding, just you, as
25  the president and an individual of the words soft
```

```
 1  landing?
 2    A.    I don't know.
 3    Q.    Did you ever have conversations with Jim
 4  Carr regarding his interpretation of the word soft
 5  landing?
 6    A.    No, not about his interpretation.
 7    Q.    About the words soft landing?
 8    A.    I really didn't analyze what it meant.
 9    Q.    Did you and Mr. Carr ever discuss the fact
10  that Mr. Carr believed that Mr. Chernys would be able
11  to participate in profit sharing through the year
12  2006?
13        MS. WILSON:  Objection to form.
14        THE WITNESS:  Yes.
15  BY MR. CARMAN:
16    Q.    And when did you and Mr. Carr have those
17  conversations?
18    A.    At the same time or around the same time,
19  December of 2005.
20    Q.    And I guess we'll have to go into who
21  Mr. Carr is in a minute.
22        At that time why did you call Mr. Carr?  If
23  you remember.
24    A.    I don't remember.
25    Q.    When Mr. Carr told you that he believed
```

```
 1  Lenny was due a soft landing through the end of 2006,
 2  that was not what Mr. Courtney believed; is that
 3  correct?
 4    A.    That's correct.
 5    Q.    Did you pick up the phone and then call
 6  Mr. Eisenacher to ask him what his understanding was?
 7    A.    No.
 8    Q.    I don't want to put words in your mouth and
 9  I just want to see if I understand.  Mr. Courtney
10  believed that he had an agreement with Mr. Carr and
11  with Mr. Eisenacher regarding Lenny?
12        MS. WILSON:  Objection to form.  Calls for
13        speculation.
14  BY MR. CARMAN:
15    Q.    You can answer if you know.
16    A.    I don't know what he thought.
17    Q.    But I thought you testified, and I'm not
18  trying to be critical, that he said that he agreed to
19  give Lenny the profit sharing through 2005.  That was
20  the agreement he had with Hal and with Jim to give him
21  a soft landing.
22    A.    Yes, that's what he said.
23    Q.    Did you tell Mr. Courtney that was not
24  Mr. Carr's recollection of the agreement?
25    A.    Yes.
```

```
 1      Q.    And what did Mr. Courtney say?
 2      A.    He said that was absolutely not true.
 3      Q.    And when you spoke to Mr. Carr, did you tell
 4 him that Mr. Courtney said it wasn't true?
 5      A.    Yes.
 6      Q.    And what did Mr. Carr say?
 7      A.    He said well, I can see where I
 8 misinterpreted because our conversation was in the
 9 summer of 2004, and in the two years -- it may have
10 thought the two years was 2004 and 2005 where I
11 thought it was 2005 and 2006.  I can see where he may
12 have misunderstood.
13      Q.    So he was saying to you that he thought that
14 somebody may have misunderstood.
15            Now, you've never spoken to Hal about this
16 agreement; is that a fair statement?
17            MS. WILSON:  Objection to form.  I don't
18      recall.
19 BY MR. CARMAN:
20      Q.    I'm sorry.
21      A.    At that time?
22      Q.    At any time.  Sorry.
23      A.    Yes, I have.
24      Q.    And when did you speak to Hal?
25      A.    Recently.
```

```
 1      Q.    And by "recently," when would that be?
 2      A.    Two months ago approximately.
 3      Q.    And why did you call him?
 4      A.    No, I didn't call him.  He came to visit our
 5 office.
 6      Q.    Do you know why he was there?
 7      A.    To see our new office and visit everyone.
 8      Q.    While he was there, did you have occasion to
 9 discuss Lenny with him?
10      A.    Yes.
11      Q.    What did you discuss?
12      A.    He said that he had heard about Len, about
13 the case, and that Len had been trying to call him.
14      Q.    And did you discuss with him this agreement?
15      A.    No.
16      Q.    Did you discuss with him what his
17 understanding was of the agreement that Mr. Courtney
18 referred to?
19      A.    I don't recall.
20      Q.    Now, Hal was basically the president of the
21 company prior to your assuming that role.  Is that a
22 fair statement?
23      A.    Yes.
24      Q.    And as president of the company you were
25 responsible for generating a budget?
```

```
 1      A.    Yes.
 2      Q.    And in generating that budget, how often do
 3 you do that?  How often is a budget generated?
 4      A.    Quarterly.
 5      Q.    Are there longer budgets?  Are there
 6 basically budgets that are produced by your company
 7 for -- that run for three years, five years?  Are
 8 there projections or long-range budgets?
 9      A.    Yes, there are three-year budgets.
10      Q.    And those three-year budgets, are they
11 matters in which you as a president of the company
12 look at?
13      A.    Yes.
14      Q.    What role do you play in the preparation of
15 these budgets?
16      A.    I play a role with -- I get together with
17 your controller, VP of sales, VP of construction, and
18 it's basically looking at a crystal ball.  When you
19 are talking three years, and we try to figure out what
20 we think our budget will be as far as how many sales,
21 how we can meet construction, et cetera.
22      Q.    And you also look at expenses; is that a
23 fair statement?
24      A.    Not on the three-year plan.
25      Q.    Does the three-year plan have a list of
```

```
 1 expenses on it?
 2      A.    It's just a number, line item.
 3      Q.    And in that line item number, would there be
 4 salaries, profit sharing, these kinds of things?
 5      A.    Yes.
 6      Q.    And you've been president now for almost
 7 three years and you would oversee a three-year budget.
 8 Is it done every year?
 9      A.    Yes, I believe so.  Actually in January.
10      Q.    So this past January 2007 you would have
11 done a budget not only for the first quarter of 2007
12 but through 2010?
13      A.    That's correct.
14      Q.    And that was a practice done by a majority
15 of the presidents before you which I guess the only
16 one would have been Hal; is that a fair statement?
17            MS. WILSON:  Objection to form.
18            THE WITNESS:  No.
19 BY MR. CARMAN:
20      Q.    Was Jim a president of the Standard Pacific
21 before you?
22      A.    Yes.  Well, it was called Westbrooke at that
23 time.
24      Q.    So Mr. Carr was president of Westbrooke and
25 Mr. Eisenacher president of the Westbrooke and you
```

1  Diana yourself.

2          Would you have the ability to go back and

3  look at the three-year budgets that each of those

4  gentlemen prepared and then your budget that you

5  prepared?

6      A.   Do I have the ability to look at them?

7      Q.   Yes.

8      A.   Yes.

9      Q.   Where are they maintained?  Is there a

10  particular file or name for them?

11     A.   The name is three-year budget.

12     Q.   Simple enough.  Is there a particular keeper

13  of the three-year budget, somebody who maintains

14  copies?

15     A.   Our controller.

16     Q.   And may I ask you please that person's name?

17     A.   Claudia Feldman.

18     Q.   How long has Claudia Feldman been the

19  controller of the company?

20     A.   Approximately I want to say eight years.

21  I'm not sure.

22     Q.   Okay.  So plenty of time before we need to

23  discuss that.

24          So during that eight-year period she would

25  be the person who would be putting together the budget

1  and then submitted it into I guess a format or form

2  for you to look at; is that a fair statement?

3      A.   Yes.

4      Q.   And is there a particular document that you

5  would see?  Is there like a draft budget first that's

6  produced?

7      A.   Yes.

8      Q.   Would it be called a draft budget?

9      A.   No, it still says budget.

10     Q.   How would -- and if you know it's fine.  If

11  not, we'll worry about it later.

12          How would she gather the information to put

13  into that budget?

14     A.   As I said, we have a meeting prior with the

15  department heads, construction, sales, myself, her to

16  figure out number of units that we are going to sell,

17  build, et cetera.

18     Q.   Okay.  Now on the other line items, the

19  expense side, if Mr. Eisenacher was to testify that

20  during his tenure as president he prepared

21  history-year budget and then his year budget showing

22  that Mr. Chernys was to receive profit sharing for

23  both '05 and '06, would you have the ability to look

24  at those budgets to reach that determination?

25          MS. WILSON:  Objection to form.

1  BY MR. CARMAN:

2      Q.   I'm sorry.  You can answer the question.

3          MS. WILSON:  If you understand.

4  BY MR. CARMAN:

5      Q.   If you don't --

6      A.   I understand, but it's a line item.  There

7  is no way to know.  The three-year plans are just

8  generalities.

9      Q.   Okay.

10     A.   It's not detailed.  It's just a percentage.

11  Overhead is usually this percentage.

12     Q.   Okay.

13     A.   So you would not be able to get that.

14     Q.   If he was to put it in a yearly budget,

15  would you be able to see it?

16          MS. WILSON:  Objection to form.

17          THE WITNESS:  Yes.

18  BY MR. CARMAN:

19     Q.   And when did he leave?

20     A.   In December of 2004.

21     Q.   Okay.  So the profit sharing of both

22  yourself and Mr. Chernys for 2005, because you were

23  the only two that were left, is that a fair statement

24  that you were entitled to profit sharing in 2005 or

25  was Mr. Webber?

1      A.   In 2005, no, Mr. Webber was not.

2      Q.   So just you and Lenny were the only ones

3  that would participate in South Florida's profit

4  sharing?

5      A.   Yes.

6      Q.   So that budget initially would have been

7  prepared by Mr. Eisenacher; is that a fair statement?

8      A.   No, I prepared the '05 budget.

9      Q.   And in the 2005 budget did you budget profit

10  sharing rewards -- not rewards, but entitlements for

11  yourself and Len?

12     A.   Yes.

13     Q.   And you did that when you did your third

14  quarter and fourth quarter budgets in 2005; is that

15  right?

16          MS. WILSON:  Objection to form.  Calls for

17  speculation.

18  BY MR. CARMAN:

19     Q.   I don't know what you did.

20     A.   I'm not sure I understand the question.

21     Q.   When did you stop budgeting Mr. Chernys's

22  profit sharing interest?

23     A.   I'm not quite sure.

24     Q.   What document, Diana, would you need to

25  refresh your recollection or help you?  If I had it I

Page 32

```
 1  will give it to you is what I'm saying.
 2     A.    Yes.  I don't even know.  I'd have to talk
 3  to our controller.
 4     Q.    So in order to -- and I don't want to put
 5  words in your mouth.  I just want to get it clear.
 6           In order to answer my question you would
 7  have to talk to Ms. Feldman; is that a fair statement?
 8     A.    Yes.
 9     Q.    Now I'm going to jump, and I don't really
10  want to but let me do it right now.  Ms. Feldman is
11  the controller of the company?
12     A.    Yes.
13     Q.    And as controller of the company, what are
14  her duties?
15     A.    Projects, financial statements, account
16  payable, accounts receivable, et cetera.
17     Q.    Is she responsible for putting the final
18  figures together on the profitability of the company?
19     A.    Yes.
20     Q.    And to whom does she report besides to you?
21  Does she report to you?
22     A.    Yes.
23     Q.    Does she report to anybody else, for
24  example, in Irvine or Austin?
25     A.    I'm not sure.
```

Page 33

```
 1     Q.    Okay.  Perfect.
 2           With respect to doing these projections and
 3  financial statements, do you and she communicate by
 4  e-mail?
 5     A.    Yes.
 6     Q.    Do you and she communicate by memo, written
 7  memo?
 8     A.    I'm not sure.
 9     Q.    And I'm sure you talk to her on the phone or
10  see her in person, as well?
11     A.    I see her in person.
12     Q.    Is her office near yours?
13     A.    Yes.
14     Q.    Now, with respect to e-mails, do you know
15  whether or not she would e-mail you copies of her
16  proposed budgets for 2005 and 2006?
17           MS. WILSON:  Objection to form.
18           THE WITNESS:  I'm not sure.
19  BY MR. CARMAN:
20     Q.    Would she give you a draft budget for 2006
21  so that you could look at it and work off of it?
22           MS. WILSON:  Objection, form.
23  BY MR. CARMAN:
24     Q.    You can answer the question.  Unless -- I
25  should have said that.  I'm sorry.  Counsel is going
```

Page 34

```
 1  to make objections to form, and what that is is she
 2  doesn't like my question or she's telling me that it
 3  may be leading or wants me to rephrase it.  And she's
 4  putting me on notice that if it gets read at trial
 5  she's going to make an objection.  So it's sort of
 6  like saying to me if I want to rephrase the question
 7  to overcome her objection I can or it's a warning.  In
 8  she says that you may still answer the question.  If
 9  she gives you an instruction not to, then you need to
10  follow her instruction.  That's what you are going to
11  hear.  I assume somewhere down the road she'll
12  instruct you not to answer, and you'll follow her
13  instructions.  We don't fight.  We are not here to
14  have a war.  We have these like technicalities, so
15  sometimes she'll do that to annoy me, make me lose my
16  train of thought.  We learn all these little tricks.
17  And she's a competent lawyer.  So if she says
18  "objection to form" that means she's preserving the
19  record.  And sometimes you'll forget the question and
20  we'll read it back.  Such as now.
21           THE WITNESS:  I forgot the question.
22           MR. CARMAN:  We'll turn to the court
23      reporter.  And it's also a test to see whether she
24      can take it down right and tell us what you just
25      said.  Would you be kind enough to read it back?
```

Page 35

```
 1           (Thereupon, a portion of the record was read
 2  by the reporter.)
 3           THE WITNESS:  Yes.
 4  BY MR. CARMAN:
 5     Q.    And would you have a file in which you would
 6  keep those draft budgets?
 7     A.    No.
 8     Q.    What would you do with them?
 9     A.    I would sit with her, review them.
10     Q.    Okay.
11     A.    And then she would revise them.
12     Q.    Sometimes as a lawyer I'll write something
13  out or type something out on the computer, I'll save
14  it, write it out, print it and then edit it.  I'm a
15  paper rat.  I stick things in the file and save it.
16  They are called drafts.
17           Do you know whether it's her practice to
18  keep drafts?
19     A.    No, I don't know.
20     Q.    Is it your practice to keep drafts?
21     A.    No.  And because they are not called drafts,
22  they just say "budget", I calls get confused so I
23  throw them out immediately.
24     Q.    Do you remember having any conversation with
25  her either at the end of the 2005 or end of 2006 in
```

1  which you advised her that Lenny would no longer
2  participate in profit sharing?
3      A.   Yes.
4      Q.   And do you know how you advised her of that?
5      A.   I don't recall.
6      Q.   Do you know when you discussed that with
7  her?
8      A.   At the end of 2005.
9      Q.   Do you know whether you had already seen a
10 draft of the 2006 budget or first quarter of 2006 from
11 her?
12     A.   I don't recall.
13     Q.   Did you have any conversations with her as
14 to the reason why this change was to occur?
15     A.   I don't recall.  It was a long time ago.
16     Q.   Okay.  That's fair.
17          Now, in your conversations with Hal, did you
18 ever ask him what his recollection was on the budget
19 for Mr. Chernys in 2005 and 2006, his projected
20 budget, three-year budget?
21     A.   No.
22     Q.   Did you ever ask him what his recollection
23 was of the agreement?
24     A.   I don't recall.
25     Q.   When was the last time that you spoke to Jim

1  Carr regarding this issue?
2          MS. WILSON:  Objection to form.
3  BY MR. CARMAN:
4      Q.   You may answer.
5      A.   Approximately a month ago.
6      Q.   And may I ask you please, did Mr. Carr come
7  to look at the office, too, or did you have a phone
8  conversation?
9      A.   We had a phone conversation with our
10 attorney present.
11     Q.   Well, here is what we want to do.  You can
12 tell me -- and she'll make her objection in a minute.
13 You can tell me what you and Mr. Carr talked about,
14 but I don't want you to tell me anything that you and
15 counsel talked about or you and Ms. Schwartz talked
16 about or anyone from your attorney's firm, okay?
17     A.   All right.
18     Q.   Now, with that instruction did you and
19 Mr. Carr have a conversation?
20     A.   Yes.
21     Q.   Would you be kind enough to tell me the
22 nature of the conversation, what was discussed?  But
23 again, nothing that she said to you.  I don't want to
24 know.  I do want to know, but I'm not going to make
25 you tell me now and get into a fight today.  I'd love

1  to know.
2          (Thereupon, a short recess was taken, after
3      which the following proceedings were held:)
4  BY MR. CARMAN:
5      Q.   Let's go back to where we were, and I think
6  we were talking about drafts.
7          (Thereupon, a portion of the record was read
8  by the reporter.)
9  BY MR. CARMAN:
10     Q.   Can you tell me the nature of the
11 conversation that you had with Mr. Carr?
12     A.   It was in reference to this case, and it was
13 -- he was relaying again his recollection of his
14 conversation with Mike Courtney.  He recalls it must
15 have been in the summer, around June or July because
16 he remembers he was on his boat and the -- two year,
17 the same thing.  Mike Courtney said two years, and he
18 assumed it was 2005 and 2006 where Mike Courtney could
19 have meant 2004 and 2005.
20     Q.   2005?  And did he tell you that it was his
21 recollection that he told Mr. Chernys it would be for
22 an additional two years?
23          MS. WILSON:  Objection to form.
24 BY MR. CARMAN:
25     Q.   And let me rephrase the question.

1  Mr. Chernys was under the belief that he was going to
2  have profit sharing through 2005 and 2006.
3          Did Jim advise you that he thought it would
4  end in 2006?
5      A.   I don't recall.  I'm trying to think.
6      Q.   What else did you and Jim talk about if you
7  remember?
8      A.   You mean during that conversation?
9      Q.   Yes.  I'm sorry.  I apologize.
10     A.   I think that's the main thing that I can
11 recall.
12     Q.   And did you reach any conclusions with Jim?
13     A.   No, I was just asking him the question.
14     Q.   And did you ask him if he would testify in
15 this case?
16     A.   I don't recall.
17     Q.   Did you have any other conversations with
18 Jim Carr during 2006, 2007 about this case?
19     A.   Prior to that phone conversation?
20     Q.   Yes.
21     A.   I asked him if he would mind talking to her
22 attorney.
23     Q.   And did he?
24     A.   Yes, he said he wouldn't mind.
25     Q.   And which attorney did he talk to?

1    A.    Christine Wilson.

2    Q.    Were you present during those conversations

3 or was there just one conversation?

4    A.    Just the one.

5    Q.    With respect to your conversation with

6 Mr. Carr, do you remember anything else he said?

7    A.    Yes.  I recall talking about Len's

8 retirement and his -- and the fact that he felt that

9 Len was no longer very productive and that Hal felt

10 that way.

11    Q.    And Jim told you that?

12    A.    Yes.

13    Q.    And do you know when Jim had that

14 conversation with you?

15    A.    That was the conversation.

16    Q.    That was like a month ago?

17    A.    Yes.

18    Q.    And did he express to you his belief that

19 Len was entitled to the profit sharing for 2006?

20         MS. WILSON:  Objection to form.

21         THE WITNESS:  I don't recall.

22 BY MR. CARR:

23    Q.    Did he ever tell you at any time that he

24 thought that the soft landing he negotiated with

25 Mr. Courtney was for Len to receive his profit sharing

1 for the years 2005 and 2006?

2    A.    When we spoke in December he said that's

3 what was his understanding.

4    Q.    Now, with respect to Mr. Carr, let's get to

5 an issue that seems to be a big issue.

6         Mr. Carr -- and again, same instruction.  If

7 you don't know, Diana, just tell me.

8         Going back to the questions I was just going

9 to go into, with respect to Mr. Carr, let me start it

10 this way:  When did you first meet Jim Carr?  We'll do

11 it the old fashioned way.  We'll work our way up.

12    A.    When I started working at Westbrooke in

13 1981.

14    Q.    And he tells me that you basically were in

15 law school.  Is that true?

16    A.    Very short time.

17    Q.    Yes.

18    A.    One semester.

19    Q.    He told me you were too smart because you

20 basically got out of law school, went to work for the

21 company as a receptionist, and he saw how smart you

22 were and you worked your way up real quick.

23    A.    I started working as a clerk in the closing

24 department while I was in college, not law school.

25    Q.    But then you were going to go to law school?

1    A.    Yes.

2    Q.    And what made you see the light not to go to

3 law school?

4    A.    That's personal.

5    Q.    You don't have to answer the question.

6 That's fine.  All right.  You went to work for the

7 company; is that right?

8    A.    Yes.

9    Q.    And you worked as a clerk; is that correct?

10    A.    Yes.

11    Q.    And right away you moved into another

12 position?

13    A.    Many different positions over the years.

14    Q.    And let's start if we can with the first

15 couple of positions and then we'll go easy.  From the

16 clerk where did you move?

17    A.    Customer service.

18    Q.    How long were you in customer service?

19    A.    Oh, I don't remember.  A few years.

20    Q.    Okay.

21    A.    Probably a year.

22    Q.    And in customer service did you have a title

23 or anything?

24    A.    No.

25    Q.    And from customer --

1    A.    Customer service rep maybe.

2    Q.    Where did you go from there?

3    A.    Color selection/options coordinator in the

4 sales office.

5    Q.    And during this time that you started with

6 the company, was there also another young man like

7 starting there as well sitting over here on this side

8 of the table?

9    A.    Yes.

10    Q.    Did you pretty much start together?

11    A.    But I was younger than him.

12    Q.    I know that.  So had Len started at the same

13 time?

14    A.    Prior.  He was there longer.

15    Q.    And Hal was there, as well?

16    A.    No, Hal started years later.

17    Q.    Okay.  So at the beginning of Westbrooke we

18 had Jim who started the company.

19    A.    Yes.

20    Q.    Len was there.

21    A.    Uh-hum.

22         MS. WILSON:  You have to say yes or no.

23         THE WITNESS:  Yes, yes.  Sorry.

24 BY MR. CARMAN:

25    Q.    And do you know what position Len was in at

```
 1  that time?  If you do, it's fine.  If you don't I --
 2      A.    It was corn instruction related.  I don't
 3  know exactly.
 4      Q.    Now, after you left color selection and
 5  whatever --
 6      A.    Options.
 7      Q.    Options.  It's funny because I bought my
 8  first house in '74, and I remember all that.  It's
 9  interesting.
10           Where did you go next?
11      A.    Sales.
12      Q.    Now the real trick question.  What projects
13  were you selling at that time?
14      A.    Country Village Estates, Westbrooke Homes,
15  Aspen Townhomes.
16      Q.    Do you know where they were being built?
17      A.    Country Club of Miami, North Miami area.
18      Q.    How long did you stay in sales?
19      A.    Several years.
20      Q.    And eventually you became the head of sales?
21      A.    Sales manager, yes.
22      Q.    And do you know when that was?
23      A.    I want to say approximately 1984.  I'm not
24  100 percent sure of the year.
25      Q.    In 1984.  Some sometime in the mid '80s you
```

```
 1  became sales manager, and do you know what Lenny's job
 2  was at that time?
 3      A.    It was construction related.  I don't know
 4  his title.
 5      Q.    Was there sort of a group of you that would
 6  form the executive base of the company at that time?
 7      A.    I doesn't know exactly at that time, but at
 8  a certain time, yes.
 9      Q.    Okay.  But it was primarily a company owned
10  by Jim?
11      A.    Yes.
12      Q.    When did Hal join if you know?
13      A.    I don't remember.
14      Q.    Let's fast forward a little bit toward the
15  '90s.
16           In the early '90s were you employed by
17  Westbrooke?
18      A.    Yes.
19      Q.    In what capacity?
20      A.    In the '90s I believe I was already vice
21  president of sales and marketing.
22      Q.    And do you know what Len's job was?
23      A.    I know was vice president.  I think
24  construction.
25      Q.    Was there another vice president besides the
```

```
 1  two of you?
 2      A.    In the '90s?
 3      Q.    Yes.  Was Hal there?
 4      A.    Yes, Hal was there in the '90s.
 5      Q.    Do you know what his title was?
 6      A.    I'm not sure.
 7      Q.    Okay.  Perfect.
 8           Do you know when the three of you started to
 9  participate in a profit sharing arrangement for the
10  company?
11      A.    I'm not sure.  I think it's '95.
12      Q.    And do you know whose idea that was?
13      A.    Jim Carr's.
14      Q.    And that was something that Jim Carr
15  basically gave his executives at Westbrooke, and you
16  were an executive at that time; is that a fair
17  statement?
18      A.    Yes, it is.
19      Q.    And it was important to Mr. Carr and his
20  philosophy that his people be paid well?
21           MS. WILSON:  Objection to form.
22  BY MR. CARMAN:
23      Q.    Is that a fair statement?
24      A.    Yes.
25      Q.    And he basically gave each of you the right
```

```
 1  to participate in a profit sharing program?
 2      A.    Yes.
 3      Q.    And did he give a percentage of profits that
 4  you and Len and Hal were to receive?
 5      A.    Yes.
 6      Q.    And what was that percentage?
 7      A.    2 percent.
 8      Q.    Did that ever increase between the time he
 9  owned the company and the time you took over as
10  president?
11      A.    Yes.
12      Q.    Did there come a time when you were to get 3
13  percent as president of the profit sharing?
14      A.    Yes.
15      Q.    And Len was to get 2 and a half percent and
16  when Hal was there he was to get 3 percent?
17           MS. WILSON:  Objection to form.
18  BY MR. CARMAN:
19      Q.    You can answer.
20      A.    Yes.
21      Q.    Now, during the years 1995 through 2000 you
22  maintained your position as vice president of the
23  sales and marketing?
24      A.    I don't know exactly when.  I'd got the
25  title senior VP, but I can't tell you exactly when.
```

1    Q.    Did your duties change at all as senior VP?

2    A.    Not really.

3    Q.    Did you report to anyone?

4    A.    Yes.

5    Q.    To whom did you report?

6    A.    Jim Carr.

7    Q.    And he was the person who actually ran the

8  company?

9    A.    Yes.

10   Q.    Okay.  Okay.  When did Mr. Carr decide to

11  sell the company?

12   A.    When did he decide to sell?

13   Q.    Yes.  Maybe a better question is did there

14  come a time when Westbrooke Homes was sold?

15   A.    Yes.

16   Q.    And do you know to whom it was sold?

17   A.    Yes.

18   Q.    Would you be kind enough to tell me to whom?

19   A.    Pacific Realty I believe is the name of the

20  entity.

21   Q.    And do you know who Pacific Realty is or

22  was?

23   A.    It was a company that owned another home

24  builder, Newmark Homes.

25   Q.    And did that transaction take place in the

1  Bahamas?

2    A.    Yes.

3    Q.    And did you and Lenny and Hal go to the

4  Bahamas?

5    A.    Yes, we did.

6    Q.    And are those photographs of you and Lenny

7  and Hal --

8    A.    Yes --

9    Q.    We won't talk about the ones I've seen.  In

10  the Bahamas.

11   A.    It was just a one-day trip.

12   Q.    With respect to that particular transaction,

13  did you receive any profit sharing or bonuses or any

14  interest in the purchase price?

15   A.    We received an employment agreement that

16  stated a profit sharing, yes.

17   Q.    And during the time you worked for Jim at

18  Westbrooke, did you have any written employment

19  agreements?

20   A.    We had an agreement.  I don't know if there

21  was an -- it was an employment agreement.

22   Q.    Did there come a time in that transaction

23  where each of you got a promissory note from Newmark

24  Homes for a payout of earnings?

25   A.    Yes.

1    Q.    What was that for?

2    A.    That was the profit sharing.  Same thing.

3    Q.    Was that paid by Newmark?

4    A.    I don't know if it was Newmark or Pacific.

5    Q.    During the time that Pacific Realty owned

6  Newmark Homes, and we won't get into the legal

7  technicalities right now, was Jim still president?

8    A.    Yes.

9    Q.    And Jim still ran the company?

10   A.    Yes.

11   Q.    And you were still vice president?

12   A.    Yes.

13   Q.    And Hal was basically a senior vice

14  president?

15   A.    Hal was CFO I believe.

16   Q.    And CFO is chief financial officer?

17   A.    Yes.

18   Q.    And by background and training Hal is an

19  accountant.  Is that a fair statement?

20   A.    Yes.

21   Q.    Do you know what his job was prior to coming

22  to Westbrooke?

23   A.    You know, I'm not sure.

24   Q.    Okay.  Not a problem.

25   A.    I don't want to guess.

1    Q.    Okay.  During the time that you were all

2  working together at let's just call it Pacific

3  Realty/Westbrooke, how long did you work together for

4  that company, Pacific Realty?

5    A.    I'm not sure.  Approximately I want to say

6  one to two years perhaps.

7    Q.    Do you know what years they were, what --

8    A.    '98 I know -- I think it was when the

9  company was sold.

10   Q.    Okay.  And do you know -- I apologize.

11  Sorry.  Was it Westbrooke Homes, the Carr Westbrooke

12  Homes was sold to Pacific in '98?

13   A.    Yes, I believe.

14   Q.    That's all I can ask.

15        Do you know how long Pacific owned

16  Westbrooke Homes?

17   A.    That's what I'm not sure.  A year or two.

18   Q.    And what happened after that year or two?

19  Do you know who purchased them?

20   A.    Why.  Technical Olympic.

21   Q.    And where were they based?

22   A.    They are Greek company.

23   Q.    And when they took over ownership of the

24  company, who was the president of the company?

25   A.    Of Technical Olympic?

1    Q.    No, I apologize.  Good.  You are right
2  there.
3          When they purchased -- was it an asset sale
4  do you know?
5    A.    I'm not sure.  I don't know the particulars.
6    Q.    When technical bought either the stock or
7  the assets of Pacific Realty, was there a division
8  created for Westbrooke Homes of Florida?  Do you know
9  what the entity was that was -- that you were working
10  for?
11    A.    I believe it was Technical Olympic U.S.A.
12    Q.    Do you know who the president was of
13  Technical Olympic U.S.A?
14    A.    I'm not sure.
15    Q.    Were you an officer of Technical Olympic
16  U.S.A?
17    A.    No.
18    Q.    Were you still an officer of some corporate
19  entity at the time Technical Olympic U.S.A. purchased
20  Pacific Realty's interest in Westbrooke?
21    A.    Yes, I was an officer of Westbrooke.
22    Q.    Do you know if Westbrooke was a corporation
23  at that time?  Was it called Westbrooke Corporation,
24  Westbrooke, Inc.?
25    A.    I believe it was called Westbrooke

1  Communities, Inc.
2    Q.    And do you know, and if you don't it's fine,
3  who the majority shareholder was of that corporation,
4  was it Technical Olympic?
5    A.    I have no idea.
6    Q.    Do you know what year we are talking about
7  that Westbrooke Communities, Inc. was incorporated?
8    A.    No, I don't.
9    Q.    When Technical Olympic bought Westbrooke
10  Communities, Inc., was Jim still president?
11    A.    Yes.
12    Q.    You were still senior vice president of
13  sales and marketing?
14    A.    Yes.
15    Q.    And was Lenny still with the company?
16    A.    Yes.
17    Q.    What was his position?
18    A.    Senior vice president.
19    Q.    And was Hal still with the company?
20    A.    Yes.
21    Q.    He was CFO?
22    A.    Yes.
23    Q.    And who ran the company at that time?
24    A.    Technical Olympic?
25    Q.    No.  Who ran Westbrooke at that time?

1    A.    Jim Carr.
2    Q.    Now, do you know who Jim Carr reported to if
3  anyone?
4    A.    No, I really don't know.
5    Q.    Now, there came a time when technical
6  Olympic U.S.A. sold whatever interest they had in
7  Westbrooke Communities, Inc.; is that a fair
8  statement?
9    A.    Repeat the question again.
10    Q.    Okay.  There came a time when Technical
11  Olympic U.S.A. sold their interest, whatever that was,
12  in Westbrooke Communities, Inc.; is that correct?
13    A.    Yes, that is correct.
14    Q.    Do you know to whom they sold it?
15    A.    Standard Pacific Homes.
16    Q.    Were you involved in the negotiations to
17  sell Westbrooke Communities, Inc. to Standard Pacific?
18    A.    No.
19    Q.    When you learned that Technical Olympic
20  U.S.A. sold the company, you were senior vice
21  president of Standard Pacific?
22    A.    I found out before they sold it.
23    Q.    And who told you?
24    A.    Jim Carr took us on a trip to California to
25  meet the people at Standard Pacific.

1    Q.    Do you happen to remember what year that
2  was?
3    A.    2002.
4    Q.    And do you know who traveled with you on
5  that trip?
6    A.    Yes.
7    Q.    Would you kindly tell me?
8    A.    Jill, Hal, Len and myself.
9    Q.    And do you remember what month?
10    A.    No.
11    Q.    Do you know how long you were there?
12    A.    I think one or two days.
13    Q.    And do you know with whom you met?
14    A.    We met Steven Scarborough and Mike Courtney.
15    Q.    Now, during that meeting do you know what
16  the purpose was?
17    A.    Yes.
18    Q.    Would you please tell me the purpose?
19    A.    They were interested in purchasing
20  Westbrooke, and they wanted to meet the management and
21  they wanted to know what our culture was and to see if
22  we fit in with their culture.
23    Q.    During the time you had this meeting, did
24  you have any discussions with them about compensation
25  and the fact that the Westbrooke people, and I'm just

```
 1  going to label you as Westbrooke people, were
 2  receiving more compensation than they paid their
 3  executives?
 4      A.   No, I never had that conversation.
 5      Q.   Have you ever had a conversation with anyone
 6  at Standard Pacific regarding the amount of
 7  compensation that you Westbrooke people received
 8  versus what they paid their people?
 9           MS. WILSON:   Objection to form.
10           THE WITNESS:   Can you repeat the question
11      again?
12  BY MR. CARMAN:
13      Q.   Sure.   Was there ever a time in which you
14  remember either Courtney or Scarborough saying that
15  you people in Westbrooke, you senior management, make
16  too much money and we don't pay our people that way?
17      A.   Not at that time.   There was a conversation,
18  and I cannot recall when, where Mike Courtney said he
19  did not believe -- they did not do employment
20  agreements, and that no other people at Standard
21  Pacific got profit sharing.   He did say that.
22      Q.   And what was Jim's reaction to that?
23           MS. WILSON:   Objection to form.
24           THE WITNESS:   Oh, I don't remember.
25  BY MR. CARMAN:
```

```
 1      Q.   Okay.   But that was anti- or opposed to what
 2  Jim's philosophy was with the way he treated his
 3  people as far as profit sharing and payment?
 4           MS. WILSON:   Objection to form.
 5           THE WITNESS:   I don't know.
 6  BY MR. CARMAN:
 7      Q.   Let me see if I can phrase it this way:   Jim
 8  believed in paying his people, his executives,
 9  management, what he thought they were worth; is that a
10  fair statement?
11           MS. WILSON:   Objection to form.
12           THE WITNESS:   Yes.
13  BY MR. CARMAN:
14      Q.   And he believed in paying everybody who
15  worked for the company well because he believed that
16  loyalty and continuity was important in a business?
17           MS. WILSON:   Objection to form.
18  BY MR. CARMAN:
19      Q.   Do you remember ever having that --
20      A.   Yes, yes.
21      Q.   And did he ever say to you that he had a
22  problem with both Courtney and Scarborough not seeing
23  that?
24      A.   No.
25      Q.   Did he ever say to you that there was a
```

```
 1  disagreement between the way he ran his company
 2  contact and the way they ran their company?
 3      A.   Not that I recall.
 4      Q.   Did you ever feel, and I don't want to put
 5  you on the spot, but as president that there was a
 6  dichotomy of views between how executives should be
 7  compensated by Standard Pacific and how you were used
 8  to being compensated by the Westbrooke people?
 9           MS. WILSON:   Objection to form.
10           THE WITNESS:   No.
11  BY MR. CARMAN:
12      Q.   Has anybody from Standard Pacific during the
13  years 2005, 2006, 2007 said we are going to change the
14  way people from Westbrooke are compensated from this
15  point forward?
16      A.   For what years?
17      Q.   Have you ever been instructed during the
18  time you've been president, 2005, 2006, 2007, that
19  executives at your division or your company, let's
20  call it your corporation, were no longer to receive
21  the same amount of compensation that was being paid by
22  Westbrooke and would not participate in profit sharing
23  because now that Standard Pacific owned the company
24  there would be changes in salary structure and bonus
25  structure?
```

```
 1           MS. WILSON:   Objection to form.
 2           THE WITNESS:   There's always conversations
 3      about salaries and bonus, but nothing to that
 4      effect.
 5  BY MR. CARMAN:
 6      Q.   Are those conversations, do they ever find
 7  their way into memos?
 8           MS. WILSON:   Objection to form.
 9           THE WITNESS:   No, I don't think so.
10  BY MR. CARMAN:
11      Q.   Sometimes executives write memos explaining
12  what they believe the philosophy is of a company.
13           Have you ever seen a memo prepared or any
14  kind of document prepared by Standard Pacific Corp. in
15  California about what they expect subsidiary
16  corporations -- what their philosophy is with respect
17  to salaries?   Is there such a document?
18      A.   No, not that I know of.
19      Q.   Has there ever been any meetings in which
20  the issue of salaries and structures and what their
21  beliefs are been discussed?
22      A.   No.
23      Q.   Okay.   Have they ever criticized any of the
24  salary structures that any of the current executives
25  receive or have received at Standard Pacific of South
```

1  Florida Inc. for the years 2005 and 2006?

2     A.    No.

3     Q.    Have they ever directed you to reduce any of

4  the salaries of any executive management that was

5  employed at Standard Pacific of South Florida in

6  either 2005 or 2006?

7     A.    You said management?

8     Q.    Yes.

9     A.    No.

10    Q.    Have they ever directed you to reduce any

11 vice president or senior vice president's salary?

12    A.    No.

13    Q.    Who has the authority who reduce or

14 negotiate salaries for vice presidents on up at

15 Standard Pacific of South Florida, Inc. for the years

16 2005 and 2006?

17    A.    Myself.

18    Q.    Do you have that -- and the word I would

19 use, unbridled authority -- or do you have to

20 get -- permission isn't the right word -- consent from

21 any other company to do that?

22    A.    Yes, I need get consent from my regional

23 president.

24    Q.    And that would be Mr. Dickson?

25    A.    Yes.

1     Q.    Has Mr. Dickson ever advised you either

2  verbally or in writing to basically reduce the salary

3  of any individual working for your company?

4     A.    No, he has not.

5     Q.    Have you made any recommendations to

6  Mr. Dickson to reduce the salary of any employee that

7  works for you in 2006?

8     A.    To reduce the salary in 2006, yes.

9     Q.    And how have you indicated that to him?  Is

10 it by memo?

11    A.    It was part of our RIF that what he had in

12 your --

13    Q.    Part of what?  I'm sorry.

14    A.    Reduction in force.

15    Q.    Okay.  And was that in a formal document?  I

16 mean, by "formal document" was it in a document?

17    A.    Yes.

18    Q.    And what would that document be called?

19    A.    I don't know.

20    Q.    Does it have a title?  Is it a reduction in

21 force document or plan or --

22    A.    I'm sorry.  I don't know the name.

23    Q.    If you were to look for such a document,

24 where would you look?

25    A.    I would ask my human resources head.

1     Q.    And who is your human resources head?

2     A.    Janet Tavel.

3     Q.    And has Ms. Tavel been in HR for a long

4  time?

5     A.    Yes.

6     Q.    How long has she been there?

7     A.    A very long time.  Years and years.

8     Q.    During that years and years has she been the

9  person responsible for putting together RIFs as you

10 call them?

11    A.    Yes.

12    Q.    And would she have put together a RIF in

13 2005?

14          MS. WILSON:  Objection to form.

15          THE WITNESS:  2005?

16 BY MR. CARMAN:

17    Q.    Yes.  I'm sorry.

18    A.    No.

19    Q.    Would she have put together any memos either

20 for herself or for Standard Pacific Corporation

21 describing, listing, identifying employee salaries in

22 the year 2005?

23    A.    Objection to form.

24          THE WITNESS:  Not that I'm aware of.

25 BY MR. CARMAN:

1     Q.    Does she take orders from anyone besides

2  you?

3     A.    Not that I'm aware of.

4     Q.    Does Mr. Dickson communicate with her

5  directly, bypassing you, if you know?

6     A.    I'm not aware of it.

7     Q.    Mr. Dickson, does he have like a Ms. Tavel

8  in his side of the business?

9          MS. WILSON:  Objection to form.

10 BY MR. CARMAN:

11    Q.    Does he have an HR person?

12    A.    Not that I'm aware of.

13    Q.    Who is the HR person in California?

14    A.    Heather Breidenthal.

15    Q.    Does Heather Breidenthal ever communicate

16 with you?

17    A.    On occasion.

18    Q.    Has she ever had any communications with you

19 regarding Lenny?

20    A.    I don't recall.

21    Q.    Okay.

22          MS. WILSON:  Can we take a restroom break in

23    the next five or 10 minutes?

24          MR. CARMAN:  Sure.

25          (Thereupon, a short recess was taken, after

Page 64

```
 1      which the following proceedings were held:)
 2  BY MR. CARMAN:
 3      Q.    Does she ever come to Miami?
 4      A.    Once that I recall.
 5      Q.    Do you know when?
 6      A.    When the company was first acquired.
 7      Q.    Do you have occasion to talk to her on a
 8  frequent basis?
 9      A.    No.
10      Q.    Have you spoken to her about any employee at
11  the company, your company?  And by your company I'm
12  referring to Standard Pacific of South Florida.
13      A.    Have I talked to her about any employee?
14      Q.    Of your company.
15      A.    Yes.
16      Q.    Okay.  When?
17      A.    Many times.
18      Q.    Would you bypass Janet Tavel and talk to her
19  or would you go through Ms. Tavel first?
20      A.    I would go through Ms. Tavel first.
21      Q.    Did Ms. Breidenthal ever have a role in the
22  RIF?
23      A.    Yes.
24      Q.    What role did she have in the RIF?
25      A.    We discussed the targeted people, et cetera.
```

Page 65

```
 1      Q.    I don't know how we got on this subject,
 2  because it wasn't where I was going, but let me go on
 3  it for a minute.
 4            With respect to the RIF, when do you
 5  remember there -- when was the first time that you
 6  began working on the RIF?
 7      A.    Approximately three to four weeks before it
 8  occurred.
 9      Q.    Okay.
10      A.    So August or September.
11      Q.    Of what year?
12      A.    Of 2006.
13      Q.    Were you advised, were you requested, were
14  you asked by anyone to prepare a RIF?
15      A.    No.
16      Q.    Why then did you prepare a RIF?
17            MS. WILSON:  Objection to form.
18  BY MR. CARMAN:
19      Q.    You may answer.
20      A.    It was a business decision.
21      Q.    And in making that business decision, with
22  whom did you discuss that decision with?
23      A.    Bruce Dickson.
24      Q.    And when you discussed this decision with
25  Mr. Dickson, was that a discussion that took place
```

Page 66

```
 1  face-to-face?
 2      A.    No.
 3      Q.    Was it a telephone discussion?
 4      A.    Yes.
 5      Q.    Were there any communications, electronic or
 6  paper, that went back and forth between you and
 7  Mr. Dickson?
 8            MS. WILSON:  Objection to form.
 9            THE WITNESS:  I don't recall.
10  BY MR. CARMAN:
11      Q.    Do you have a secretary?
12      A.    No.
13      Q.    Do you have an administrative assistant?
14      A.    No.
15      Q.    Did you have a secretary?
16      A.    Yes.
17      Q.    And maybe I don't want to ask this question.
18  And was basically that secretary Elizabeth Burdette?
19      A.    Yes.
20      Q.    And had Ms. Burdette been with the company a
21  long time?
22      A.    Yes.
23      Q.    And when did she leave?
24      A.    In September of 2006.
25      Q.    Was she part of the RIF?
```

Page 67

```
 1      A.    Yes.
 2      Q.    And do you know whether she knew she was
 3  part of the RIF before she was RIF'd?  New terminology
 4  we now have.
 5      A.    I have no idea.
 6      Q.    Was she the person that would receive
 7  corporate communications for you?  Was she a true
 8  executive assistant?
 9      A.    Yes.
10      Q.    And she would have the ability to look at
11  your e-mail?
12      A.    No.
13      Q.    Did anyone have the ability to look at your
14  e-mail?
15      A.    No.
16      Q.    It was private as to you?
17      A.    Yes.
18      Q.    Okay.  And in the company do you have a
19  direct e-mail address?
20      A.    Yes.
21      Q.    And does it go directly to you or is it able
22  to be viewed by anyone else in the company?
23      A.    No, it goes directly to me.
24      Q.    Did she ever have access to the e-mail?
25      A.    No.
```

1    Q.    Would you ever leave your computer on during
2  the day where she would walk in and see what was on
3  there?
4              MS. WILSON:   Objection.  Calls for
5      speculation.
6              THE WITNESS:  No idea.
7  BY MR. CARMAN:
8      Q.    In this discussion with Mr. Dickson, did you
9  and he ever e-mail each other about who should be
10 RIF'd, who shouldn't be RIF'd, what the goals of the
11 RIF were?
12             MS. WILSON:   Objection to form.
13             THE WITNESS:  No.
14 BY MR. CARMAN:
15     Q.    When did it first come up that there was
16 going to be a need for a RIF?
17     A.    Approximately three to four weeks before it
18 happened.  Probably four weeks.
19     Q.    So sometime during the summer of 2006?
20     A.    Yes.
21     Q.    And were there discussions about severance
22 packages that people who were going to be RIF'd were
23 going to receive?
24     A.    Yes.
25     Q.    Who is responsible within your company for

1  that severance package?
2              MS. WILSON:   Objection to form.
3              THE WITNESS:  What do you mean by who is
4      responsible?
5  BY MR. CARMAN:
6      Q.    I'm sorry.  Was there a particular
7  individual within your company -- your corporation
8  that was charged with responsibility of coming up with
9  a severance package?
10     A.    No.   There was discussions among several
11 people.
12     Q.    And who were those people?
13     A.    Janet Tavel, myself, Heather Breidenthal,
14 Claudia Feldman the controller.
15     Q.    And were any of those discussions
16 electronic?
17     A.    Not that I can recall.
18     Q.    Were they done on conference calls?
19     A.    No.
20     Q.    Were those conversations with Breidenthal in
21 California, would that be on the phone?
22     A.    Yes.
23     Q.    So you and maybe the others would have a
24 conference call with her about something?
25     A.    Well, it would be on a speaker.  Wouldn't

1  actually be on a conference call.
2      Q.    Would all of you be together on the speaker
3  phone?  I guess what I'm asking, Diana, is that you
4  are very busy.
5              Is this something that you would turn over
6  or delegate to somebody within the company?
7      A.    No, this is too important to delegate.
8      Q.    Okay.  And why is it too important?
9      A.    Because you are talking about laying off
10 people.  It's very important.
11     Q.    Okay.
12     A.    And who to lay off, et cetera.
13     Q.    Was there a person who had the final say in
14 yea or nay of an individual's career at the company?
15     A.    Yes.
16     Q.    Who would that person be?
17     A.    Me.
18     Q.    Did Mr. Dickson have the final say over you?
19     A.    Yes.
20     Q.    So you would make a recommendation.  Were
21 you ever overruled by Mr. Dickson?
22     A.    You mean on a person?
23     Q.    Yes.
24     A.    No.
25     Q.    Were you ever overruled to any labor or

1  business decision regarding the RIF by Mr. Dickson?
2      A.    No.
3      Q.    So Mr. Dickson -- and I don't want to put
4  words in your mouth, please.  Mr. Dickson was
5  in -- Mr. Dickson was in complete agreement with your
6  decisions under the RIF?
7      A.    Yes.
8      Q.    Now, I may have asked this, but as part of
9  the RIF was there a list of people that were to leave?
10     A.    Yes.
11     Q.    Was there a criteria that you and
12 Ms. Breidenthal and Ms. Tavel and Ms. Feldman and
13 Mr. Dickson were using in compiling such a list?
14     A.    A criteria?
15     Q.    Yes.
16     A.    What do you mean?
17     Q.    Was there any type of a person that you were
18 looking at?  In other words, was there a particular
19 area that you were looking to lay off someone, was
20 there a particular salary base you were looking to lay
21 off someone, was there a particular age group, was
22 there a particular specialty that the person worked in
23 that you were looking at?  Were there categories, were
24 there any categories?
25             MS. WILSON:   Objection to form.

1        THE WITNESS:  No.  It was first given to
2    each department head to come up with a list based
3    on the fact that there was very little work in the
4    company, sales had drastically fallen.  So we
5    asked each department head and worked for weeks
6    back and forth based on their department needs.
7    And it was based on -- we tried to keep the A/B,
8    the good people.
9  BY MR. CARMAN:
10       Q.    I apologize.  A/B, what does that mean?
11       A.    It's a grade.  A rating.  B rating.
12       Q.    A rating and B rating.
13       A.    Yes.
14       Q.    And who would -- who would do the rating?
15       A.    The department head of who their -- what I
16  mean by A/B is who was there best people, what's the
17  efficiency of their area without certain people
18  because of the fact that we had drastically slowed
19  down and there was not work for all the people we had.
20       Q.    I'm going to get to the slow down in a
21  minute but I just want to understand.  On the A/B, is
22  there any written guidelines?  I know that you all had
23  reviews.
24       A.    Yes.
25       Q.    Employee reviews.  Were those employee

1  reviews the way you determined an A, B, C, D person?
2        A.    That's one of the ways, yes.
3        Q.    What was the other way?
4        A.    Yes, perhaps a job or duty that was no
5  longer necessary.
6        Q.    Okay.  Any others that you can think of?
7        A.    No.
8        Q.    Let's go back to little work.  Was there
9  little work as far as the construction?
10       A.    Yes, very little.
11       Q.    And the reasoning for that?
12       A.    There were no sales.  Most of the sales --
13  we had at the time hundreds of specs meaning homes
14  that were already built so there really wasn't much
15  construction going on.
16       Q.    So there was no new construction because
17  there was an inventory of built homes?
18       A.    Yes.
19       Q.    Was the company offering any programs or
20  incentives to sell those built homes?
21       A.    Oh, yes.
22       Q.    Did you in your budget revise any of your
23  budgets in '06 to reflect this issue?
24       A.    Oh, yes.
25       Q.    When did you first revise your budget, your

1  2006 budget?
2        A.    We revised it every quarter.
3        Q.    Do you know when you began the revision
4  process?
5        A.    What do you mean by "revision"?
6        Q.    You said there was going to be homes unsold
7  and construction was down.  When did you realize that
8  was a company?  Was it the first quarter of 2006, the
9  second quarter?
10       A.    The first quarter.
11       Q.    And as of the first quarter of 2006 you
12  revised the budget for that year?
13       A.    Yes.
14       Q.    Do you know when that revision was done?
15       A.    At the end of the quarter it's usually done.
16       Q.    Did you then further revise the second
17  quarter budget?
18       A.    I'm not sure.  Probably.
19       Q.    Who would have copies of those revised
20  budgets or guidelines?
21       A.    Claudia Feldman.
22       Q.    Would she provide you with information as
23  far as what the future sales would be?
24       A.    No, it was done again like I said, jointly
25  between sales and marketing and her and myself.

1        Q.    Who was the head of the head of marketing
2  and sales in 2005 and 2006?
3        A.    Casey Messer.
4        Q.    And who was the head of construction in
5  2005?
6        A.    Henry Laureiro.
7        Q.    And when did he become head of construction?
8        A.    I don't recall.
9        Q.    Is he still there today?
10       A.    Yes.
11       Q.    How long has he been with the company?
12       A.    Very long time.  I want to say over 15
13  years.
14       Q.    And what position did he have before he
15  became head of construction?
16       A.    I don't know all the positions he's had over
17  the years.
18       Q.    And you don't know when he became head of
19  construction?
20       A.    Several years ago.
21       Q.    2005, 2006 do you think?
22       A.    Oh, much farther.
23       Q.    So before you became president?
24       A.    Yes.
25       Q.    Are there any others -- we've talked about

1  Ms. Tavel, Ms. Feldman, Ms. Messer, Mr. Laureiro.
2  Anyone else in the company in 2006?
3      A.    Yes.
4      Q.    Who?
5      A.    Freddy Marante, vice president of
6  purchasing.
7      Q.    When did he become vice president of
8  purchasing?
9      A.    Oh, I don't recall.
10     Q.    Okay.  Anyone else?
11     A.    Yes, Janet Tavel.
12     Q.    Okay.
13     A.    Vice president of administration.
14     Q.    Anyone else?
15     A.    Claudia Feldman, controller.
16     Q.    Okay.
17     A.    Terri Chapman, director of budgeting.
18     Q.    And when did she become director of
19  budgeting?
20     A.    All of these people were before I became
21  president.  I can tell you the year.
22     Q.    Is she still there?
23     A.    Yes.
24     Q.    She is responsible for doing what?
25     A.    Budgets, house budgets.

1      Q.    House budgets meaning what?  I'm sorry.
2      A.    You take a community, you have to figure out
3  what the land development is going to cost, stick and
4  brick cost, construction costs, et cetera.
5      Q.    Who was responsible for land acquisition in
6  2006?
7      A.    David Webber.
8      Q.    Is he still with the company today?
9      A.    No.
10     Q.    When did he leave?
11     A.    Either end of October or beginning of
12  November of 2006.
13     Q.    And did he enter into an agreement with the
14  company?
15     A.    After?
16     Q.    Yes.
17     A.    No.
18     Q.    Has he signed any severance agreement with
19  the company?
20     A.    Yes.
21     Q.    When were they signed?
22     A.    At the same time, October or November.
23     Q.    And do you know what the terms are of his
24  severance agreement?
25     A.    What do you mean by "terms"?

1      Q.    I'm sorry.  Do you know what he was to
2  receive as compensation when leaving the company?
3      A.    I don't recall the exact amount.
4      Q.    Do you know the approximate amount?
5      A.    Around $100,000.
6      Q.    Did he receive anything else?
7      A.    No.
8      Q.    Was that negotiated by you?
9      A.    Yes.
10     Q.    Was there anyone else that participated in
11  the negotiations with Mr. Webber for the company?
12     A.    You mean with Mr. Webber?
13     Q.    No.  I'm sorry.  With you.  I apologize.
14  With you.
15     A.    Bruce Dickson.
16     Q.    And did Mr. Dickson and you meet with
17  Mr. Webber personally?
18     A.    No.
19     Q.    Does the company have a corporate counsel?
20     A.    Yes.
21     Q.    Who is the corporate counsel for the
22  company?
23     A.    Clay Halvorsen.
24     Q.    And is he in-house?
25     A.    Yes.

1      Q.    Where is he based?
2      A.    Irvine.
3      Q.    And he is your corporate counsel as well as
4  Standard Pacific Corp.'s counsel, your corporate
5  counsel?
6      A.    When you say my corporate counsel, we have
7  many.
8      Q.    Well, let me ask it another way and then
9  we'll get to that.  Thank you.
10         Do you as president of the company from the
11  years 2005 and 2006 employ legal counsel?
12     A.    Yes.
13     Q.    Do you make the choice for the counsel you
14  hire?
15     A.    Yes, I guess I do, but we've had the same
16  one for many years.
17     Q.    And who is that?
18     A.    Steve Vainder.
19     Q.    Where is he?
20     A.    White & Case.
21     Q.    Is it fair to say then that White & Case is
22  your corporate counsel?
23     A.    For affairs relating to land acquisition, et
24  cetera.
25     Q.    For matters relating to litigation, who is

1  your corporate counsel?

2     A.   Michael Keen.

3     Q.   And Mr. Keen is employed where?

4     A.   He's got his own firm, Keen, Regeira (sic),

5  Berman. Something like that. I don't remember the

6  name of the firm.

7     Q.   Who hired Christine?

8     A.   Corporate.

9     Q.   By corporates, and I'm not trying to be a

10 pain in the ass, is that somebody in California hired

11 her?

12    A.   Yes.

13    Q.   Do you think Mr. Halvorsen hired her?

14    A.   I don't know.

15    Q.   Did you have any role in selecting counsel

16 in this case?

17    A.   Yes.

18    Q.   Did you select her?

19    A.   There was a discussion.

20       MS. WILSON:  Do you know if it was with Clay

21 or --

22       THE WITNESS:  It was with Paul Wakerly.

23 BY MR. CARMAN:

24    Q.   Who is that?

25    A.   He's an attorney.

1        MS. WILSON:  So all your conversations with

2  Paul and Clay are privileged.

3  BY MR. CARMAN:

4     Q.   Let me see who he is. Who is Clay?

5     A.   He's an in-house attorney for corporate.

6     Q.   Does he have a particular specialty? Is he

7  a litigation attorney, corporate attorney, a labor

8  attorney, real estate attorney?

9     A.   He's our in-house attorney and we go to him

10 with any -- I don't know.

11    Q.   So would he be the one who would have

12 prepared Mr. Weber's severance package or documents?

13       MS. WILSON:  Objection to form.

14       THE WITNESS:  I have no idea.

15 BY MR. CARMAN:

16    Q.   Were there written documents that the

17 company prepared in which Mr. Webber signed as part of

18 the severance package?

19    A.   Yes.

20    Q.   Who would have prepared those?

21       MS. WILSON:  Objection to form.

22       THE WITNESS:  I don't know.

23 BY MR. CARMAN:

24    Q.   Skipping ahead, which I really don't want,

25 there was a consult agreement and a release letter

1  prepared in this case.

2     A.   Yes.

3     Q.   Who prepared that?

4     A.   I did.

5     Q.   You wrote the documents?

6     A.   Well, it was a document we already had in

7  existence from a prior -- we had already someone that

8  was a consultant for the company. The original

9  document was prepared for another person by White &

10 Case. I took the document, made some modifications,

11 changed names, changed several things, sent it to

12 corporate for -- corporate counsel for approval, and

13 that's how we arrived at it. But it was in existence

14 prior.

15    Q.   I don't want to go there right now, but let

16 me end it and we'll come back to it. That particular

17 document was something you prepared from a document

18 that someone else had signed. You then changed the

19 names, sent it to corporate counsel, and that's how it

20 was done.

21    A.   Right.

22    Q.   Do you know which corporate counsel you sent

23 it to?

24    A.   I'm not sure.

25    Q.   Was it retained by corporate counsel and

1  edited or changes made to it by them?

2     A.   Some minor.

3     Q.   Do you have a copy of the document you sent

4  them?

5     A.   Probably.

6     Q.   What would it be called?

7     A.   I don't remember. Then consulting agreement

8  maybe.

9     Q.   This seems like an apropos part. Is there a

10 file maintained on Len?

11    A.   There is a personnel file.

12    Q.   Do you have a personal file on Len?

13    A.   No.

14    Q.   Does anyone besides personnel?

15    A.   Not that I'm aware of.

16    Q.   Is there a file on Len in corporate,

17 California?

18    A.   You mean on personnel?

19    Q.   Yeah. On him, on his career, on his --

20    A.   I really don't know.

21    Q.   Have you ever sent -- strike that.

22       Have you ever seen his personnel file?

23    A.   I don't think I have.

24    Q.   Who would be the person in the company that

25 would be in charge of maintaining Lenny's personnel

1  file?

2      A.    Heather Breidenthal I assume.

3      Q.    But Heather would be the person in

4  California, the parent company perhaps, that would

5  have that file, right?

6      A.    Yes.

7      Q.    Would there be anybody in your company,

8  South Florida, that would have a file on Lenny?

9      A.    I don't think so.

10     Q.    Well, okay.  There came a time when there

11  were, and we'll go through it later, reviews done.  I

12  think maybe two reviews were done.  One was done by

13  you.  Where would they go?

14     A.    They go to California.

15     Q.    So there would not be a file maintained

16  locally by Ms. Tavel, for example, HR here on him?

17     A.    No, we don't keep those here.

18     Q.    So if you were to get copies of what you

19  wrote, they would go to California, you would have to

20  ask them to send them back to you?

21     A.    Yes.

22     Q.    So there are no files kept here on any

23  employee?

24     A.    Not that I'm aware of.

25     Q.    Now California would also have the RIF

1  program there, as well?

2          MS. WILSON:  Objection to form.

3          THE WITNESS:  What do you mean by "program"?

4  BY MR. CARMAN:

5      Q.    The RIF memo or file or action plan.

6          MS. WILSON:  Objection to form.

7  BY MR. CARMAN:

8      Q.    What would you call it?

9          MS. WILSON:  Objection to form.

10  BY MR. CARMAN:

11     Q.    I don't know what to call it.  What would

12  you call it?

13     A.    I don't know.

14     Q.    We can't call it the RIF.  I don't know.

15  What would you call it?

16     A.    A spreadsheet.

17     Q.    When I think of a spreadsheet I think of

18  what you gave me this morning.

19     A.    That's exactly what it would be.

20     Q.    So would it be -- which one of these?

21          (The document referred to was thereupon

22     marked as Plaintiff's Exhibit 1 for

23     identification)

24  BY MR. CARMAN:

25     Q.    We've marked the first document as

1  Plaintiff's Exhibit 1 and ask you to identify it for a

2  second.

3      A.    This is the income statement for the

4  company.

5      Q.    So that's not the spreadsheet we are talking

6  about?

7      A.    No.

8      Q.    Let me mark as Plaintiff's Exhibit 2 this

9  document.  I think this is the same.  Hold on.  All

10  I'm trying to do is not go into that right now.  Is

11  that what you would call a spreadsheet?  Is that what

12  the RIF looked like?

13     A.    Yes.

14     Q.    Okay.

15     A.    Or something like this, yes.  A spreadsheet

16  like this.

17          (The document referred to was thereupon

18     marked as Plaintiff's Exhibit 2 for

19     identification)

20  BY MR. CARMAN:

21     Q.    And look at Plaintiff's Exhibit 2 for

22  identification, Plaintiff's Exhibit 2 for

23  identification would be similar in nature as to what

24  the RIF is or what the RIF looked like; is that right?

25          MS. WILSON:  Objection to form.

1          THE WITNESS:  I don't know.  Similar would

2     be on an Excel spreadsheet.

3  BY MR. CARMAN:

4      Q.    Was the RIF ever produced in hard copy?

5          MS. WILSON:  Objection to form.

6          THE WITNESS:  In hard copy?

7  BY MR. CARMAN:

8      Q.    Yes.  On paper.

9      A.    Yes.

10     Q.    And who was it distributed to?

11          MS. WILSON:  Objection to form.

12          THE WITNESS:  I'm not sure.

13  BY MR. CARMAN:

14     Q.    Would you have a copy of it?

15     A.    No.

16     Q.    Why would you not have a copy?

17     A.    Because I don't keep things like that,

18  personnel things in my office.

19     Q.    Who would you give your copy to?

20     A.    Janet Tavel.

21     Q.    And she would keep a copy?

22          MS. WILSON:  Objection to form.

23          THE WITNESS:  I don't know if she kept a

24     copy or sent it to corporate.

25

1  BY MR. CARMAN:

2    Q.    Would she have her own copy of that

3  spreadsheet?

4    A.    I don't know.

5    Q.    Did you ever sit down together in a

6  conference room like this and discuss the spreadsheet,

7  the RIF?

8    A.    Many times.

9    Q.    And was Mr. Chernys ever part of that

10  discussion?

11   A.    No, not that I recall.

12   Q.    When did his name first appear on this RIF?

13   A.    I don't recall.

14   Q.    Who placed his name on the RIF?

15   A.    I did.

16   Q.    Okay.  When?

17   A.    Around the same time we were discussing it.

18   Q.    Why did you place his name on the RIF?

19   A.    Because the job that he was doing was no

20  longer required, he was head of product development,

21  and we really weren't going to be doing any product

22  for a long time.

23   Q.    Had he done any build-out of office space

24  for you?

25   A.    Yeah, he helped with our office space.

1    Q.    Was he responsible for building that?

2    A.    No, the person responsible for building was

3  Carlos Avila.  He was our construction head.

4    Q.    And you had determined that Mr. Chernys

5  should be outsourced?

6          MS. WILSON:  Objection to form.

7          THE WITNESS:  Yes.

8  BY MR. CARMAN:

9    Q.    And you don't remember when you reached that

10  conclusion?

11   A.    No.

12   Q.    Did you discuss that with anyone?

13   A.    Oh, yes.

14   Q.    And with whom did you discuss it?

15   A.    Bruce Dickson.

16   Q.    And what did Mr. Dickson say?

17   A.    He felt that's something we should do.

18   Q.    Did anyone disagree with you?

19   A.    No.

20   Q.    And what else did Mr. Dickson say about your

21  decision?  He concurred with it?

22   A.    Yes.

23   Q.    And did you get his concurrence in writing?

24   A.    No.

25   Q.    Did you notify anyone about your decision

1  besides Mr. Dickson?

2          MS. WILSON:  Objection to form.

3          THE WITNESS:  Yes.

4  BY MR. CARMAN:

5    Q.    Who did you notify?

6    A.    Janet Tavel and Claudia Feldman.

7    Q.    And they agreed with you?

8    A.    Yes.

9    Q.    And they agreed with you because Mr. Chernys

10  was no longer needed; is that a fair statement?

11         MS. WILSON:  Objection to form.

12         THE WITNESS:  Say the question again.

13  BY MR. CARMAN:

14   Q.    Sure.  That was because Mr. Chernys's

15  services were no longer needed at the company?

16         MS. WILSON:  Objection to form.

17  BY MR. CARMAN:

18   Q.    Or was it because he was having this soft

19  landing at the end of 2006?

20         MS. WILSON:  Objection to form.

21         THE WITNESS:  No.

22  BY MR. CARMAN:

23   Q.    Okay.  His services were no longer needed?

24   A.    The job that he did was no longer needed.

25   Q.    And you were aware of course that he was on

1  the soft landing program that Mr. Carr told you about?

2          MS. WILSON:  Objection to form.

3          THE WITNESS:  No.

4  BY MR. CARMAN:

5    Q.    You weren't?

6    A.    No.

7    Q.    Did you have any conversations with

8  Mr. Chernys before the RIF was final that he was being

9  terminated?

10   A.    Yes.

11   Q.    And when did you have those conversations?

12   A.    It was the day that I was going to meet with

13  the employees of the company.

14   Q.    When was that?

15   A.    It was the day after we had laid off all the

16  people.

17   Q.    Isn't it true that you had asked him to

18  participate in determining who was going to be laid

19  off?  Wasn't that one of the roles he was to help you

20  with?

21   A.    No.

22   Q.    He didn't have any role in determining

23  terminations or people who were going to be laid off?

24   A.    No, even though he wasn't part of management

25  at the time.

```
 1      Q.    Wasn't management asked to look at this RIF
 2  and comment?
 3      A.    Possibly.  I don't recall.
 4      Q.    Do you recall what day or month that
 5  conversation was with Mr. Chernys?
 6      A.    It was the day that I addressed the company.
 7  I can't tell you the day, but I called them into my
 8  office because I was going to address the company and
 9  I told him I wanted to know that he was part of the
10  RIF, but I was working on the a plan to try to work
11  out a consulting agreement so that he could stay on
12  work in a role as a consultant.
13      Q.    Now, do you keep a calendar?
14      A.    Yes.
15      Q.    Would that calendar have the address of the
16  meeting?
17      A.    I'm not sure.
18            MR. CARMAN:  Why don't we take a break now,
19      and we'll come back at 1:30 I guess at the latest.
20      And that will give everybody a chance for lunch.
21            (Thereupon, a luncheon recess was taken,
22      after which the following proceedings were held in
23      Volume II:)
24                         * * *
25
```

```
 1                 CERTIFICATE OF NOTARY
 2
 3
    STATE OF FLORIDA     )
 4
    COUNTY OF MIAMI-DADE)
 5
            I, Michele Anzivino, Court Reporter, Notary
 6  Public, State of Florida at Large, do hereby certify
    that I was authorized to and did report said
 7  deposition in stenotype; and that the foregoing pages
    are a true and correct transcription of my shorthand
 8  notes of said deposition.
 9
            I further certify that said deposition was
10  taken at the time and place hereinabove set forth and
    that the taking of said deposition was commenced and
11  completed as hereinabove set out.
12
            I further certify that I am not an attorney
13  or counsel of any of the parties, nor am I a relative
    or employee of any attorney or counsel connected with
14  the action, nor am I financially interested in the
    action.
15
16          The foregoing certification of this
    transcript does not apply to any reproduction of the
17  same by any means unless under the direct control
    and/or direction of the certifying reporter.
18
19          IN WITNESS HEREOF, I have hereunto set my
    hand this 16th day of March, 2007.
20
21
22          _____
            MICHELE ANZIVINO
            Notary Public - State of Florida
23          My Commission Expires: 12/12/2010
            My Commission No.: DD621770
24
25
```

03500
SFCHOMEFS
SCH01_M012

1
01/04/07
10:16:08

Standard Pacific of South Florida (CMB)
Schedule 1 - Income Statement
For the Twelve Months Ending December 31, 2006

| Description | December Actual | December Budget | Variance | % Var | QTD Actual | QTD Budget | Variance | % Var | YTD Actual | YTD Budget | Variance | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Units Sold | 82 | 57 | 25 | 43.9 % | 121 | 147 | <26> | 17.7 % | 574 | 600 | <26> | 4.3 % |
| Average Sales Price | 357,210 | 331,100 | 26,110 | 7.9 % | 348,164 | 338,500 | 9,654 | 2.9 % | 307,976 | 307,352 | 624 | .2 % |
| Base Revenues | 30,775,190 | 19,763,429 | 11,011,761 | 55.7 % | 43,796,400 | 51,622,871 | <7,826,471> | 15.2 % | 172,769,833 | 180,596,309 | <7,826,471> | 4.3 % |
| Lot Premium | 726,500 | 430,118 | 296,382 | 68.9 % | 1,092,500 | 1,210,494 | <117,994> | 9.7 % | 3,513,500 | 3,631,494 | <117,994> | 3.2 % |
| Option Revenue | 969,266 | 382,955 | 586,311 | 153.1 % | 1,431,401 | 1,073,595 | 357,806 | 33.3 % | 5,760,717 | 5,402,911 | 357,806 | 6.6 % |
| Incentives | <3,179,771> | <1,703,788> | <1,475,983> | 86.6 % | <4,193,663> | <4,147,524> | <46,139> | 1.1 % | <5,265,646> | <5,219,507> | <46,139> | .9 % |
| Sales | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Revenues | 29,291,185 | 18,872,714 | 10,418,471 | 55.2 % | 42,126,638 | 49,759,436 | <7,632,798> | 15.3 % | 176,778,409 | 184,411,207 | <7,632,798> | 4.1 % |
| Cost of Sales | 19,435,089 | 13,208,061 | 6,227,028 | 47.1 % | 27,863,269 | 34,534,279 | <6,671,010> | 19.3 % | 111,477,854 | 118,148,864 | <6,671,010> | 5.6 % |
| Lot Sale COS | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Cost of Sales | 19,435,089 | 13,208,061 | 6,227,028 | 47.1 % | 27,863,269 | 34,534,279 | <6,671,010> | 19.3 % | 111,477,854 | 118,148,864 | <6,671,010> | 5.6 % |
| Gross Margin | 9,856,096 | 5,664,653 | 4,191,443 | 74.0 % | 14,263,369 | 15,225,157 | <961,788> | 6.3 % | 65,300,555 | 66,262,343 | <961,788> | 1.5 % |
| Gross Margin % | 33.6 | 30.0 | 3.6 | 12.0 % | 33.9 | 30.6 | 3.3 | 10.8 % | 36.9 | 35.9 | 1.0 | 2.8 % |
| Selling & Marketing Exp | 1,522,629 | 1,167,159 | 355,470 | 30.5 % | 2,802,733 | 3,448,549 | <645,816> | 18.7 % | 11,251,489 | 11,897,305 | <645,816> | 5.4 % |
| General & Administrive Ex | 1,081,771 | 1,008,751 | 73,020 | 7.2 % | 2,271,496 | 2,755,362 | <483,866> | 17.6 % | 11,387,649 | 11,871,515 | <483,866> | 4.1 % |
| SG&A % | 8.9 | 11.5 | <2.6> | 22.6 % | 12.0 | 12.5 | <.5> | 4.0 % | 12.8 | 12.9 | <.1> | .8 % |
| Amortization of Goodwill | | | | .0 % | | | | .0 % | | | | .0 % |
| Income from Joint Venture | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Equity Income from JV | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| JV Interest Amortization | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Management Fee Income | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Interest Income | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Mortgage JV Income | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Income from Joint Vent | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Income from Subsidiaries | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Interest Expense | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Other Income-Title Servic | 32,100 | 7,000 | 25,100 | 358.6 % | 43,402 | 20,000 | 23,402 | 117.0 % | 169,775 | 146,373 | 23,402 | 16.0 % |
| Other Income-Constr. Fees | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % |
| Other Income (Expense) | | | | .0 % | | | | .0 % | | | | .0 % |
| Other Income | 376,021 | 15,000 | 361,021 | .0 % | 570,412 | 45,000 | 525,412 | .0 % | 766,260 | 240,848 | 525,412 | .0 % |
| Other Expense | 1,927,926 | 15,000 | 1,927,926 | .0 % | 1,927,926 | 45,000 | 1,927,926 | .0 % | 1,927,926 | 240,848 | 1,927,926 | .0 % |
| Other Income (Expense) | <1,551,905> | <1,566,905> | <1,566,905> | 10,446.0 % | <1,357,514> | 45,000 | <1,402,514> | 3,116.7 % | <1,161,666> | 240,848 | <1,402,514> | 582.3 % |
| Pretax Income | 5,731,891 | 3,510,743 | 2,221,148 | 63.3 % | 7,875,028 | 9,086,246 | <1,211,218> | 13.3 % | 41,669,525 | 42,880,744 | <1,211,218> | 2.8 % |
| Pretax Income % | 19.6 | 18.6 | 1.0 | 5.4 % | 18.7 | 18.3 | .4 | 2.2 % | 23.6 | 23.3 | .3 | 1.3 % |
| Provision for Income Taxe | 0 | 0 | 0 | .0 % | 0 | 0 | 0 | .0 % | 11,828,600 | 11,828,600 | 0 | .0 % |
| Net Income | 5,731,891 | 3,510,743 | 2,221,148 | 63.3 % | 7,875,028 | 9,086,246 | <1,211,218> | 13.3 % | 29,840,926 | 31,052,144 | <1,211,218> | 3.9 % |

PLAINTIFF'S DEPOSITION EXHIBIT

**2005 Westbrooke Division**
**Bonus and Salary Worksheet**

| | Name | Hire Date | Drivers/Sec Service/Employment | Title | 2006 Annual Salary | 2006 Current Annual Bonus Award (1) | 2005 Current Payment 2/28/06 (2) | 2005 YTD Overtime 1/1/05-9/30/05 | 2005 YTD Current Contract Services 1/1-9/30 | 2006 Bonus Award (3) 12/15/05-2/28/06 | % Change 1/1/05-12/31/05 | | 2006 Holiday Bonus to be Paid 12/15/2005 | 2006 Bonus Annual Auto Allowance | | 2006 Annual Salary | | | 2006 New Base Salary Change (9) | Change in Base Salary Change (10) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounting** | | | | | | | | | | | | | | | | | | | | |
| | Abreu, Maria | 8/21/1993 | 12 | Sr A/P Clerk | 36,046 | 38,000 | 3,018.30 | | | 1,694 | 4.285% | 1/1/2005 | | | | | | | | |
| | Diaz, Cindy | 7/15/2004 | 1 | Accounts Payable Clerk | 26,000 | 20,000 | 1,083.33 | | | 4,200 | 15.38% | 1/1/2005 | | | | | | | | |
| | Feldman, Claudia | 8/1/1991 | 7 | Division Controller | 125,000 | 130,000 | 20,000.00 | | | 4,200 | 4.00% | 1/1/2005 | | | | | | | | |
| | Mirna, Jacqueline | 5/22/1991 | 14 | Lead Staff Accountant | 31,497 | 35,000 | 3,212.36 | 988.14 | | 3,585 | 11.13% | 1/1/2005 | | | | | | | | |
| | Morales, Lisbet | 5/17/2004 | 1 | Financial Analyst | 43,000 | 48,000 | 1,791.67 | | | 5,000 | 11.63% | 1/1/2005 | | | | | | | | |
| | Natanmad, Barra | 6/1/1980 | 25 | Accounting Manager | 75,713 | 78,742 | 8,154.72 | | | 3,089 | 4.00% | 1/1/2005 | | | | | | | | |
| | Pratt, Amanda | 2/1/1985 | 3 | Bookkeeper | 33,145 | 35,000 | 5,000.00 | 472.00 | | 1,855 | 6.00% | 1/1/2005 | | | | | | | | |
| | Rancon Garfield Maj | 2/1/1981 | 24 | Accounts Payable Mgr | 62,191 | 64,079 | 5,391.30 | | | 2,868 | 4.00% | 1/1/2005 | | | | | | | | |
| | Trent, Karen | 7/21/1993 | 8 | Sr A/P Clerk | 42,615 | 44,300 | 3,575.60 | | | 1,706 | 4.00% | 1/1/2005 | | | | | | | | |
| **Administrator** | | | | | | | | | | | | | | | | | | | | |
| | Siska Laila Bona | 9/22/2000 | 2 | HR Assistant | 29,699 | 30,000 | 1,091.64 | 46.63 | | 4,041 | 13.57% | 1/1/2005 | | | | | | | | |
| | Baralns Christine E. | 12/22/2002 | 2 | Receptionist | 12,679 | 18,720 | 469.20 | 207.07 | | 5,741 | 44.23% | 2/7/2005 | | | | | | | | |
| | Bonello Elizabeth | 5/23/1995 | 5 | Asst. Rel Council / Exec | 64,904 | 67,601 | 3,724.38 | | | 2,385 | 4.00% | 1/1/2005 | | | | | | | | |
| | Chairman Trent | 12/20/1995 | 5 | Sr VP Planning and Bud | 50,000 | 55,000 | 0.00 | | | 16,000 | 5.95% | 6/2/2005 | | | | | | | | |
| **Construction** | | | | | | | | | | | | | | | | | | | | |
| | Charron, Leonardo | 2/1/1978 | 27 | Sr VP Project Develop | 185,699 | 193,461 | 0.00 | | | 7,442 | 4.00% | 10/2/2005 | | | | | | | | |
| | Cranves, Stephen | 10/2/2000 | 0 | Crew Asst | 20,000 | 20,000 | 0.00 | | | 456 | n/a | 10/2/2000 | | | | | | | | |
| | Kawer Egris Marie | 7/19/2000 | 2 | Admin/quality Asst | 39,000 | 40,682 | 750.00 | | | 1,562 | 4.01% | 2/7/2005 | | | | | | | | |
| | Larenzo Eretson | 12/13/1993 | 11 | VP Construction | 170,000 | 170,000 | 45,000.00 | | 110,000 | 0.00% | 10/1/2005 | | | | | | | | | |
| | Tuteloso Draws M | 10/15/2004 | 0 | Receptionist | 18,732 | 23,600 | 386.00 | 3,195.13 | | 6,396 | 27.78% | 3/15/2005 | | | | | | | | |
| | Hazelon, Nancy | 3/15/1992 | 1 | VP Purchasing | 120,000 | 152,500 | 26,000.00 | | 76,000 | 5.14% | 4.00% | 1/1/2005 | | | | | | | | |
| | Messaa Anmoho | 8/19/1991 | 14 | VP Sales & Marketing | 90,000 | 50,000 | 15,000.00 | | | 3,008 | 3.00% | 1/1/2005 | | | | | | | | |
| | Rayans Assunçao | 9/5/2000 | 5 | Receptionist | 39,000 | 31,000 | 1,250.00 | 44.00 | | 1,606 | 4.00% | 1/17/2005 | | | | | | | | |
| | Rule Andry A | 6/28/2002 | 2 | Sales & Marketing Clerk | 18,200 | 20,800 | 2,983.17 | 138.00 | 2,500 | 14.28% | 1/9/2005 | | | | | | | | | |
| | Stra, Charis | 4/4/2005 | 0 | Customer Care Asst | 18,780 | 19,780 | 0.00 | 196.76 | | n/a | n/a | 10/1/2005 | | | | | | | | |
| | Tijoril Jane | 8/9/1993 | 17 | VP of Administration | 93,000 | 93,000 | 30,000.00 | | | 3,820 | 4.00% | 1/1/2005 | | | | | | | | |
| | Winter, David | 9/11/1996 | 7 | Sr VP Land Acquisition | 156,151 | 156,477 | 225,000.00 | | | 6,305 | 4.00% | 1/1/2005 | | | | | | | | |
| | Yanda, Robert | 5/29/1993 | 22 | VP Construction | 100,000 | 190,000 | 24,000.00 | | 21,000 | | 0.00% | 10/1/2005 | | | | | | | | | |
| **Construction** | | | | | | | | | | | | | | | | | | | | |
| | Albu Juan M | 2/7/2005 | 0 | Construction Laborer | | 20,800 | 2,100 | 0.00 | 1,282.50 | n/a | n/a | 2/7/2005 | | | | | | | | |
| | Amesti Amedo | 7/17/2000 | 20 | Construction Laborer | 33,327 | 34,691 | 2,100 | 4,528.37 | | 1,334 | 4.00% | 1/7/2005 | | | | | | | | |
| | Amesti Yolanda | 6/24/1991 | 14 | Housekeeper | 25,553 | 26,362 | 250.00 | 3,041.50 | | 1,014 | 4.00% | 1/7/2005 | | | | | | | | |
| | Arceda, Cielo | 6/2/2001 | 4 | Construction Laborer | 20,553 | 21,667 | 2,100 | 200.00 | 5,403.81 | 824 | 4.00% | 1/7/2005 | | | | | | | | |
| | Alvarado, Cielo | 4/1/2002 | 2 | Superintendent | 57,700 | 59,498 | 3,800 | 3,000.00 | | 2,288 | 4.00% | 1/7/2005 | | | | | | | | |
| | Amoroz, Albor | 4/1/2002 | 2 | Superintendent | 30,084 | 31,686 | 2,100 | | | 5,780 | 4.00% | 1/1/2005 | | | | | | | | |
| | Arizna, Iran | 3/19/1996 | 9 | Construction Laborer | 30,084 | 31,686 | 2,100 | | 91.50 | 2,288 | 4.00% | 1/7/2005 | | | | | | | | |
| | Arteta, Juan | 7/31/2000 | 3 | Asst. Project Manager | 49,873 | 51,000 | 3,620 | 3,000.00 | | 1,211 | 4.00% | 1/1/2005 | | | | | | | | |

PLAINTIFF'S EXHIBIT

**2005 Westbrooke Division**
**Bonus and Salary Worksheet**

| Name | Hire Date | Years of Service | Title | 2004 Annual Salary |
|---|---|---|---|---|
| Ayala Ramon M | 7/18/2005 | 0 | Construction Laborer | 18,760 |
| Banks Luis | 2/2/2004 | 1 | Construction Laborer | 18,640 |
| Banks Orlando | 7/18/2005 | 0 | Construction Laborer | 20,800 |
| Bosco Allan | 8/12/1985 | 20 | Construction Laborer | 30,477 |
| Boyd Christopher | 2/8/1993 | 6 | Asst Project Manager | 125,000 |
| Buono Robert L | 4/19/2004 | 1 | Superintendent | 55,000 |
| Campins Miguel | 12/16/1996 | 8 | Construction Laborer | 29,046 |
| Crews Pedro | 11/22/1997 | 12 | Construction Laborer | 35,347 |
| De Leon Abel | 6/29/1998 | 6 | Construction Laborer | 27,408 |
| Delgado Jose | 6/14/1995 | 5 | Project Manager | 86,195 |
| Owono Alfred J | 12/9/1993 | 5 | Project Manager | 60,000 |
| Garcia de Alba Rold J | 10/27/2003 | 1 | Superintendent | 51,000 |
| Gonzalez Armando | 5/3/2004 | 1 | Construction Laborer | 21,840 |
| Gonzalez Reynaldo | 4/1/1998 | 11 | Construction Laborer | 30,203 |
| Guzman Gabriel | 9/3/1991 | 14 | Project Manager | 65,530 |
| Hernandez Robert | 9/18/2005 | 0 | Superintendent | |
| Hernandez Roberto | 7/6/2005 | 5 | Construction Laborer | 20,000 |
| Joseph Alex | 1/18/2000 | 5 | Construction Laborer | 23,341 |
| Alfredo Gitarres | 9/17/2001 | 4 | Construction Laborer | 20,852 |
| Juarez | 12/27/1990 | 6 | Superintendent | 63,716 |
| Juarez Thomas | 9/27/1999 | 6 | Project Manager | 55,000 |
| Laborde Maria | 4/9/2002 | 2 | Construction Laborer | 43,680 |
| Lukacs Harvey | 5/3/1999 | 6 | Construction Laborer | 24,747 |
| Lopez Wenceslao | 2/27/2000 | 5 | Construction Laborer | 25,000 |
| Laborde Yoneiida | 11/22/1998 | 2 | Construction Laborer | 27,154 |
| Martinez Flavio | 3/31/2003 | 2 | Superintendent | 58,000 |
| Mateos Thomas Edwin | 4/1/2004 | 1 | Construction Laborer | |
| Medina Lazaro | 3/15/2005 | 0 | Construction Laborer | |
| Martinez Lino L | 1/18/2004 | 8 | Construction Laborer | 18,720 |
| Martinez Miguel A | 8/14/1997 | 8 | Housekeeper | 22,308 |
| Mendez Antonio | 9/22/2004 | 1 | Construction Laborer | 20,800 |
| Mendez Guillermo J | 2/18/2002 | 3 | New Home Warranty Pr | 40,000 |
| Miller David W | 11/1/2004 | 0 | Superintendent | 58,400 |
| Network Yudel E | 3/29/2004 | 1 | Superintendent | 54,000 |
| Ortiz Miguel | 4/20/1998 | 6 | Construction Laborer | 24,960 |
| OrtizReyes Christopher | 12/1/2006 | 6 | Project Manager | 79,500 |
| Perch Charles | 1/24/2000 | 5 | Project Manager | 63,500 |
| Ramirez AlexisAlfred | 7/1/2004 | 1 | Construction Laborer | 18,720 |
| Ramirez Guillermo J | 1/2/2002 | 0 | Construction Laborer | 20,800 |
| Reyes Jose | 9/15/1992 | 10 | Construction Laborer | 30,313 |
| Rengan Thomas | 6/5/2000 | 5 | Superintendent | 40,500 |
| Sanchez Teodulo | | | | |
| Rengan Thomas | 6/12/2000 | 3 | Superintendent | 63,500 |

**2006 Westbrooke Division**
**Bonus and Salary Worksheet**

| Name | Start Date | Yrs Others | Job Title | 2004 Annual Salary | 2005 Proj Annual Salary | 2005 Comm Allowance (1?) | 2005 Bonus (Overtime) | 2006 YTD Comm Thru 09-30-2006 | 2006 YTD Overtime 08-30-2006 | 2006 YTD Bonus 9-30-2006 | 2006 Estimate Annual 2004-2005 | 2006 Proj 2006 | % Change 2004-2005 | 1st Review Date | 2006 Holiday Bonus/Pay To Be | 2006 Year End Annual | 2006 Allowance | Reason for Change | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Customer Service**

| Sequeira John L. | 2/19/2000 | 0 | Superintendent | 55,000 | | 3,500 | 0.00 | n/a | | | 750 | n/a | n/a | | | | | | | | |
| Sosa Rafael | 10/9/1995 | 9 | Superintendent | 45,560 | 55,000 | 3,500 | 3,200.00 | | | 23,372 | 8,500 | 9,440 | 30.72% | 2/1/2006 | | | | | | | |
| Saldsaivald Christian | 10/18/2004 | 0 | Superintendent | 91,440 | | 3,000 | 0.00 | 216.10 | | 15,197 | 2,500 | n/a | 0.00% | 10/18/2005 | | | | | | | |
| Termick Anthony J | 2/2/2005 | 2 | Superintendent | 30,400 | 91,200 | 3,000 | 3,200.00 | | | | 3,500 | 4,500 | 15.15% | 1/1/2005 | | | | | | | |
| Tychiak Thomas | 2/22/2000 | 5 | Project Manager | 61,200 | 61,200 | 3,180 | 6,000.00 | | | 8,750 | 8,750 | 0 | 0.00% | 1/1/2005 | | | | | | | |
| Urena Emilio | 7/1/2005 | 0 | Construction Laborer | | 19,760 | | 0.00 | 458.00 | | | n/a | n/a | n/a | | | | | | | | |
| Vasquez Efrain | 4/17/2000 | 5 | Construction Laborer | 36,560 | 28,078 | 200.00 | 2,604.20 | | | | 1,890 | 1,890 | 4.00% | 1/1/2006 | | | | | | | |
| Vasquez Salvador | 11/22/1999 | 5 | Construction Laborer | 24,666 | 28,078 | 2,100 | 200.00 | 2,462.22 | | | 3,000 | 1,890 | 4.00% | 1/1/2006 | | | | | | | |
| Weiss Richard Dale | 3/1/2001 | 3 | Superintendent | 62,600 | 52,000 | 3,000 | 0.00 | | | | 5,000 | | 0.00% | 1/1/2005 | | | | | | | |
| Wilcester Douglas | 12/19/2011 | 3 | Superintendent | 45,276 | 60,000 | 1,500.00 | 1,500.00 | 597.79 | | 13,724 | 4,500 | 13724 | 28.85% | 2/1/2006 | | | | | | | |
| Yriza Adan | 3/16/2005 | 0 | Construction Laborer | 20,800 | 55,000 | 3,100 | 3,000.00 | | | | n/a | n/a | 0.00% | | | | | | | | |
| Yriza Armando | 5/15/2000 | 5 | Superintendent | 59,544 | 55,000 | 3,100 | 3,000.00 | 562.50 | | 8,500 | 8,500 | 4,459 | 8.35% | 1/1/2006 | | | | | | | |
| Yriza Oziel | 2/11/1995 | 10 | Construction Laborer | 52,137 | 54,223 | 3,100 | 3,000.00 | | | 5,000 | 5,000 | 2,065 | 4.00% | 1/1/2006 | | | | | | | |
| Yrunda Caesar | 2/11/1998 | 16 | Superintendent | 52,137 | 54,223 | 3,500 | 3,500.00 | | | 5,000 | 5,000 | 2,065 | 4.00% | 1/1/2006 | | | | | | | |

**Net Ops**

| Del La Torre Andres | 11/13/1997 | 17 | Customer Service Adm | 37,034 | 38,516 | | 1,543.10 | 874.93 | | 1,000 | 1,000 | 1,481 | 4.00% | 1/1/2005 | | | | | | | |
| Gonzalez Yvette A | 9/14/2000 | 3 | Customer Service Adm | 18,068 | 24,278 | | 705.60 | | | 5,000 | 5,250 | 5,250 | 24.66% | 1/1/2006 | | | | | | | |
| Lugones Teri | 3/15/2005 | 0 | New Home Warranty R | | 35,500 | 4,800 | 0.00 | | | 750 | n/a | n/a | n/a | 8/16/2005 | | | | | | | |
| Gonzalez Maria C | 3/16/2005 | 0 | New Home Warranty R | 34,500 | 34,500 | 4,800 | 0.00 | | | n/a | 750 | n/a | n/a | 3/16/2005 | | | | | | | |
| Greenfield Erik | 2/20/1998 | 10 | New Home Warranty R | 36,606 | 38,072 | 4,800 | 2,750.00 | | | 4,000 | 4,000 | 1,464 | 4.00% | 1/1/2005 | | | | | | | |
| Kinzham Carl | 3/28/1993 | 6 | Customer Service Mgr | 50,000 | 67,500 | 8,600 | 5,600.00 | | | 2,500 | 7,500 | 7,502 | 10.00% | 1/1/2005 | | | | | | | |
| Marquipc Sylvio | 8/27/1993 | 12 | New Home Warranty R | 75,712 | 78,741 | 8,600 | 2,080.34 | | | 5,500 | 3,200 | 3,200 | 4.00% | 1/1/2005 | | | | | | | |
| Newson Angelo | 3/13/2000 | 3 | New Home Warranty R | 48,000 | 50,000 | 8,400 | 5,600.00 | 666.34 | | 6,000 | 3,200 | 3,200 | 3.84% | 1/1/2005 | | | | | | | |
| Rentfield Donald Chri | 7/1/2004 | 1 | New Home Warranty R | 33,000 | 34,320 | 4,800 | 0.00 | | | 3200 | 520 | 1,300 | 4.00% | 9/7/2005 | | | | | | | |
| Sanchez, Walter | 10/20/2001 | 0 | New Home Warranty R | 34,000 | 34,000 | 4,800 | 0.00 | | | n/a | n/a | n/a | 4.00% | 10/27/2005 | | | | | | | |
| Steven Mark L Laura | 6/7/2001 | 1 | Customer Service Adm | 20,800 | 20,800 | | 300.00 | | | | 500 | 2,667 | 0.00% | 1/1/2005 | | | | | | | |
| Sud.baro-Boldo Daniel | 8/24/1998 | 2 | New Home Warranty R | 71,578 | 74,543 | 8,400 | 4,000.00 | | | 5,000 | 2,667 | 4.00% | 1/1/2006 | | | | | | | | |
| Trotter Chelsea Marie | 9/1/2001 | 2 | Office Assis | 20,760 | 19,760 | | 0.00 | | | | n/a | (1,000) | -5.00% | 9/18/2005 | | | | | | | |

**Design Center**

| Luster Krietin | 7/2/1995 | 10 | Design Center Manager | 44,995 | 48,000 | | 220.00 | | 23,372 | | 3,205 | 7.12% | 1/1/2005 | | | | | | | | |
| Lewis Scott E. | 3/24/2003 | 2 | House Design Consulta | 38,000 | 40,560 | | 2,750.00 | | 15,197 | | 1,500 | 4.00% | 1/1/2005 | | | | | | | | |
| Marks Gina Renita | 3/17/1993 | 6 | House Design Consulta | 33,000 | 35,000 | | 250.00 | 214.51 | 32,511 | | n/a | 0.00% | 10/1/2004 | | | | | | | | |
| Perez Adela | 4/13/2000 | 5 | Home Design Consulta | 33,000 | 33,000 | | 250.00 | 485.78 | 53,682 | | 1,678 | 6.86% | 1/1/2005 | | | | | | | | |

**Land Development**

| Mendoza Michael C | 1/31/2000 | | Director of Land Develop | 80,000 | 96,000 | 8,000 | 15,000.00 | | | 30,000 | 10,000 | 12.50% | 1/1/2005 | | | 6,500 | | 56,130 | | | |

## 2006 Westbrooke Division
## Bonus and Salary Worksheet

| Name | Date of Hire | Yrs of Service | Div of Land Development | 2006 Annual Salary | 2006 Current Annual Salary | 2006 Current Annual Auto Allowance (1) | 2006 YTD Overtime through 06-30-2006 | 2006 YTD Overtime through 06-30-2006 | 2006 YTD Bonus at 06-30-2006 (through) | % Change 2005-2006 | % Change 2004-2006 | Last Increase Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales & Marketing** | | | | | | | | | | | | |
| Nella, Julio | 8/21/1981 | 19 | | | 97,120 | 6,000 | 22,000.00 | | 16,000 | 3,725 | 4.00% | 1/1/2006 |
| Barstow, Michelle H | 9/26/2004 | 1 | Sales & Marketing Asst | 40,000 | 42,000 | | 1,500.00 | 62,009 | 1,500 | 5.00% | n/a | 10/1/2006 |
| Barstow, Carina | 9/26/2004 | 1 | Sales & Marketing Asst | 31,200 | | | | | | | | |
| Bruno, Adele | 2/18/2006 | 0 | Sales Assoc | 31,200 | 31,200 | 3,000 | 1,664.67 | 41,069 | 2,000 | 0.00% | n/a | 6/1/2006 |
| Buscaglia, Robert | 9/26/1985 | | Sales Assoc | 31,200 | 31,200 | | | | | 0.00% | | 2/1/2006 |
| Cruz, Daniel | 11/70/2005 | 9 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 39,664 | | 0.00% | 10/1/2006 | |
| Deleon, Jacqueline | 3/17/1984 | 21 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 68,287 | | 0.00% | 10/1/2006 | |
| Diem, Cleopatra | 3/20/1900 | 5 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 135,593 | | 0.00% | 8/4/2006 | |
| Emelin, Diane | 6/18/1997 | 9 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 25,663 | | 0.00% | 10/1/2006 | |
| Encinla, Jack | 6/18/1997 | 9 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 55,071 | | 0.00% | 10/1/2006 | |
| Golden, Lee | 3/7/1995 | 7 | Sales Assoc | 31,200 | 37,200 | | 1,200.00 | 37,363 | | 0.00% | 7/6/2006 | |
| Greenfield, Gaye | 6/7/1977 | 28 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 75,759 | | 0.00% | 10/1/2006 | |
| Hachad, Suzana | 3/22/2005 | 2 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 120,817 | | 0.00% | 10/1/2006 | |
| Hawes, V. Eleanor | 1/16/1977 | 8 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 35,523 | | 0.00% | 10/1/2006 | |
| Luczynski, Bonnie | 1/18/1977 | 9 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 80,050 | | 0.00% | 10/1/2006 | |
| Molina, Rita | 8/22/1995 | | Sales Assoc | 31,200 | 31,200 | | 250.00 | 51,654 | | 0.00% | 10/1/2006 | |
| Pancor, Jr Pedro | 3/28/1988 | 9 | Sales Assoc | 35,000 | 66,000 | | 2,795.00 | | 10,000 | 4.00% | 10/1/2006 | |
| Pancor, Jr Pedro | 3/28/1988 | | Sales Assoc | 31,200 | 31,200 | | 250.00 | | | 0.00% | 10/1/2006 | |
| Rarison, Cristina | 1/25/1990 | 12 | Closing Assistant | 66,000 | 88,640 | | 1,170.00 | | 2,840 | 4.00% | 10/1/2006 | |
| Riina, Jennifer | 2/22/2006 | 1 | Closing Assistant | 26,000 | 26,200 | | 250.00 | | 1,532 | 4.00% | 10/1/2006 | |
| Sanchez, Leonardo | 1/5/1996 | 20 | Sales Assoc | 31,200 | 31,200 | | 250.00 | 210,965 | | 0.00% | 10/1/2006 | |
| Spezga, Scarlett | 5/4/2004 | 1 | Sales Assoc | 31,200 | 31,200 | | | 127,823 | | 0.00% | 8/4/2006 | |
| **Land Development** | | | | | | | | | | | | |
| Aschelman, Rudy | 1/4/1999 | 5 | Land Development Coord | 70,000 | 76,000 | 6,000 | 4,500.00 | | 18,000 | 5,000 | 7.14% | 1/2/2006 |
| Duross, Jacqueline | 8/16/2005 | 0 | HOA Coordinator | | 48,000 | 3,000 | 0.00 | | 2,000 | n/a | n/a | 9/20/2005 |
| LeDuen, R | 3/7/2000 | 0 | Land Development Asst | | 50,000 | 6,000 | 0.00 | 49.88 | 10,500 | n/a | n/a | 8/10/2006 |
| Spizio, William J | 2/22/2004 | 1 | Land Development Mgr | 55,000 | 85,000 | 6,000 | 750.00 | | 10,500 | 20,000 | 54.55% | 8/10/2006 |

## 2005 Westbrooke Division
## Bonus and Salary Worksheet

**Purchasing**

| Name | Years of Service | 2004 Annual Salary | 2005 Annual Salary | 2005 Current Annual Auto Allowance (1) | 2004 OT Cost (Overtime Expense) | 2005 YTD Overtime Through 06/30/2005 | 2005 YTD Overtime Through 9/30/2005 | 2006 YTD Bonus & Incentive Through 06/30/2005 | 2006 YTD Bonus & Incentive % Change | 2006 YTD Bonus & Incentive % Change 2004/2005 | 12/1/2005 2005 Bonus | 2005 Holiday Bonus To Be Paid 12/16/2005 | 2005 Holiday Bonus Total Paid 01/01/2006 | 2006 Annual Auto Allowance | 2006 Annual Salary | Reason for Change / Base Salary Change ($) Comment | Base Salary Change (%) | Base Salary Change ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Diaz, Daniel Maria | 8/13/1999 | 6 | Purchasing Assistant | 46,538 | 46,140 | 0.00 | | | 1,500 | 1,622 | 4.00% | 1/2005 | | 46,000 | | | 2,840 | | 51,000 | | 8.69% | $ 2,790.00 |
| Expedito Vermudez Ba | 5/29/2004 | 1 | Purchasing Assistant | 31,200 | 35,000 | 1,150.00 | | | 1,500 | 3,800 | 12.18% | 2/1/2005 | | 40,000 | | | 60,000 | | | | 15.21% | $ 1,666.67 |
| Coestalo Leonard | 4/4/2015 | 0 | Purchasing Assistant | 40,000 | 0.00 | | | n/a | n/a | 4/4/2005 | | 40,000 | | | 47,000 | | 15.85% | $ 3,730.34 |
| Spagolo John | 9/5/2000 | 5 | Purchasing Coordinator | 43,550 | 47,000 | 3,190.00 | | 2,000 | 5,440 | 15.85% | 5/7/2005 | | 47,000 | | | | | | |

| | | | | **6,495,501** | | 815,565 | | | | | | | **59,565** | **878,530** | **264,000** | | **8,855,471** | | | **348,220** | | | **303,720** |

For any requested change of 10% or more, please provide more detailed explanations on the attached form.

| | Salary Change Adjustment | | |
|---|---|---|---|
| C | Cost of Living | | |
| J | Job Re-classification | | |
| B | Benchmarking/Market Adjustment | | |
| M | Merit/Performance | | |
| P | Promotion | | |

**Notes:**

[1] Represents the current semi-monthly auto allowance multiplied by the number of pay periods in the year.

[2] Includes any bonus/incentive received from January 21, 2004 through January 20, 2005 through September 20, 2005, for work performed in 2004.

[3] Includes any bonus/incentive received from January 21, 2005 through September 20, 2005, for work performed in 2005.

## 2006 Division
## Bonus and Salary Worksheet

| First Name | Last Name | Years of Service | Time in Title | Job Title | 2005 Annual Salary | 2006 Annual Salary | 2006 Current Annual Auto Allowance | 2006 YTD Earned (Total between the 2 paid on Jan 15...) | 2006 monthly & quarterly Bonus (paid between Feb and Oct 15) | 2005 YTD Commission (Total between 12/31/2005...) | 2006 YTD Commission through Oct 15, 2006 | 2006 YTD Draw Oct 15, 2006 | 2005/2006 Salary Increase ($) | 2005-2006 Salary Increase (%) | Time of Last Increase | Proposed Raise (Salary) | 2007 Proposed Bonuses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounting & Finance** | | | | | | | | | | | | | | | | | |
| Elena | Nathaniel | 25 | 6/11/1996 | Accounting Manager | 70,742 | 75,000 | | 12,261 | | | | | (3,742) | -4.73% | 9/18/2006 | 1,000 | 9,000 |
| Gladys D | Felix | | 7/18/2004 | Accounts Payable Clerk | 50,000 | 52,000 | | 3,240 | | | | | 2,000 | 6.67% | 9/18/2006 | 1,000 | 2,000 |
| Candided | Standardo | 25 | 7/5/1981 | Accounts Payable Manager | 64,679 | 43,875 | | 8,185 | | | | | (20,804) | -32.16% | 9/18/2006 | 1,000 | 5,300 |
| Antonia | Prats | | 2/17/2002 | Bookkeeper | 35,066 | 31,200 | | 7,600 | | | | | (3,866) | -11.10% | 9/18/2006 | 500 | 2,600 |
| David | Alfano | | 10/5/2004 | Sr Accounts Payable Coordinat | 38,000 | 42,000 | | 3,000 | | | 182 | | 4,000 | 10.53% | 1/1/2006 | 1,000 | 2,600 |
| Ileana | Tavel | 15 | 7/21/1999 | Sr Accounts Payable Coordinat | 44,393 | 34,507 | | 4,847 | | | | | (9,816) | -22.18% | 9/18/2006 | 1,000 | 500 |
| Lisbet | Morales | 2 | 5/17/2004 | Financial Analyst | 48,000 | 39,749 | | 7,000 | | | | | (6,251) | -17.19% | 9/18/2006 | 1,000 | 5,000 |
| | | | | Dept Totals | 338,816 | 298,331 | | 47,659 | | | 182 | | (40,505) | -10.02% (average) | | 6,500 | 27,000 |
| **Executive & Administrative** | | | | | | | | | | | | | | | | | |
| Jennifer | Paradela | | 2/20/2004 | Closing Assistant | 29,203 | 23,451 | | 6,217 | | | 270 | | (5,772) | -19.76% | 9/18/2006 | 1,000 | 5,000 |
| Cynthia | Boynton | 13 | 1/25/1983 | Closing Manager | 68,540 | 70,000 | | 17,660 | | | | | 1,360 | 1.98% | 1/1/2006 | 1,500 | 15,000 |
| Claudia | Siles | 1 | 4/4/2005 | Customer Care Assistant | 19,760 | 20,800 | | 923 | | | 23 | | 1,040 | 5.26% | 10/7/2005 | 950 | 500 |
| Tami | Chapman | | 12/30/1999 | Director of Planning & Budget | 95,000 | 100,415 | | 28,000 | | | | | 5,415 | 5.70% | 1/1/2006 | 6,700 | 28,000 |
| Claudia | Feldman | | 5/1/1998 | Division Controller | 130,000 | 155,000 | | 60,000 | | | | | 25,000 | 19.23% | 1/1/2006 | 6,700 | 60,000 |
| Ligia Elena | Bird | | 9/22/2003 | Human Resources Assistant | 30,000 | 32,400 | | 4,250 | | | | | 2,400 | 8.00% | 1/1/2006 | 3,000 | 3,000 |
| Jacqueline | Molina | | 5/23/1994 | Lot Start Coordinator | 36,000 | 38,000 | | 4,458 | | | 274 | | 3,000 | 8.57% | 1/1/2006 | 1,000 | 3,000 |
| Alclsi M | Balbano | | 11/7/2004 | Office Assistant | 18,200 | 20,280 | | | 2,444 | | 29 | | 2,080 | 11.43% | 1/9/2006 | 750 | 3,000 |
| Janet | Tirado | | 8/9/1996 | VP Administration | 90,000 | 96,385 | | 46,000 | | | | | 6,385 | 5.70% | 1/1/2006 | 5,335 | 45,000 |
| Kimberly | Matear | | 9/19/1991 | VP Sales & Marketing | 90,000 | 96,130 | 4,800 | 35,150 | | | | | 6,130 | 5.70% | 1/1/2006 | 5,335 | 20,000 |
| Michelle H | Stameco | | 3/23/2004 | Sales & Marketing Assistant | 42,000 | 44,284 | | 4,750 | | | 72 | | 2,284 | 5.70% | 1/1/2006 | 2,394 | 3,000 |
| Ashley K | Ruiz | | 5/25/2005 | Sales & Marketing Assistant | 26,000 | 28,000 | | 2,387 | | | | | 1,400 | 20.15% | 2/1/2006 | 1,200 | 1,500 |
| Kathy L | Klinger | 0 | 6/15/2005 | Sales Manager | 50,000 | 53,000 | 3,800 | n/a | | | | | 50,000 | | 6/15/2005 | 750 | 5,000 |
| | | | | Dept Totals | 672,204 | 773,768 | 8,400 | 223,725 | 37,634 | | 688 | | 101,592 | 8.43% (average) | | 7,000 | 185,000 |
| **Construction** | | | | | | | | | | | | | | | | | |
| Enrique | Laureano | 12 | 12/13/1993 | VP Construction | 170,000 | 178,690 | 9,000 | 160,000 | 50,000 | | | | 9,660 | 8.70% | 1/1/2006 | | 90,000 |
| Robert | Yundt | 23 | 6/2/1983 | VP Construction | 160,000 | 160,000 | 6,000 | 15,000 | 25,000 | | | | 0 | 0.00% | 1/1/2006 | | 15,000 |
| Christopher | Endo | 8 | 2/9/1999 | Area Project Manager | 125,000 | 132,785 | 9,000 | 22,000 | 25,000 | | | | 7,785 | 5.70% | 1/1/2006 | | 25,000 |
| Jose | Delgado | 8 | 6/14/1999 | Project Manager | 83,644 | 86,000 | 3,000 | 3,760 | 5,000 | | | | 4,356 | 5.35% | 1/1/2006 | | 7,000 |
| Michael | Downey | 8 | 10/4/1999 | Project Manager | 75,000 | 76,000 | 3,600 | 6,000 | 5,000 | | | | 6,960 | 13.57% | 1/1/2006 | | 7,000 |
| Gabriel | Guzman | 6 | 9/3/2001 | Project Manager | 70,500 | 74,549 | 3,600 | 6,000 | 6,000 | | | | 4,020 | 5.70% | 1/1/2006 | | 6,000 |
| Christopher | O'Sullivan | 7 | 1/31/2000 | Project Manager | 72,000 | 76,000 | 3,600 | 4,500 | 5,000 | | | | 4,133 | 5.70% | 1/1/2006 | | 8,000 |
| Charles | Prpek | 7 | 4/24/2000 | Project Manager | 72,550 | 78,033 | 3,600 | 8,000 | 5,000 | | | | 4,183 | 5.70% | 1/1/2006 | | 6,000 |
| Thomas | Tonstad | 7 | 2/22/2000 | Project Manager | 81,200 | 78,000 | 6,000 | 5,000 | 5,000 | | | | (5,200) | -6.40% | 9/18/2006 | | 3,000 |
| Carlos Abreu | Mitchell | 7 | 3/31/2000 | Project Manager | 51,500 | 55,000 | 3,000 | 5,000 | 3,000 | | | | 7,500 | 14.56% | 1/1/2006 | | 3,000 |
| Robert L | Burns | 3 | 4/18/2004 | Superintendent | 87,616 | 90,900 | 3,000 | 2,500 | 2,000 | 2,580 | | | 7,684 | 14.83% | 1/1/2006 | | 3,000 |
| Mario | Lago | 13 | 12/27/1993 | Superintendent | 87,127 | 77,000 | 3,600 | 3,760 | 3,500 | | | | (10,127) | -11.62% | 9/18/2006 | | 5,000 |
| David W | Martin | 4 | 4/1/2004 | Superintendent | 58,203 | 61,580 | 4,000 | 3,000 | 1,500 | 178 | | | 3,249 | 5.70% | 7/1/2006 | 200 | 1,500 |
| Thomas Edward | Miller | 4 | 11/1/2004 | Superintendent | 56,000 | 59,616 | 3,600 | 2,500 | 2,000 | | | | 3,216 | 5.70% | 7/1/2006 | 200 | 3,000 |
| Theobaldo | Sanchez | 1 | 10/5/2005 | Superintendent | 43,000 | 52,000 | 3,600 | 3,600 | 3,500 | 504 | | | 9,000 | 20.93% | 7/1/2006 | 200 | 3,000 |
| David | Rafael | | 9/1/1998 | Superintendent | 55,000 | 58,135 | 3,600 | 4,000 | 3,500 | | | | 3,135 | 5.70% | 7/1/2006 | 200 | 3,000 |
| Yira | Armando | | 5/15/2000 | Superintendent | 55,000 | 56,135 | 3,600 | 3,000 | 2,050 | 660 | | | 3,135 | 5.70% | 7/1/2006 | 200 | 3,000 |
| David | Yundt | 17 | 7/11/1989 | Superintendent | 54,223 | 57,314 | 3,600 | 3,000 | 2,000 | | | | 3,091 | 5.70% | 7/1/2006 | 200 | 3,000 |
| Doris | Emmilo | 17 | 3/31/1989 | Superintendent | 54,691 | 36,869 | 2,100 | 2,000 | | 256 | | | 2,178 | 5.99% | 1/1/2006 | 200 | 3,000 |
| Annesel | Amsud | | 9/24/1995 | Construction Laborer | 34,691 | 36,869 | 2,100 | 2,100 | | | | | 2,178 | 5.99% | 1/1/2006 | 200 | 200 |
| Ivan | Ancene | | 3/19/1996 | Construction Laborer | 31,496 | 33,671 | 2,100 | 2,100 | | | | | 2,075 | 5.70% | 1/1/2006 | 200 | 200 |
| Miguel | Carrdelo | | 12/10/1996 | Construction Laborer | 29,168 | 30,830 | 2,100 | 2,100 | | | | | 1,663 | 5.70% | 1/1/2006 | 200 | 200 |
| Pedro | Celeon | | 11/25/1996 | Construction Laborer | 36,714 | 38,799 | 2,100 | 2,100 | | | | | 2,085 | 5.70% | 1/1/2006 | 200 | 200 |
| Abel | De Leon | | 6/20/1996 | Construction Laborer | 31,200 | 32,878 | 2,100 | 200 | | | | | 1,678 | 5.70% | 1/1/2006 | 200 | 200 |
| Yvnodisu | Loulpene | | 11/30/1995 | Construction Laborer | 28,250 | 29,860 | 2,100 | 200 | | | | | 1,610 | 5.70% | 1/1/2006 | 200 | 200 |

1

PLAINTIFF'S DEPOSITION EXHIBIT 3

2006 Division
Bonus and Salary Worksheet

| First Name | Last Name | Date of Hire | Years of Service | Job Title | 2005 Annual Salary | 2006 Annual Salary | 2006 Current Annual Auto Allowance | 2006 YTD Bonus (paid between Feb 1 and Oct 15) | 2006 monthly & quarterly Bonus (paid between Feb 1 and Oct 15) | 2006 YTD Overtime (paid between Feb 1, 2006 and Oct 15, 2006) | 2006 YTD Commission through Oct 16, 2006 | 2006 YTD incentives through Oct 15, 2006 | 2006 YTD Draw through Oct 15, 2006 | 2005-2006 Salary Increase ($) | 2005-2006 Salary Increase (%) | Date of Last Change | 2007 Proposed Bonuses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jose | Rivas | 5/19/1995 | 11 | Construction Laborer | 33,813 | 35,740 | 2,100 | 200 | 214,900 | 200 | 644 | 4,631 | | 1,927 | 5.70% | 1/1/2006 | 200 |
| | | | | **Dept Totals** | 1,782,110 | 1,835,346 | 103,500 | 162,300 | | | 4,631 | | | 73,233 | 5.21% | | 1,400 |
| | | | | | | | | | | | | | | | | | 199,500 |
| | | | | **Land Development** | | | | | | | | | | | | | |
| Michael C. | Diebel | 12/1/2003 | 3 | Director of Land Division | 80,000 | 85,180 | 6,000 | 30,000 | 20,000 | | | | | 5,180 | 5.70% | 1/1/2006 | 26,000 |
| Dylan R. | Lee | 3/7/2005 | 1 | Land Development Assistant | 50,000 | 52,500 | 6,000 | 3,000 | 10,000 | | | | | 2,500 | 5.00% | 4/1/2006 | 5,000 |
| Rudy | Archuleta | 1/4/1999 | 7 | Land Development Mgr | 75,000 | 80,600 | 6,000 | 5,000 | 10,000 | | | | | 5,600 | 7.47% | 4/1/2006 | 5,000 |
| Mike | Julio | 6/5/1995 | 7 | Land Development Mgr | 97,120 | 102,855 | 6,000 | 30,000 | 20,000 | | | | | 5,698 | 5.70% | 4/1/2006 | 30,000 |
| David | Webber | 5/17/1998 | 8 | SVP Development | 164,477 | 173,832 | 12,200 | 450,000 | 60,000 | | | | | 9,275 | 5.70% | 1/1/2006 | 70,000 |
| | | | | **Dept Totals** | 476,597 | 504,728 | 36,000 | 518,000 | | | | | | 28,141 | 5.31% (average) | | 70,000 |
| | | | | **Sales** | | | | | | | | | | | | | |
| Debra | Bantler | 9/29/1995 | 21 | Sales Associate | 31,200 | 31,200 | | 500 | 1,667 | | 15,565 | | | | 0.00% | 10/1/2004 | 1,000 |
| Adele | Baron | 3/15/2000 | 6 | Sales Associate | 31,200 | 31,200 | | 500 | 2,767 | | 31,620 | | | | 0.00% | 10/1/2004 | 1,000 |
| | Bashluk | 11/20/1995 | 10 | Sales Associate Mgr | 31,200 | 31,200 | | 500 | 9,858 | | 42,403 | | | | 0.00% | 12/13/2005 | 1,000 |
| Dawn | Cleopatra | 3/17/1994 | 22 | Sales Associate | 31,200 | 31,200 | | 500 | 60,000 | | 104,888 | | | | 0.00% | 10/1/2004 | |
| Diane | English | 6/3/1993 | 9 | Sales Associate | 31,200 | 31,200 | | 500 | 71,382 | | 15,565 | | | | 0.00% | 6/4/2005 | 3,000 |
| Jack | English | 6/16/1997 | 9 | Sales Associate | 31,200 | 31,200 | | 1,000 | | | 28,860 | | | | 0.00% | 5/18/2005 | |
| | Gollen | 2/1/1998 | 8 | Sales Associate | 31,200 | 31,200 | | 500 | | | 31,520 | | | | 0.00% | 10/1/2004 | |
| Susana | Hanton | 3/25/2003 | 3 | Sales Associate | 31,200 | 31,200 | 3,800 | 900 | | | 168,611 | | | | 0.00% | 10/1/2004 | |
| Georgia | Hawes Jr | 1/16/1997 | 9 | Sales Associate | 31,200 | 31,200 | | 900 | | | 91,670 | | | | 0.00% | 10/1/2004 | |
| Max R. | Devlin | 7/11/2006 | 0 | Sales Associate | | | n/a | | | | | | 48,000 | n/a | | 7/11/2006 | |
| Bozena | Lucyvaldi | 1/16/1997 | 9 | Sales Associate | 31,200 | 31,200 | 4,800 | 500 | | | 131,651 | | | | 0.00% | 7/11/2006 | |
| | Proctor Jr. | 3/29/1999 | 7 | Sales Associate | 31,200 | 31,200 | | 500 | | | 31,520 | | | | 0.00% | 10/1/2004 | |
| Olga | Greenfield | 8/29/1997 | 9 | Sales Consultant | 31,200 | 31,200 | | 500 | | | 91,606 | | | | 0.00% | 7/5/2005 | |
| Hills | | 6/29/1999 | 7 | Sales Consultant | 31,200 | 31,200 | | 600 | | | 41,971 | | | | 0.00% | 10/1/2004 | |
| Lorraine | Sanchez | 1/5/1985 | 21 | Sales Associate | 31,200 | 31,200 | | 600 | | | 91,863 | | | | 0.00% | 10/1/2004 | |
| Scarlett | Sasane | 5/4/2004 | 2 | Sales Representative | 31,200 | 31,200 | | 500 | | | 102,573 | | | | 0.00% | 5/4/2004 | |
| | | | | **Dept Totals** | 455,000 | 515,000 | | 8,500 | | | 1,020,469 | | | | 0.00% (average) | | |
| | | | | **Office Sales** | | | | | | | | | | | | | |
| Yolanda | Almirall | 8/24/1991 | 16 | Housekeeper | 26,567 | 27,870 | | 250 | 250 | 4,880 | | | | 1,303 | 5.70% | 1/1/2005 | 250 |
| Lilida | Medrano | 5/14/1997 | 9 | Housekeeper | 23,262 | 24,566 | 3,000 | 250 | 250 | 780 | | | | 1,526 | 5.70% | 1/1/2006 | 250 |
| | | | | **Dept Totals** | 49,829 | 52,436 | 3,000 | 500 | | | 5,443 | | | 2,829 | 5.70% (average) | | 500 |
| | | | | **Customer Care** | | | | | | | | | | | | | |
| Annay | Rodriguez | 4/5/2006 | 0 | Customer Care Coordinator | 28,629 | 28,629 | n/a | n/a | 1,150 | | | | | 28,629 | n/a | 9/18/2006 | 600 |
| Maria Laura | Simon | 9/7/2004 | 2 | Customer Care Coordinator | 20,800 | 24,960 | | | 1,150 | 225 | | | | 4,160 | 20.00% | 9/27/2006 | 750 |
| Cori | Chirino | 1/17/2005 | 1 | Customer Care Coordinator | 62,272 | 65,650 | | | 1,500 | | | | | 3,378 | 5.70% | 1/1/2006 | 5,000 |
| Ronald | Marrero | 9/27/1993 | 13 | New Home Admin Supervisor | 74,741 | 81,103 | 8,400 | | 3,500 | 7,000 | | | | 6,362 | 5.70% | 1/1/2006 | 1,000 |
| Todd A. | Dickison | 3/15/2005 | 1 | New Home Warranty Rep | 38,570 | 40,685 | 4,900 | | 2,000 | 3,500 | | | | 2,193 | 5.70% | 1/1/2006 | 4,000 |
| Yuliain | Gonzalez | 5/16/2005 | 1 | New Home Warranty Rep | 34,500 | 35,250 | 4,900 | | 750 | 2,500 | | | | | 5.70% | 1/1/2006 | 1,500 |
| Erik | Greenfield | 2/20/1995 | 11 | New Home Warranty Rep | 48,072 | 39,264 | 4,900 | | 3,600 | 23 | | | | (8,820) | -24.89% | 9/1/2006 | 1,500 |
| Angelo | Newton | 6/16/2003 | 3 | New Home Warranty Rep | 50,000 | 39,640 | 6,400 | | 4,000 | 504 | | | | (10,360) | -20.72% | 9/1/2006 | 1,100 |

2

## 2006 Division
## Bonus and Salary Worksheet

| First Name | Last Name | Date of Title | Years of Service | Job Title | 2005 Annual Salary | 2006 Annual Salary | 2006 Current Annual Auto Allowance | Bonus Paid between Dec 2 and June 1 Salary | 2006 monthly & quarterly Bonus (paid between Feb 1 and Oct 15) | 2006 YTD Bonuses through Oct 15, 2005 | 2006 YTD Commission through Oct 15, 2005 | 2006 YTD Bonus/Commission through Oct 15, 2006 | 2006 YTD Draw through Oct 15, 2006 | 2005-2006 Salary Increase (Monthly) | 2005-2006 Salary Increase (%) | Date of Last Change | 2007 Proposed Bonuses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rowell Charlie | Rambles | 7/1/2004 | 2 | New Home Warranty Rep | 34,320 | 40,000 | 4,800 | 2,000 | 4,500 | | | | | 5,680 | 16.55% | 1/1/2006 | 2,000 |
| Owens | Scallan-Bor | 8/24/1999 | 8 | New Home Warranty Rep | 74,545 | 66,000 | 6,400 | 2,000 | 4,000 | | | | | (8,545) | -11.40% | 8/16/2006 | 1,500 |
| Cris | Bell | 11/19/1997 | 18 | Sr Customer Care Coordinator | 38,516 | 40,711 | | 2,665 | | 250 | | | | 2,195 | 5.70% | 2/1/2006 | 1,000 / 1,000 |
| | | | | Dept Totals | 455,694 | 476,959 | 44,400 | 23,501 | 30,800 | 1,213 | | | | 11,168 | -2.10% | | 3,230 |
| **Design Center** | | | | | | | | | | | | | | | | | |
| Sonja R. | Lewis | 3/24/2003 | 3 | Design Consultant | 46,550 | 32,698 | 3,600 | 500 | | | 21,218 | | | (7,863) | -16.38% | 8/16/2006 | 500 |
| Addis | Perez | 4/15/2000 | 8 | Design Consultant | 38,000 | 23,780 | 2,400 | 500 | | 183 | 7,334 | | | (8,210) | -20.70% | 9/16/2006 | 500 |
| Kristen | Lasser | 7/7/1995 | 11 | Design Studio Manager | 48,000 | 49,646 | 5,000 | 1,090 | 2,704 | | 9,132 | | | 1,446 | 3.00% | 7/1/2006 | 500 |
| | | | | Dept Totals | 119,760 | 106,134 | | 1,090 | 2,704 | 183 | 37,682 | | | (12,627) | -13.39% | (average) | 1,500 |
| | | | | Division Totals | 4,814,434 | 4,840,769 | 215,700 | 1,130,069 | 311,238 | 12,450 | 1,655,548 | 0 | 0 | 228,276 | (average) | | 323,160 / 385,750 |

There are no salary increases for 2007

2007 Proposed Bonuses (2)3/15/2007 4:10 PM

WESTBROOKE HOMES
Len Chernys
Bonus Calculation
For the Year Ended December 31, 2005

| | | |
|---|---|---|
| Pre-tax Income | | $45,043,041.00 |
| Add: Other Adjustment per general ledger | | 2,483,902.18 |
| Add: Family Lending Allocation | | 222,918.00 |
| Pretax before Profit Sharing Adjustment | | 47,749,861.18 |
| Bonus rate | x | 5.50% |
| | | 2,626,242.36 |
| | / | 1.055 |
| | | $2,489,329.26 |
| Percentage of Bonus Pool | | 45.45% |
| **Total Bonus** | | **$1,131,513.30** |

Approved By: _Len Chernys_      Date: _____

| | Profit Sharing Percentage | | % of Total |
|---|---|---|---|
| | | As a % of Pretax | Pool |
| Ibarria | | 3.00% | 54.55% |
| Chernys | | 2.50% | 45.45% |
| | | 5.50% | 100.00% |


PLAINTIFF'S DEPOSITION
EXHIBIT
4
3-14-07  mc



# STANDARD PACIFIC HOMES

DIANA IBARRIA
PRESIDENT

June 8, 2006

TO WHOM IT MAY CONCERN

I have known Leonard and Griselle Chernys for over 20 years both professionally and personally. Both have always shown the highest integrity and honesty in their personal and business relationships.

The Chernys have been involved with charitable fund raising and community affairs donating both time and money to help others.

I feel confident that their presence in Great Exuma will be good for both the Chernys' and the Community.

If you need further information, please do not hesitate to contact me.

Sincerely,

Diana Ibarria

DI/erb



South Florida Division
9350 Sunset Drive, Suite 100 • Miami, FL 33173
TEL (305) 595 3281 • FAX (305) 595 2676



IN THE CIRCUIT COURT
IN AND FOR THE ELEVENTH
JUDICIAL CIRCUIT OF
MIAMI-DADE COUNTY,
FLORIDA

06 - 25162 CA 2 旺

LEONARD CHERNYS )
)
Plaintiff, )
) CIVIL DIVISION
vs. )
)
STANDARD PACIFIC OF SOUTH ) CASE NO.:
FLORIDA, G.P. INC., and )
STANDARD PACIFIC CORP. )
)
Defendants. )
_____)

> ORIGINAL
> FILED
> NOV 22 2006
> HARVEY RUVIN
> CLERK

## COMPLAINT

**The Plaintiff,** Leonard Chernys, by and through his undersigned counsel sues the

Defendants, Standard Pacific of South Florida, G.P. Inc. and Standard Pacific Corp. and

alleges as follows:

1. This is an action for damages and other relief. The damages sought herein

   exceed the sum of fifteen thousand dollars exclusive of costs, interest and

   attorney's fees.

2. The Plaintiff, Leonard Chernys ("Chernys") is a resident of Miami-Dade

   County, Florida and is over the age of eighteen.

3. The Defendant, Standard Pacific of South Florida, G.P. Inc. ("Standard

   Pacific") is a Florida corporation engaging in the construction of residential

   homes, town homes and apartments in the Tri-County areas of Palm Beach,

   Broward, and its principal place of business, Miami-Dade County, Florida.

4.  The Defendant, Standard Pacific Corp. is a corporation organized under the laws of the State of California and does business in Miami-Dade County, Florida and is the parent corporation of Standard Pacific of South Florida, G.P., Inc.

5.  Chernys began his career with the predecessor to Standard Pacific, Inc., Westbrooke Communities, Inc. ("Westbrooke") over 27 years ago.

6.  As a young man he held many positions with "Westbrooke" and its successor, was responsible for the development of many residential communities in South Florida.  In fact, Chernys held the General Contractor's license used by the Company to build these projects.

7.  He was recognized by his employer and peers as being a team player, an astute businessman and a person of great trust.  In fact, at Westbrooke Communities, he was one of the executives running the Company.

8.  During his years with the Company, he was constantly called upon to take a leadership role in the Company and repeatedly performed to his fullest potential, and as such the Company prospered.

9.  In April 15, 2002 Westbrooke was acquired by Standard Pacific Corporation, one of the nation's largest homebuilders, and Chernys joined Standard Pacific.

10. At first he continued to serve as its Senior V.P. for Operations, which encompassed both purchasing and construction, then Senior Vice President of Product Development, in which he continued to give counsel and aid to both departments.  As part of his duties, he was required to hire and train

subordinates who were less experienced and younger than he and whom ultimately would replace him.

11. He was part of the key management team which led the Company to great financial success. He, like other top executives, participated in a profit sharing program and received sizable distributions.

12. In August of 2004, discussions took place between Standard Pacific and its consultant, Jim Carr ("Carr"), the former owner of Westbrooke regarding Chernys' age, as he was approaching sixty years old and Standard was discussing his retirement.

13. Carr dealt exclusively with Standard Pacific Corporation's Chairman Michael Cortney regarding the negotiation about Chernys' retirement and discussed and agreed that his retirement should be done in a way to allow Chernys a "soft landing".

14. It was agreed that both Standard Pacific and Standard Pacific Corporation would allow Chernys to participate in the Company's profit sharing plan through the end of December, 2006 and that Chernys' retirement would thus give him a "soft landing".

15. Carr relayed this "soft landing" proposal to Chernys. He understood, though agreed reluctantly, that he would leave the Company at the end of 2006.

16. This conversation took place in July of 2004; Chernys continued to labor and as the Sr. Vice President for Product Development, and assistant to the President Diana Ibarria ("Ibarria") to reach the goals they had set.

17. He participated in the Company's profit sharing, feeling robust; being in good health, he chose not to dwell on the "planned soft landing" but continued to work. He expressed this to Ibarria and she accepted this decision gratefully.

18. In 2006 he served as the Company Sr. Vice President of Product Development and was responsible for the Company's move to new headquarters. This process was handled in an expeditious fashion due to the termination of the company's lease.

19. Chernys was in a state of denial concerning his forced retirement, and labored hard and long for the Company and its projects. He frequently spoke to Ibarria, provided her guidance and advice and remained active within the company. She valued his service and continually assured him that would be the case.

20. 2005 was a wonderful year for Standard Pacific Corporation; they had great sales and made a substantial profit. Chernys, as part of the management team, participated in the Company's substantial profit sharing plan. He received – as previously agreed to by Cortney and Carr - for these efforts a distribution in excess of 1 million dollars.

21. In early 2006, prior to the receipt of the 2005 profit sharing distribution, he met with Ibarria and she advised him that he would not participate in the 2006 profit sharing plan as previously agreed upon, but that he could continue to work past 2006 for several more years.

22. In reliance on these statements, he agreed to work in 2006 for a substantially reduced salary and not contest the breach of the agreement as to the profit

4

sharing plan, believing that he would be employed with the company for several years to come; and negotiated a $200,000 salary with a $50,000 bonus.

23. This decision would allow him to continue to work in a job he loved, with people who respected his leadership and talent and would serve as Senior Vice-President of Product Development and would assist the Company's President.

24. As the year progressed, the parent Company, Standard Pacific Corporation decided that Chernys was now expendable. He was sixty years old, was being paid a substantial salary and since an economic decline in the housing market was on the horizon, instead of using his skills to develop new products for the market, they chose to terminate him.

25. In October of 2006, Chernys was advised by the Defendants to resign. He was provided the opportunity to stay on as a consultant for a year at a severely reduced rate of pay and was denied the right to participate in this year's profit sharing despite his previous understandings with the Defendants. A copy of the consultant's Agreement is attached as Exhibit A.

26. In addition to the consultancy Agreement, the Defendants requested Chernys consult counsel and agree to sign a release waiving all claims he had against the Defendants, waive his rights and remedies under the Age Discrimination in Employment Act, Older Worker's Benefit Act and for other relief including the signing of a covenant not to compete, which clearly restricted his ability to make a living and had not been a prior criteria for employment.

27. He was never provided a severance package, never had an exit interview, though it was represented to him by email that the package would be forthcoming and would be in excess of $100,000.00

28. Chernys refused to sign the Agreement, requested the payment of his profit sharing and salary and/or continued employment and was terminated.

29. Chernys was now treated as a persona non-grata and his request that the company provide him an acceptable indemnity agreement for using his license was withheld.

## COUNT I – DECLARATORY RELIEF

30. The Plaintiff, Chernys, realleges and reavers the allegations of paragraphs 1 through 31 as is set forth herein.

31. This is an action for Declaratory relief pursuant to sections 86.011 and 86.061 of the Florida Statutes and damages in excess of $15,000.00

32. The Plaintiff Chernys and the Defendant Pacific agreed in 2004, that Chernys would participate in the executive profit sharing program for the year 2004, 2005 and 2006. The Contract was oral in nature but fully performed in 2004 and 2005.

33. In the beginning of 2006, the Plaintiff and Defendants had certain contractual decisions in which it was agreed that the Plaintiff would waive his right to the profit sharing plan for continued long term employment with the company.

34. Despite these representations, the Defendants breached the Agreement with Chernys and terminated him.

35. Thereafter Chernys demanded that the Defendants honor the terms of their agreement and either restore his right to the profit sharing program for 2006, pay the balance of his 2006 salary, or continue his employment.

36. The Defendants refused and contends that it is not obligated to pay him this year's profit sharing moneys or the remainder of his salary and bonus.

37. The Plaintiff contends that Defendants are obligated to either pay him for his profit sharing interest or continue his employment and a dispute has occurred.

38. There is an actual, practical, and present need for declaratory and supplemental relief as Plaintiff is in doubt of its rights under the Agreement and there is a bona fide, actual, justicable controversy existing between the parties and a practical and present need for a declaratory judgment and supplementary relief exists.

39. A declaration is the most effective remedy to resolve the controversy.

WHEREFORE, Plaintiff Chernys requests the Court to:

A.      Enter a declaratory judgment, adjudging and declaring his right to participate in the 2006 profit sharing plan of the Defendants,

B.      Grant such supplemental relief as may be proper including the awarding of costs, interest and attorney's fees.

C.      Require the Defendants to execute an acceptable Indemnification Agreement.

D.      Award lost wages, salary and benefits.


## COUNT II – FRAUDULENT MISREPRESENTATION

40. The Plaintiff, Chernys realleges and reavers the allegations of paragraphs 1 through 31 above as is stated herein.

41. The Defendants represented to the Plaintiff that if he agreed to waive his right to participate in the 2006 profit sharing program he would remain as a Senior Vice President of the Company and not forced to retire or resign and that his employment would continue.

42. That these statements were made with the purpose of including the Plaintiff to waive his right to the moneys and the Defendants were aware that the Plaintiff would rely on it to his detriment.

43. The Defendants knew that the representations were false and known by them to be false at the time they made them.

44. Defendants terminated the Plaintiff's employment and advised him that he could not participate in the 2006 profit sharing program.

45. As a result of these misrepresentations, the Plaintiff suffered damages.

WHEREFORE, Chernys demands judgment against the Defendants for damages, interest, attorney's fees, costs, interest on and judgment obtained, and other relief as the Court may deem proper.

## COUNT III -- BREACH OF CONTRACT

46. The Plaintiff reavers and realleges the allegations in paragraphs 1 through 31 as is set forth herein.

8

47. Following the Defendants' representation that he would participate in the profit sharing plan for 2004, 2005 and 2006, Chernys continued his employment with the Defendants and continued to discharge his duties.

48. Chernys, honestly, faithfully, conscientiously and in good faith discharged his duties to the Defendants and performed in accordance with his Agreement.

49. The Defendants in 2004 and 2005 complied with the Agreement and he was paid his profit share interest and salary.

50. The Defendants have breached the Agreement by terminating Chernys, and his interest in the 2006 profit sharing program.

51. By reason of the breach, Chernys has suffered damages.

52. All conditions precedent to bring this lawsuit have been complied with.

WHEREFORE, Chernys demands judgment against the Defendants for damages, interest, attorney's fees, costs, interest on and judgment obtained, and other relief as the Court may deem proper.

## COUNT IV – WRONGFUL TERMINATION

53. The Plaintiff Chernys realleges and reavers the allegations of paragraphs 1 through 31 as set forth herein.

54. Following the Agreement reached with the Defendants in February of 2006, the Plaintiff continued to work and discharging his duties.

55. Chernys, honestly, faithfully, conscientiously and in good faith discharged his duties to the Defendants.

56. Chernys' termination of employment was, without cause and in violation of the Agreement he reached with the Defendants.

57. Chernys at all times remained ready, willing and able to continue to perform his duties under the Agreement.

58. By reason of the Defendants' wrongful termination of the Contract, the Plaintiff has been damaged.

WHEREFORE, Chernys demands judgment from the Defendants for damages, interest, attorney's fees, costs and other relief as the Court may deem proper.


## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all causes of action and issues triable as such.


Respectfully submitted,

Gary M. Carman
1111 Brickell Avenue,
Suite 2050
Miami, Florida 33131
Phone: 305-379-8300
Fax: 305-379-4404
Florida Bar No. 179409


By: _____

EXHIBIT A

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**") is made effective as of October 5, 2006 (the "**Effective Date**"), by and between Standard Pacific of South Florida, a Florida general partnership (the "**Company**") and Leonard Chernys (the "**Consultant**").

WHEREAS, Consultant served as the Senior Vice President-Operations of the Company;

WHEREAS, concurrently herewith, Consultant is resigning from his position as Senior Vice President-Operations of the Company and his employment with the Company and its affiliates is terminating;

WHEREAS, the Company desires to continue to take advantage of Consultant's skills through the engagement of Consultant for a transition period; and

WHEREAS, Consultant desires to accept such engagement, all as more particularly described below.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Consultant agree as follows:

1. <u>Services.</u>

(a)   During his term of engagement with the Company, Consultant shall assist the Company and its affiliates (as requested by the Company, up to a full-time basis) with such matters related to the operation of the Company's business in South Florida as the Company may request (collectively, the "**Services**"). Without limiting the generality of the foregoing, Company may, in its discretion, request that Consultant provide the following Services: (i) make recommendations with regard to on-site safety, (ii) provide the Company with input on the design of new product, (iii) provide analysis of standard and upgraded features in the South Florida area, (iv) provide input and assist in architectural details, site development, and common area features, and (v) assist in value engineering existing product.   It is anticipated that Consultant will primarily perform the Services from the office that he will maintain in his home, but will, from time to time, be required to travel to the offices of the Company in the South Florida Area.  Consultant does not expect and the Company is not obligated to supply office space, secretarial assistance, or other assistance or support services to Consultant in connection with his performance of such Services.

(b)   In performing the Services, Consultant shall use his best efforts to promote the interests of the Company and its affiliates and to perform the Services in a professional manner and in accordance with applicable laws.  The methods, details and means of performing the Services shall be within the discretion of the Consultant so long as they are consistent with recognized business and professional practices.  Consultant acknowledges he is not authorized, and agrees he shall not, make any representations or warranties to, or enter into any contract or agreement with, any third parties on behalf of the Company, unless the Company expressly pre-authorizes such conduct specifically and in writing.  In addition, Consultant shall not use the Company's name, trademark or logo in any publication, advertisement, display or article without

the prior written approval of the Company (which may be withheld in the Company's sole and absolute discretion).

(c)     Consultant represents to the Company that Consultant has no outstanding commitments inconsistent with any of the terms of this Agreement or the duties or responsibilities to be rendered by her hereunder.

(d)     Consultant may not represent, perform services for, or be employed by any other persons or companies during the term of this Agreement and will not engage in any conduct which is injurious to the Company or its affiliates, monetarily or otherwise. Without limiting the foregoing, during the term of this Agreement, Consultant will not, directly or indirectly: (i) compete with the Company, either for himself or as a member of a partnership or as a stockholder, investor, owner, officer or director of a company or other entity, or as an employee, agent, associate or consultant of any person, partnership, corporation or other entity, in any business in competition with the Company, including, without limitation, any aspect of the Company's business in the South Florida area, (ii) solicit or induce or attempt to induce (A) any employee of the Company to leave his or her employment; (B) customers of the Company to become customers of any other entity or person engaged in a business similar to or in competition with the Company; or (C) suppliers, contractors or agents of the Company to become suppliers or contractors of any other entity or person engaged in a business similar to or in competition with the Company.

2.     Term and Termination. The term of this Agreement shall commence on the Effective Date and end on the first anniversary of the Effective Date (the "Term"), provided, that, this Agreement may be terminated by either party for any reason or no reason upon thirty (30) days written notice. In addition, this Agreement may be terminated immediately by the Company if Consultant takes any action or fails to take any action that: (a) constitutes negligence or willful misconduct by Consultant, (b) constitutes a breach of this Agreement, or (c) is beyond the scope of Consultant's authority hereunder and not otherwise authorized in writing by the Company. This Agreement will automatically terminate upon Consultant's death or permanent disability. If this Agreement is terminated as contemplated by this Section 2, Consultant shall not be entitled to receive any compensation following the termination date and shall have no further rights hereunder, except that Consultant shall be entitled to receive such pro-rated Compensation (as defined below) and expense reimbursement as shall have accrued as of such date.

3.     Compensation and Benefits. For all services rendered by Consultant pursuant to this Agreement, the Company shall compensate Consultant as set forth below. Consultant has no right to any specific compensation or benefits other than as expressly set forth herein or required pursuant to applicable law.

(a)     Compensation. The Company shall pay to Consultant a monthly consulting fee equal to $8,000.00. The Compensation will be paid monthly in accordance with the Company's customary consultant payment schedule and policies, and will be prorated based upon the number of days Consultant is engaged by the Company pursuant to this Agreement for any partial month. Consultant shall keep complete, accurate and detailed descriptions of the actual time spent by Consultant on any matter, as requested by the Company.

(b)     Benefits.  Consultant is not entitled to any employment rights or benefits from the Company, including, without limitation, workers' compensation, disability insurance, retirement or 401(k) plan, stock options, medical reimbursement or other fringe benefit plan, overtime pay, unemployment compensation, vacation or sick pay.

(c)     Expenses.  In accordance with the general policies and practices of the Company in effect from time to time, Consultant shall be entitled to reimbursement by the Company for his ordinary and necessary out-of-pocket business expenses incurred in the performance of his duties under this Agreement if supported by adequate and reasonable documentation as required by the Company in accordance with its usual practices, but in no event will Consultant be reimbursed for his general overhead expenses.

4.     Liability for Taxes.  Consultant will be responsible for the payment of all federal, state, local or other taxes payable with respect to all amounts paid to the Consultant under this Agreement including without limitation, any unemployment insurance tax, federal, state and foreign income taxes, federal Social Security (FICA) payments, and disability insurance taxes; provided that, if the Company is determined to be liable for collection or remittance of any such taxes, Consultant will immediately reimburse the Company for all such payments made by the Company.  Consultant shall make all payments of all applicable taxes when the same may become due and payable with respect to compensation earned under this Agreement. Consultant shall indemnify, defend and hold harmless the Company, its officers, directors, agents, employees and the successors or heirs of any of them, from any and all losses, costs and expense arising out of any failure of the Consultant to make any payment of taxes required to be made by Consultant under this paragraph.

5.     Nondisclosure, Non-Disparagement and Indemnification.

(a)     Confidential Information.  Consultant hereby acknowledges that in connection with his former employment with the Company and during the term of his engagement with the Company hereunder he was and will be exposed to, and obtained or will obtain, Confidential Information of the Company and its affiliates.   Consultant further acknowledges that such Confidential Information is unique, valuable and deemed proprietary by the Company.  For purposes of this Agreement, "Confidential Information," shall mean all trade secrets, proprietary or confidential knowledge, data or other information of the Company, its affiliates, and any third parties having a business relationship with the Company or its affiliates, including, without limitation, all of the following information (whether or not reduced to writing, whether or not patentable or protected by copyright and whether or not such information has been or is made, developed or compiled by Consultant or otherwise has been or is made available to her and whether obtained or learned by Consultant during the Term or prior to the Term):  plans, drawings, designs, programs, research, business plans, budgets, strategic plans regarding the present and future business and operations, financial information, procedures, lists of customers, prospects and suppliers, source and object codes, employee lists, skills and compensation of employees.  The following shall not be considered Confidential Information: (i) information disclosed on a non-confidential basis to third parties by the Company (but not by Consultant or any other Person in violation of this Agreement or any similar agreement), (ii) information released from confidential treatment by written consent of the Company and

3

approved by the Company's Board of Directors, and (iii) information lawfully available to the general public.

(b)     Use of Confidential Information.  Except as otherwise required by law, while engaged by the Company and at all times thereafter, Consultant shall hold in the strictest confidence all Confidential Information, and shall not, directly or indirectly, duplicate, sell, lease, commercialize, disclose or otherwise divulge to any Person any portion of the Confidential Information or use any Confidential Information for his own benefit or profit or allow any Person, other than the Company, to use or otherwise gain access to any Confidential Information.

(c)     Non-Disparagement.  Consultant shall not publish, republish, comment upon, or otherwise disseminate: (i) any claims made by him against the Company; (ii) any other comments suggesting or otherwise accusing the Company or its agents or employees of any act of discrimination, misconduct, other negative behavior, or any breach of any agreements. Nothing in this provision shall be construed, however, to prevent Consultant from giving testimony pursuant to a subpoena appearing valid on its face.

(d)     Equitable Relief.  The covenants set forth in Sections 1(d), 5(a), (b) and (c) are a material part of the bargain between the parties and Consultant acknowledges that any breach of these provisions would cause irreparable harm to the Company.  It is the intention of the parties that these provisions be enforced to the fullest extent permissible under Florida law. Thus, if any provision of these sections shall be adjudicated to be invalid or unenforceable because its duration or scope is excessive, or the subject matter is excessively broad, such duration, scope or subject matter shall be reduced or modified to the extent necessary to permit the enforcement of such covenants to the broadest extent permissible under Florida law.  Upon any breach, or threatened breach, by Consultant of any one or more of these covenants, the Company shall be entitled to preliminary and permanent injunctive relief, with or without an allowance for damages, as well as an accounting of all such earnings, profits and other benefits arising from such breach, which remedies shall be cumulative and in addition to any other remedies to which the Company may be entitled at law or in equity.  The covenants set forth in Sections 1(d), 5(a), (b) and (c) are in addition to any rights the Company may have in law or at equity, and the expiration date set forth in the nondisclosure and nonsolicitation covenants shall not be deemed to be a waiver by the Company of any such rights in law or in equity.

(e)     Indemnification.  Consultant shall indemnify, defend, and hold harmless the Company and its affiliates, and the officers, directors, employees, agents, and shareholders of any of them, from and against any and all claims, losses, damages, liabilities, obligations, assessments, penalties and interest, demands, actions and expenses, whether direct or indirect, known or unknown, absolute or contingent (including, without limitation, settlement costs and any legal, accounting and other expenses for investigating or defending any actions or threatened actions) reasonably incurred by any such indemnitee, arising out of or in connection with, any breach of any covenant made by the Consultant with respect to this Agreement.

6.     Memoranda, Notes, Records, Etc.

(a)     All memoranda, notes, records, software, customer lists or other documents (including, without limitation, Confidential Information) made or compiled by

Consultant or otherwise made available to him (whether before or after the date hereof, including when Consultant was an employee of the Company) concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company upon the expiration or termination of Consultant's engagement with the Company or at any other time upon request by the Company, and Consultant shall retain no copies of those documents.

(b)     Consultant will promptly make full written disclosure to the Company of, will hold in trust for the sole right and benefit of the Company, and subject to any exceptions under applicable law, hereby assigns to the Company or its designee all of Consultant's right, title, and interest in and to, any and all inventions, original works of authorship, developments, concepts, ideas, discoveries, improvements and trade secrets, whether or not patentable or registrable under copyright or similar laws, that Consultant solely or jointly conceived or developed or reduced to practice during the time Consultant was an employee of the Company or that Consultant may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time Consultant is engaged by the Company pursuant to the terms hereof. To the extent permitted by applicable law, rule or regulation, all original works of authorship that are made by Consultant (solely or jointly with others) within the scope of Consultant's engagement by the Company and that are protectable by copyright are "works for hire," as that term is defined in the United States Copyright Act. Consultant shall never at any time have or claim any right, title or interest in any material or matter of any sort prepared for or used in connection with the business or promotion of the Company or its affiliates.

7.     Release.   In consideration of the Company entering into this Agreement, Consultant on behalf of himself and his agents, successors and assigns, is entering into the release letter attached hereto as Exhibit A (the "Release Agreement"). If, as permitted by law, Consultant revokes the Release Agreement, Consultant acknowledges that, notwithstanding anything contained to the contrary herein, this Agreement shall immediately terminate and Consultant shall not be entitled to any compensation hereunder, irrespective of whether such compensation is attributable to the time period before or after termination.

8.     Miscellaneous.

(a)     Relationship of Parties.  In rendering services pursuant to this Agreement, Consultant is acting as an independent contractor and not as an employee or agent of the Company. As an independent contractor, Consultant shall have no authority, express or implied, to commit or obligate the Company in any manner whatsoever, except as specifically authorized from time to time in writing by an authorized representative of the Company, which authorization may be general or specific. Nothing contained in this Agreement shall be construed or applied to create a partnership or joint venture, or an employer/employee or master/servant relationship.

(b)     Non-Delegation of Duties.  This Agreement is a personal services contract and Consultant may not delegate the performance of any of his obligations or duties hereunder, or assign any rights hereunder, without the prior written consent of the Company. Any such purported delegation or assignment in the absence of such written consent shall be null and void with no force or effect. Notwithstanding the foregoing, nothing herein shall prevent Consultant

from delegating ministerial tasks to assistants of the type that are normally assigned by executives to assistants.

(c)   Binding Effect.   The Company may assign its rights, duties and obligations to a direct or indirect wholly owned subsidiary of Standard Pacific Corp. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns and any receiver, trustee in bankruptcy or representative of the creditors of each such Person.

(d)   Survival of Covenants.   Notwithstanding anything contained in this Agreement, if Consultant's engagement with the Company is terminated pursuant to Section 4 hereof, the covenants and agreements of Consultant contained in Sections 1(c), 3(e), 4, 5, 6, 7 and 8, and the covenants of the Company contained in Section 8 shall survive any such termination and shall not lapse.

(e)   Rules of Construction.

(i)   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its conflicts-of-laws provisions.   Captions contained in this Agreement are for convenience of reference only and shall not be considered or referred to in resolving questions of interpretation with respect to this Agreement.

(ii)   If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (A) such provision will be fully severable, (B) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (C) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (D) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

(iii)   Unless the context clearly requires otherwise, "or" is not exclusive, and "includes" means "includes, but is not limited to."

(iv)   The parties have participated jointly in the negotiation and drafting of this Agreement.   If an ambiguity or question of intent or interpretation arises under this Agreement, this Agreement shall be construed as drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring one party by virtue of the authorship of any of the provisions of this Agreement.

(f)   Entire Agreement; Amendment; Waiver.   This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter contained herein and supersedes all prior and contemporaneous agreements and understandings, oral or written, express or implied, between the parties with

respect to such subject matter and any express or implied employment or other agreements between Consultant and the Company or any affiliate or predecessor of the Company (and Consultant shall not be entitled to any further payments or other consideration under such agreements, including salary and bonus, if any). Neither this Agreement nor any provision hereof may be waived, modified, amended, changed, discharged or terminated, except by an agreement in writing signed by the party against whom enforcement of any such waiver, modification, change, amendment, discharge or termination is sought. No right or power of any party shall be deemed to have been waived unless such party expressly waives such right or power in writing. No waiver by any party given hereunder shall operate or be construed as a waiver by such party with respect to any other or continuing or subsequent breach.

(g)   Notices.   All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed given upon personal delivery or three business days after being mailed by certified or registered mail, postage prepaid, return receipt requested, or one business day after being sent via a nationally recognized overnight courier service if overnight courier service is requested from such service or upon receipt of electronic or other confirmation of transmission if sent via facsimile, to the parties, their successors in interest or their assignees at the following addresses and facsimile numbers, or at such other addresses or facsimile numbers as the parties may designate by written notice in accordance with this Section 8(g):

> If to Consultant:   Leonard Chernys
> REDACTED
> Coral Gables, FL 33133
>
> If to the Company:   Standard Pacific of South Florida
> c/o Standard Pacific Corp.
> 15326 Alton Parkway
> Irvine, California 92618-2338
> Attention: Clay A. Halvorsen

(h)   Attorneys' Fees and Costs.   If any party to this Agreement brings any action, arbitration or other proceeding, at law or in equity, to enforce this Agreement or on account of any breach of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party the reasonable attorneys' fees and costs of the prevailing party incurred in such action.

(i)   Arbitration.   Any dispute regarding the application, interpretation or breach of this Agreement, or with respect to any aspect of Consultant's engagement with the Company hereunder, shall be resolved by final and binding arbitration before a single arbitrator who is a retired judge with the American Arbitration Association (the "AAA"). This subsection (i) does not apply to any claims which are expressly prohibited by law from being subject to arbitration under this Agreement. Any resolution, opinion or order of the AAA may

be entered as a judgment in a court of competent jurisdiction. This Agreement is admissible in any proceeding to enforce its terms.

(j)    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

(k)    Legal Representation. Consultant acknowledges that he has been given the opportunity to consult with and has consulted with counsel of his own choosing in connection with the negotiation and execution of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

CONSULTANT:

_____
     Leonard Chernys

COMPANY:
STANDARD PACIFIC OF
SOUTH FLORIDA,
a Florida general partnership

By:  Standard Pacific of South Florida, Inc.
Its:  Managing Partner

By:_____
Name:_____
Title:_____

8

## Exhibit A

## Release Agreement

Leonard Chernys
REDACTED
Coral Gables, Florida 33133



Dear Leonard:

This letter sets forth the agreement (the "Agreement") that Standard Pacific of South Florida, a Florida general partnership, and its affiliates (collectively, the "Company") and you have reached concerning the release required by the Consulting Agreement you and the Company are entering into concurrent herewith (the "Consulting Agreement"). This Agreement and the benefits and payments described in it are conditioned upon your complying with the terms and conditions set forth in this Agreement, including your execution and delivery to the Company of this Agreement and the release contained herein. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Consulting Agreement.

1.  Employment Status. You acknowledge that you resigned your employment with the Company effective as of the close of business on September 29, 2005, and that of such date you are no longer an employee of the Company.

2.  Payments. In exchange for entering into the release contained herein, the Company has agreed to enter into the Consulting Agreement with you.

3.  Confidentiality. Except as required by law, you and the Company agree to keep the terms of this Agreement strictly confidential and agree not to disclose its terms to anyone other than your respective legal or financial advisors; provided, further, to the extent to which information contained in this Agreement is disclosed to any of them, you or the Company (as applicable) will likewise obtain from the person to whom such information is disclosed the promise not to disclose this information unless required to do so by law.

4.  No Claims. You represent and warrant that you have not instituted any complaints, charges, lawsuits or other proceedings against the Company (including any of its subsidiaries, affiliates or current or former employees, directors or officers) with any governmental agency, court, arbitration agency or tribunal, and that you will not file any complaint, charge, lawsuit or other proceeding against the Company or any subsidiary, affiliate or current or former employee, director or officer at any time hereafter for any act or event occurring prior to the date of this Agreement, other than claims that are not released by you under Section 6 of this Agreement. Should any agency or court assume jurisdiction of any complaint, charge, or lawsuit against the Company, its subsidiaries or current or former employees, directors or officers on your behalf, you agree to request that such agency or court dismiss the matter with prejudice.

5.  Release. To the extent not prohibited by applicable law, you hereby forever release and discharge the Company and any and all present and former direct or indirect parents (including, but not limited to, Standard Pacific Corp.), subsidiaries, divisions, affiliated companies and successors in interest, and the shareholders, directors, officers, heirs, predecessors in interest, assigns, agents, employees, attorneys and representatives of each of them, from any and all causes of action, actions, judgments, liens, indebtedness,

predecessors in interest, assigns, agents, employees, attorneys and representatives of each of them, from any and all causes of action, actions, judgments, liens, indebtedness, damages, losses, claims, complaints (including, but not limited to, those arising under the Age Discrimination in Employment Act of 1967), liabilities, and demands arising on or before the date of this Agreement, including but not limited to (1) those arising from or attributable in any way to your employment or other relationships with the Company and/or the termination thereof, (2) any claim for salary, bonus, severance pay, or other compensation, or (3) any claim for non-vested benefits under any employee benefit plan, whether or not heretofore brought before any state or federal court or before any state or federal agency or other governmental entity. You further agree that this release applies to any claims for damages incurred at any time after the date of this Agreement because of alleged acts or omissions (which occurred on or before the date of this Agreement) of the Company or any and all present and former subsidiaries, divisions and affiliated companies and successors in interest, and the shareholders, officers, directors, heirs, predecessors in interest, assigns, agents, employees, attorneys and representatives of each of them. However, you do not release the Company (or any and all present and former subsidiaries, divisions and affiliated companies and successors in interest, and the shareholders, officers, directors, heirs, predecessors in interest, assigns, agents, employees, attorneys and representatives of each of them) from any of its obligations pursuant to, and this Agreement shall not affect any rights that you may have which arise under the terms of this Agreement, or with respect to vested benefits under any stock option agreement or 401(k) plan with Company or any of its affiliates. This release shall also not apply to claims which arise from events that occur after your execution of this Agreement.

      6.    <u>Release Language Required for OWBPA/ADEA.</u>  The release described in Section 5 includes any and all claims, rights or remedies arising under the Age Discrimination in Employment Act (ADEA) and the Older Workers Benefit Protection Act (OWBPA) other than claims concerning the Company's compliance with the OWBPA. In compliance with the ADEA and OWBPA:

      (1) you shall be permitted to take up to 21 days to consider the provisions of this Agreement prior to signing it (and you acknowledge the Company has given you 21 days to consider it);

      (2) you understand that you are entitled to revoke this Agreement within seven days after its execution, that this Agreement is not effective or enforceable until the revocation period has expired, and that if you choose to revoke this Agreement the Consulting Agreement will be immediately terminated and, notwithstanding any provision contained therein to the contrary, you shall have no right to receive any payment thereunder. Any such revocation shall be in writing and shall be sent by facsimile and registered mail to the Company, c/o Standard Pacific Corp., Attn:  Clay A. Halvorsen, General Counsel, 15326 Alton Parkway, Irvine, CA 92618-2338, facsimile number (949) 789-1608. This Agreement will not be effective or enforceable until the revocation period has expired;

      (3) you acknowledge and agree that you have been advised in writing to consult with an attorney prior to signing this Agreement; and

(4) This release is not intended to preclude you from filing a charge or complaint challenging the validity of this release of ADEA claims with the Equal Employment Opportunity Commission.

7.   **Advice of Counsel.**  You represent and agree that this Agreement serves as our written notice to you to advise you to discuss this Agreement with your private attorney, you fully understand your right to discuss, and that the Company has advised you to discuss, all aspects of this Agreement with your private attorney, that you have carefully read and fully understand all the provisions of the Agreement, that you understand its final and binding effect, that you are competent to sign this Agreement, and that you are voluntarily entering into this Agreement.

8.   **Acknowledgment.**  You represent and agree that in executing this Agreement you rely solely upon your own judgment, belief and knowledge, and the advice and recommendations of any independently selected counsel, concerning the nature, extent and duration of your rights and claims.  You acknowledge that no other individual has made any promise, representation or warranty, express or implied, not contained in this Agreement, to induce you to execute this Agreement.  You further acknowledge that you are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement.

9.   **Binding on Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company and shall inure to the benefit of and be binding upon your heirs, executors, administrators, successors and assigns.

10.  **Arbitration.**  You and the Company acknowledge and agree that any dispute regarding the application, interpretation or breach of this Agreement will be subject to final and binding arbitration before a single arbitrator who is a retired judge with the American Arbitration Association (the "AAA") and in accordance with AAA's National Rules for the Resolution of Employment Disputes.  Attorneys' fees, costs and damages (where appropriate) shall be awarded to the prevailing party in any dispute, and any resolution, opinion or order of the arbitrator may be entered as a judgment of a court of competent jurisdiction.  This Agreement shall be admissible in any proceeding to enforce its terms.

11.  **Severability.**  Should any provision of this Agreement be found, held, declared, determined, or deemed by any arbitrator or court of competent jurisdiction to be void, illegal, invalid or unenforceable under any applicable statute or controlling law, the legality, validity, and enforceability of the remaining provisions will not be affected and the illegal, invalid, or unenforceable provision will be deemed not to be a part of the Agreement.

12.  **Governing Law.**  This Agreement shall be construed and interpreted in accordance with Florida law.

13.  **Entire Agreement.**  This Agreement contains the entire agreement and understanding between you and the Company regarding the matters set forth herein and replaces all prior agreements, arrangements and understandings, written or oral and neither you nor

the Company shall be bound or liable for any representation, promise or inducement not contained in this Agreement. This Agreement cannot be amended, modified, supplemented, or altered, except by written amendment or supplement signed by you and the Company.

Please sign below and return this letter to me to indicate your agreement to these terms.

Sincerely,


Dianna Ibarria
    Standard Pacific of South Florida

13



## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**") is made effective as of January 1, 2003 (the "**Effective Date**"), by and between Westbrooke Homes, a Florida general partnership (the "**Company**"), and Carr Residential I, LLC (the "**Consultant**").

WHEREAS, James Carr ("Carr"), owner of Consultant founded the Company, served as its chief executive officer since its formation, has devoted his time and attention to its growth, and is responsible in significant part for its success;

WHEREAS, concurrently herewith, Carr is resigning from his position as Chief Executive Officer of the Company;

WHEREAS, the Company desires to continue to take advantage of Carr's skills and abilities through the engagement of Consultant for a transition period;

WHEREAS, the Consultant desires to accept such engagement, all as more particularly described below.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and Consultant agree as follows:

1.    **Consultant Services.** Consultant shall cause Consultant's representative, Carr, to serve as a consultant to the Company, assisting the Company and its affiliates with land purchase opportunities, land entitlement, product development, transition services and such other matters as the Company may reasonably request (the "**Services**"). Consultant shall cause Carr to devote such time as is reasonably required for the performance of its duties and responsibilities hereunder. The parties acknowledge and agree that Consultant will not cause Carr to devote his full time to such duties and, subject to compliance with Section 5(b), that Carr's activities with respect to his private real estate related activities will not violate the terms of this Agreement. The Company shall supply the Consultant's designee with an office and reasonable support services at its headquarters facility. It is also anticipated that Consultant will maintain one or more offsite offices at its own expense. The Consultant shall determine the location, method, details and means of performing the services.

2.    **Compensation.** In full consideration of Consultant's services hereunder, the Company will pay Consultant (i) $45,833.33 per month (to be paid during the first ten (10) days of each month in arrears); and (ii) an annual success fee as provided below (the "**Success Fee**") to be paid no later than February 28 of the year following the year to which the Success Fee relates. Consultant shall not be entitled to any other compensation or benefits from the Company.

The Success Fee will be calculated as follows:

(i)   Definitions.  For purposes of this Section 2 only:

    a.   **"Operating Budget"** means the operating budget of the Company submitted to, and approved by, Standard Pacific Corp., in January of the year to which the Success Fee relates and does not include the updates to such operating budget which are required to be submitted to Standard Pacific Corp. in April, July and September of such year.

    b.   **"Pretax Net Income Target"** means the projected pretax net income of the Company reflected in the Operating Budget.

(ii)   Success Fee Calculation.  If the Company achieves the Pretax Net Income Target for any calendar year during the term of this Agreement, then the Consultant shall be paid a success fee equal to Consultant's annual compensation hereunder for such calendar year (such compensation from time to time, the **"Success Fee Amount"**).  If however, the actual pretax net income of the Company is less than the Pretax Net Income Target for such calendar year, the Success Fee for such calendar year shall be determined by multiplying (a) the Success Fee Amount by (b) a fraction, the numerator of which is the actual pretax net income of the Company for such calendar year and the denominator of which is the Pretax Net Income Target for the calendar year.

(iii)   Prorated Success Fee Calculation.  Notwithstanding the foregoing, if this Agreement is terminated by the Company (for such purposes termination shall not include notice of non-renewal) other than for cause (as hereafter defined) then the Company shall pay to Consultant an amount, if any, equal to the product of (a) a fraction, the numerator of which is the number of days which have elapsed in the calendar year in which Consultant is terminated prior to the date of such termination and the denominator of which is 365 (366 in a leap year), and (b) the Success Fee to which Consultant would have been entitled (calculated in accordance with the procedures described in Subsection 2(ii) above) assuming Consultant had not been terminated (such amount, the **"Prorated Success Fee"**). The right to the Prorated Success Fee shall accrue at the date of termination and shall be paid no later than on February 28th of the year following termination.

    **3.**   **Confidentiality.**  The Consultant acknowledges that it will have access to Confidential Information (as defined below) in the course of performing the Services.  Except as is necessary for the performance of Consultant's duties under this Agreement, Consultant shall not, and shall cause its representative not to, at any time during or after the term of this Agreement, disclose to any person or entity or use for Consultant or its representative's own direct or indirect benefit any Confidential Information pertaining to the Company or any of its affiliates.  "**Confidential Information**" includes all of the Company and any of its affiliates' confidential or proprietary information, including, without limitation, any information encompassed in proposals, reports, memoranda, marketing and sales programs, financial

000054

projections, cost summaries, pricing formulae, inventions and trade secrets, research or developmental work, drawings, designs, plans, software codes, and concepts or ideas, materials or information related to the business, products or sales of the Company, Company affiliates or Company customers, to the extent that such information has not been publicly disseminated by the Company, other than through a breach of a confidentiality obligation. The confidentiality obligations described in this <u>Section 3</u> shall survive termination or expiration of this Agreement.

4.    **Term.**

(a)    <u>Termination</u>. The initial term of this Agreement shall commence January 1, 2003 and end December 31, 2003. This Agreement shall automatically renew for consecutive one year periods upon expiration of the initial term and each successive term thereafter unless either party hereto provides the other party with written notice of its intent not to renew this Agreement at least thirty (30) days prior to the end of the then applicable term. . Notwithstanding the foregoing, either the Company or the Consultant upon at least thirty (30) days prior written notice may terminate this Agreement, provided that no advance notice of termination will be required by (i) the Consultant if the Company breaches any legal or contractual duty or obligation to Consultant, which breach is not cured within ten (10) days of receipt by the Company of notice from the Consultant of such breach, or (ii) the Company if the Consultant commits any act of intentional misconduct or negligence that is injurious to the Company or breaches any legal or contractual duty or obligation to the Company, which breach is not cured within ten (10) days of receipt by the Consultant of notice from the Company of such breach (for purposes of this Agreement, a termination under the foregoing subsections (i) and (ii) shall be deemed a termination "for cause"). This Agreement shall terminate immediately if Carr dies or Carr becomes disabled and such disability prevents him from performing the Services on behalf of Consultant for a period of thirty (30) consecutive days or such longer period as agreed to by the Company in writing. Upon termination of this Agreement, the Consultant shall not be entitled to receive any further compensation except for compensation accrued through the date of termination and any Success Fee to which Consultant may be entitled as provided herein.

(b)    <u>Return of Information</u>. Upon termination of this Agreement for any reason, the Consultant agrees to return all proprietary information provided to the Consultant by the Company in the course of providing the Services, including, without limitation, documents, encoded media or other tangible items in any form including, without limitation, all complete and partial copies, recordings, abstracts, notes or reproductions of any kind made from or about such information, which will be exclusively the property of the Company. The provisions of this <u>Section 4</u> will survive the termination of this Agreement.

5.    **Miscellaneous.**

(a)    <u>Relationship of Parties</u>. In rendering services pursuant to this Agreement, the Consultant is acting as an independent contractor and not as an employee or agent of the Company. As an independent contractor, the Consultant and its representatives shall have no authority, express or implied, to commit or obligate the Company in any manner whatsoever, except as specifically authorized from time to time in writing by an authorized representative of the Company, which authorization may be general or specific. Nothing contained in this Agreement shall be construed or applied to create a partnership or joint venture, or an

3

employer/employee or master/servant relationship. The Consultant will be responsible for the payment of all federal, state or local taxes payable with respect to all amounts paid to the Consultant under this Agreement including without limitation, any unemployment insurance tax, federal, state and foreign income taxes, federal Social Security (FICA) payments, and disability insurance taxes; provided that, if the Company is determined to be liable for collection or remittance of any such taxes, the Consultant, or Carr individually if Consultant does not, will immediately reimburse the Company for all such payments made by the Company. The Consultant shall make all payments of all applicable taxes when the same may become due and payable with respect to compensation earned under this Agreement. The Consultant and Carr and their respective successors and assigns, shall jointly and severally indemnify, defend and hold harmless the Company, its officers, directors, agents, employees and the successors or heirs of any of them, from any and all claims, losses, damages, liabilities, obligations, assessments, penalties and interest, demands, actions and expenses, whether direct or indirect, known or unknown, absolute or contingent, arising out of any failure of the Consultant to make any payment of taxes required to be made by the Consultant under this paragraph. The Consultant's representatives are not entitled to any employment rights or benefits from the Company, including, without limitation, workers' compensation, disability insurance, retirement or 401(k) plan, stock options or other equity compensation, medical reimbursement or other fringe benefit plan, overtime pay, unemployment compensation, vacation or sick pay. The Consultant shall be responsible for providing, at the Consultant's expense and in the Consultant's name, disability, workers' compensation, or other insurance as well as licenses or permits usual or necessary for performing the Services.

    (b)    Other Employment/Company Employees.

    (i) The Consultant and Carr may represent, perform services for, or be employed by such additional persons or companies as the Consultant or Carr deems fit or conduct activities for their own accounts, provided, however, that any such commitments shall not relieve the Consultant or Carr of their respective obligations hereunder. The Consultant shall, and shall cause Carr to, keep the Company advised of its and his real estate activities from time to time including, without limitation, upon the Company's reasonable request.

    (ii) During the term of this Agreement and for a period of one (1) year thereafter (the "**Restricted Period**"), without the prior written consent of the Company, Consultant and Carr shall not, and shall cause their affiliates not to, directly or indirectly, entice or solicit or seek to induce or influence any person who is an employee of the Company or any of its affiliates, to leave their employment or engagement with the Company or any of its affiliates. Notwithstanding the foregoing, the Company acknowledges and agrees that Hal Eisenacher may provide financial analysis to Consultant and/or Carr with respect to the Griffin Lakes project.

    (c)    No Conflict or Violation. The Consultant represents and warrants to the Company that the execution, delivery and performance by the Consultant of this Agreement does not and will not violate, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, service or other customer agreement or other agreement to which the Consultant is a party.

4

(d)     Entire Agreement. This Agreement, together with any schedules and exhibits hereto, represent the entire agreement and understanding of the parties with respect to the subject matter hereof and no representations or warranties or promises have been made in connection with this Agreement other than those expressly set forth herein.

(e)     Successors and Assigns; No Third Party Beneficiaries. This Agreement will inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns; provided, that neither party may assign or delegate any of the obligations created under this Agreement without the prior written consent of the other party. Notwithstanding the foregoing, the Company will have the unrestricted right to assign this Agreement and/or to delegate all or any part of its obligations hereunder to any affiliate of the Company. Nothing in this Agreement will confer upon any person or entity not a party to this Agreement, or the legal representatives of such person or entity, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.

(f)     Attorneys' Fees. If a dispute arises between the parties under this Agreement, the prevailing party shall be entitled to recover its attorneys' fees and costs from the non-prevailing party.

(g)     Severability. This Agreement will be deemed severable, and the invalidity or unenforceability of any term or provision hereof will not affect the validity or enforceability of this Agreement or of any other term or provision hereof. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties to this Agreement intend that there will be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

(h)     Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without regard to its conflicts-of-law principles.

(i)     Modification and Waiver. No waiver or modification of this Agreement or any term hereof shall be binding unless it is in writing signed by the parties hereto. No failure to insist upon compliance with any term, provision or condition to this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement.

(j)     Counterparts. This Agreement may be executed in counterparts, including facsimile counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective delivery of a manually executed counterpart to this Agreement.

(SIGNATURES ON FOLLOWING PAGE)

5

000057

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the Effective Date.

THE COMPANY

WESTBROOKE HOMES, a Florida general partnership

By: Westbrooke Companies, Inc., its managing partner

By: _____
     Name:
     Title:  President

THE CONSULTANT

Carr Residential I, LLC

By: _____
     Name:  James Carr
     Title:  President

With respect to all of the obligations of Consultant contained herein:

JAMES CARR, an individual

_____
James Carr

6

000058

 **STANDARD PACIFIC HOMES**
*Signature of Excellence*



# Annual Performance Review – Supervisory Employee

| NAME   Leonard Chernys | JOB TITLE   Sr. V.P. of Product Development | REVIEW PERIOD COVERED |
|---|---|---|
| DEPARTMENT   G&A 600010 | DATE OF HIRE   02/01/78 | 2004 |

**DESCRIPTION OF RATING SCALE:**

Employee's performance should be evaluated in relation to the level of performance expected from a competent employee in this position.

| | | | |
|---|---|---|---|
| 1 | UNACCEPTABLE – Performance requires significant improvement in all areas. | 4 | EXCEEDS EXPECTATIONS – Employee meets position requirements in all areas and exceeds requirements in certain respects. |
| 2 | PARTIALLY MEETS EXPECTATIONS -- Employee meets some of position requirements, but does not meet others. | 5 | EXCEPTIONAL – Consistently exceeds position requirements in many areas. |
| 3 | MEETS EXPECTATION – Meets position requirements. | | |

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **1.   Knowledge of Work/Adequacy** <br> Does the employee understand all phases of his/her work and related matters? | | | | | ✓ |
| Comments: *Len has excellent understanding of all facets of construction, design and architecture* | | | | | |
| **2.   Quantity of Work Performed** <br><br> • Does the employee complete a sufficient amount of work and maintain appropriate work "focus" in the workplace? | | | | ✓ | |
| • Is the employee industrious and conscientious in responding to requirements including periodic peaks, which may require extra effort? | | | | ✓ | |
| Comments: | | | | | |
| **3.   Quality and Accuracy of Work Performed** <br><br> Can the work performed by the employee be relied upon to be accurate and of sufficient quality to be used without in-depth checking and review? | | | | | ✓ |
| Comments: *Len is very accurate* | | | | | |

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

000008

# STANDARD PACIFIC HOMES
*Signature of Excellence*

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **4. Planning, Organization and Completion of Work on Schedule**<br>• Does the employee meet realistic deadlines and respond to periodic schedule commitments? | | | | ✓ | |
| • Does the employee timely follow-up on projects, including long-term projects? | | | | | ✓ |
| • Does the employee have the ability to effectively handle multiple projects at once? | | | | ✓ | |
| • Has the employee effectively staffed his/her department/unit by planning, interviewing and selecting the best people for his/her team? | | | ✓ | | |
| Comments: | | | | | |
| **5. Learning Ability, Persistence and Confidence**<br>• Does the employee have the ability to interpret and respond openly to new situations, problems, procedures, methods and change overall? | | | | ✓ | |
| • Does he/she quickly grasp new skills and/or concepts? | | | | ✓ | |
| • Does the employee gain insights from both successes and failures and use them to improve future performance? | | | | | ✓ |
| Comments: *Jen is extremely persistent he always wants to get the job done on time.* | | | | | |
| **6. Work Ethic**<br>• Is the employee punctual and is his/her attendance satisfactory? | | | | ✓ | |
| • Does the employee respond positively toward compliance with company policies/procedures? | | | | ✓ | |
| Comments: | | | | | |
| **7. Judgment**<br>• Are the employee's decisions and actions sound and are they made quickly, when required? | | | | ✓ | |
| • Does the employee have the ability to see hidden problems, looking beyond the obvious to find other solutions/answers? | | | | | ✓ |
| Comments: *Jen has very good judgment and comes up with novel solutions, that no one else thought of.* | | | | | |

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

G00009



**STANDARD PACIFIC HOMES**
*Signature of Excellence*

| 8. Initiative, Accountability & Responsibility | | | | | |
|---|---|---|---|---|---|
| • Does the employee display a willingness to be proactive about his or her own learning, to take action without needing to be directed to learn or to act by other people? | | | | ✓ | |
| • Does he/she anticipate needs, improve methods, foresee and meet changing conditions? | | | ✓ | | |
| • Does the employee demonstrate a willingness to accept responsibility for his/her work performance, including mistakes when they occur? | | | ✓ | | |
| • Does the employee broadly share both responsibility and accountability for the work of his/her subordinates? | | | ✓ | | |

Comments (Initiative, Accountability & Responsibility):

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| 9. Teamwork | | | | | |
| • Does the employee display the ability and willingness to work with and for others towards the best interest of all concerned? | | | | ✓ | |
| • Does the employee understand and appreciate the objectives and problems of other individuals and departments? | | | | ✓ | |
| • Does the employee effectively follow directions? | | | | ✓ | |
| • Is the employee seen as a team player? | | | | ✓ | |
| • Does the employee invite input from his/her subordinates when problem solving or setting group objectives? | | | | | ✓ |
| • Does he/she share ownership and visibility of departmental successes with his/her subordinates? | | | | | ✓ |

Comments: *Jen is doing a great job of getting the company back into the mode of teamwork.*

| 10. Attitude | | | | | |
|---|---|---|---|---|---|
| • Does the employee keep an open-mind and have the ability to reinterpret difficult situations, without taking things personally or becoming defensive or irritated, but rather conducting themselves professionally (open to constructive criticism)? | | | | ✓ | |
| • Is the employee cool under pressure and can he/she handle stress well? | | | | ✓ | |
| • Does the employee effectively cope with change? | | | | ✓ | |
| • Does the employee contribute positively to the work environment through his/her interaction with others? | | | | ✓ | |

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

000010

# STANDARD PACIFIC HOMES
*Signature of Excellence*

| Comments: | | | | | |
|---|---|---|---|---|---|

**11. Communication**

| | | | | | |
|---|---|---|---|---|---|
| • Does the employee communicate effectively with others in order to accomplish objectives (utilizing good listening skills, asking questions to clarify, and restating opinions/expectations)? | | | | | ✓ |
| • Is the employee able to write reports/documents clearly and succinctly in a variety of communication settings and styles? | | | | | ✓ |
| • Does he/she demonstrate good judgment as to when face-to-face, e-mail, versus phone communication techniques are appropriate? | | | | | ✓ |
| • Does the employee foster open communication with his/her subordinates? | | | | | ✓ |

Comments: *Jen is excellent with communication. His emails are detailed & very informative.*

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **12. Coaching and Developing Subordinates** | | | | | |
| • Does the employee provide current, direct, complete and "actionable" positive and corrective feedback to his/her subordinates when necessary (via informal day-to-day and formal periodic written reviews)? | | | | ✓ | |
| • Is the employee a good judge of his/her subordinates strengths and limitations? | | | | ✓ | |
| • Is the employee successful in developing his/her subordinates? | | | | | ✓ |

Comments: *Jen is a very good teacher. Thanks to him & his guidance Jenny has been able to achieve. He is an excellent mentor.*

| **13. Directing and Delegating Work** | | | | | |
|---|---|---|---|---|---|
| • Is the employee good at establishing clear directions, setting objectives, distributing work appropriately, and laying out work in a well-planned and organized manner? | | | | ✓ | |
| • Does the employee keep his/her subordinates well-informed on current expectations, progress and organizational changes? | | | | ✓ | |
| • Does the employee clearly and comfortably delegate both routine and important tasks and decisions? | | | | ✓ | |
| • Does the employee's department or group perform effectively and meet objectives? | | | | ✓ | |

| Comments: | | | | | |
|---|---|---|---|---|---|

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

C00011

# STANDARD PACIFIC HOMES
*Signature of Excellence*

| | | | | | |
|---|---|---|---|---|---|
| **14. Respect and Trust of Subordinates** | | | | | |
| • Has the employee developed and maintained good will, respect and loyalty of his/her subordinates? | | | | | ✓ |
| • Does the employee demonstrate compassion for his/her subordinates, showing concern for their work and non-work related issues? | | | | | ✓ |
| • Do others enjoy working with and for this employee? | | | | | ✓ |

Comments: *Everyone loves o respects Lew. He also cares very much for all employees and they respect him.*

| | | | | | |
|---|---|---|---|---|---|
| **15. Leadership** | | | | | |
| • Does the employee communicate a compelling, motivating and inspired vision/sense of purpose for his/her department? | | | | ✓ | |
| • Does the employee step up to conflict within their department quickly and settle disputes equitably, finding common ground and achieving cooperation with minimum noise? | | | | ✓ | |
| • Does the employee adhere to an appropriate and effective set of core values and act in line with those values, setting a good example for his/her subordinates? | | | | ✓ | |

Comments:

**\*\*\*Please be sure to complete "Section IV – Comments and Feedback"**

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

000012



**STANDARD PACIFIC HOMES**
*Signature of Excellence*

---

**IV. COMMENTS AND FEEDBACK – Attach additional pages where necessary.**

1. What are the employee's strongest skills or attributes?

   *Expertise in all aspects of construction & details. Keen eye for product development. Good relationships with our professionals.*

2. What constructive suggestions, training and objectives are appropriate for this employee in order to improve performance? How can he/she maximize his/her strengths and minimize his/her weaknesses?

   *Continue working on product development + new projects. Continue coordinating all aspects so that every thing is designed with minimal costs + efficiency.*

3. What are the performance expectations and goals for this employee for the upcoming review period? What plans should be established to meet future needs?

   1. *Improve our efficiency & quality.*
   2. *Coordinate relationships with our professionals to reduce the errors.*
   3. *Improve our product designs & systems.*

4. Other Supervisor Comments:

   *I appreciate all of Jen's help + ... He welcomes all the complexities of the design + construction process. Jen is always there when I need him.*

5. Employee Comments/Feedback

---

| PREPARED BY: (Supervisor's Name Here) | REVIEWED BY: Division President | ACKNOWLEDGE BY EMPLOYEE* (Type/Print Employee's Name Here) |
|---|---|---|
| Signed | Signed | Signed |
| Date 1-20-05 | Date 1-20-05 | Date 1/26/09 |

* Employee's signature on this document ONLY indicates receipt of this form.





PLAINTIFF'S DEPOSITION
EXHIBIT

# Annual Performance Review – Supervisory Employee

| NAME  Len Chernys | JOB TITLE  Sr. V.P. of Construction | REVIEW PERIOD COVERED  2003 |
|---|---|---|
| DEPARTMENT  Administration | DATE OF HIRE  2/01/78 | |

DESCRIPTION OF RATING SCALE:

Employee's performance should be evaluated in relation to the level of performance expected from a competent employee in this position.

| | |
|---|---|
| 1  UNACCEPTABLE – Performance requires significant improvement in all areas. | 4  EXCEEDS EXPECTATIONS – Employee meets position requirements in all areas and exceeds requirements in certain respects. |
| 2  PARTIALLY MEETS EXPECTATIONS – Employee meets some of position requirements, but does not meet others. | 5  EXCEPTIONAL – Consistently exceeds position requirements in many areas. |
| 3  MEETS EXPECTATION – Meets position requirements. | |

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **1.  Knowledge of Work/Adequacy**<br>Does the employee understand all phases of his/her work and related matters?<br><br>Comments:  _The Best !_ | | | | | ✓ |
| **2.  Quantity of Work Performed**<br>Does the employee complete a sufficient amount of work and maintain appropriate work "focus" in the workplace? Is the employee industrious and conscientious in responding to requirements including periodic peaks, which may require extra effort?<br><br>Comments: | | | | ✓ | |
| **3.  Quality and Accuracy of Work Performed**<br>Can the work performed by the employee be relied upon to be accurate and of sufficient quality to be used without in-depth checking and review?<br><br>Comments: | | | | | ✓ |

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

# STANDARD PACIFIC HOMES
*Signature of Excellence*

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **4.  Planning, Organization and Completion of Work on Schedule** | | | | | |
| Does the employee meet realistic deadlines and respond to periodic schedule commitments? | | | | | |
| Does the employee timely follow-up on projects, including long-term projects? | | | | ✓ | |
| Does the employee have the ability to effectively handle multiple projects at once? | | | | | |
| Has the employee effectively staffed his/her department/unit by planning, interviewing and selecting the best people for his/her team? | | | | | |
| Comments: _Build cycle – rates 5, Start cycle rates 2, Len is totally focused on this & results are beginning to show._ | | | | | |
| **5.  Learning Ability, Persistence and Confidence** | | | | | |
| Does the employee have the ability to interpret and respond openly to new situations, problems, procedures, methods and change overall? | | | | | ✓ |
| Does he/she quickly grasp new skills and/or concepts? | | | | | |
| Does the employee gain insights from both successes and failures and use them to improve future performance? | | | | | |
| Comments: _____ | | | | | |
| **6.  Work Ethic** | | | | | |
| Is the employee punctual and is his/her attendance satisfactory? | | | | | ✓ |
| Does the employee respond positively toward compliance with company policies/procedures? | | | | | |
| Comments: _____ | | | | | |
| **7.  Judgment** | | | | | |
| Are the employee's decisions and actions sound and are they made quickly, when required? | | | | | ✓ |
| Does the employee have the ability to see hidden problems, looking beyond the obvious to find other solutions/answers? | | | | | |
| Comments: _____ | | | | | |
| **8.  Initiative, Accountability & Responsibility** | | | | | |
| Does the employee display a willingness to be proactive about his or her own learning, to take action without needing to be directed to learn or to act by other people? | | | | | |
| Does he/she anticipate needs, improve methods, foresee and meet changing conditions? | | | | | |
| Does the employee demonstrate a willingness to accept responsibility for his/her work performance, including mistakes when they occur? | | | | | ✓ |
| Does the employee broadly share both responsibility and accountability for the work of his/her subordinates? | | | | | |

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

# STANDARD PACIFIC HOMES
*Signature of Excellence*

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| Comments (Initiative, Accountability & Responsibility): | | | | | |

**9.   Teamwork**

Does the employee display the ability and willingness to work with and for others towards the best interest of all concerned?

Does the employee understand and appreciate the objectives and problems of other individuals and departments?

Does the employee effectively follow directions?

Is the employee seen as a team player?

Does the employee invite input from his/her subordinates when problem solving or setting group objectives?

Does he/she share ownership and visibility of departmental successes with his/her subordinates?

Comments: _Instrumental in improving relations between Constr + Land Devel._

**10.   Attitude**

Does the employee keep an open-mind and have the ability to reinterpret difficult situations, without taking things personally or becoming defensive or irritated, but rather conducting themselves professionally (open to constructive criticism)?

Is the employee cool under pressure and can he/she handle stress well?

Does the employee effectively cope with change?

Does the employee contribute positively to the work environment through his/her interaction with others?

Comments: _Greatly improved._

**11.   Communication**

Does the employee communicate effectively with others in order to accomplish objectives (utilizing good listening skills, asking questions to clarify, and restating opinions/expectations)?

Is the employee able to write reports/documents clearly and succinctly in a variety of communication settings and styles?

Does he/she demonstrate good judgment as to when face-to-face, e-mail, versus phone communication techniques are appropriate"

Does the employee foster open communication with his/her subordinates?

Comments: _____

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

000026

# STANDARD PACIFIC HOMES
## *Signature of Excellence*

| Category | RATINGS | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **12. Coaching and Developing Subordinates**<br>Does the employee provide current, direct, complete and "actionable" positive and corrective feedback to his/her subordinates when necessary (via informal day-to-day and formal periodic written reviews)?<br>Is the employee a good judge of his/her subordinates strengths and limitations?<br>Is the employee successful in developing his/her subordinates? | | | | ✓ | |
| Comments: *Would suggest sometimes giving subordinates a "looser rein"* | | | | | |
| **13. Directing and Delegating Work**<br>Is the employee good at establishing clear directions, setting objectives, distributing work appropriately, and laying out work in a well-planned and organized manner?<br>Does the employee keep his/her subordinates well-informed on current expectations, progress and organizational changes?<br>Does the employee clearly and comfortably delegate both routine <u>and</u> important tasks and decisions?<br>Does the employee's department or group perform effectively and meet objectives? | | | | | ✓ |
| Comments: | | | | | |
| **14. Respect and Trust of Subordinates**<br>Has the employee developed and maintained good will, respect and loyalty of his/her subordinates?<br>Does the employee demonstrate compassion for his/her subordinates, showing concern for their work and non-work related issues?<br>Do others enjoy working with and for this employee? | | | | ✓ | |
| Comments: | | | | | |
| **15. Leadership**<br>Does the employee communicate a compelling, motivating and inspired vision/sense of purpose for his/her department?<br>Does the employee step up to conflict within their department quickly and settle disputes equitably, finding common ground and achieving cooperation with minimum noise?<br>Does the employee adhere to an appropriate and effective set of core values and act in line with those values, setting a good example for his/her subordinates? | | | | | ✓ |
| Comments: | | | | | |

***Please be sure to complete "Section IV – Comments and Feedback"**

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources       000027



## STANDARD PACIFIC HOMES
*Signature of Excellence*

---

**IV. COMMENTS AND FEEDBACK – Attach additional pages where necessary.**

1. What are the employee's strongest skills or attributes?

   *Construction Knowledge*
   *Product development expertise*

2. What constructive suggestions, training and objectives are appropriate for this employee in order to improve performance? How can he/she maximize his/her strengths and minimize his/her weaknesses?

   *Continue to improve relations w/ land devel.*
   *Continue focus on improving start cycle –*

3. What are the performance expectations and goals for this employee for the upcoming review period? What plans should be established to meet future needs?

   *Len has initiated a plan jointly with all departments*
   *to ensure delivery of houses to exceed budget.*
   *Len is assuming product development role.*

4. Other Supervisor Comments:

   *Len is a cornerstone of the company.*
   *His work ethic, knowledge & drive are second to none.*

5. Employee Comments/Feedback

| PREPARED BY:<br>(Supervisor's Name Here) | REVIEWED BY:<br>Division President | ACKNOWLEDGE BY EMPLOYEE*<br>(Type/Print Employee's Name Here) |
|---|---|---|
| Signed<br>2/2/04 | Signed | Signed<br>2/3/04 |
| Date | Date | Date |

\* Employee's signature on this document ONLY indicates receipt of this form.

One copy of completed form to be provided to employee, ORIGINAL form to be forwarded to Human Resources

000028