1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO: 07-21605 CIV-HIGHSMITH/McALILEY

LEONARD CHERNYS, an individual,

**COPY**

                              Plaintiff,

vs.

STANDARD PACIFIC OF SOUTH FLORIDA,
G.P., INC., a foreign profit
corporation, and STANDARD PACIFIC
CORP., an unregistered corporation,

                              Defendants.

_____/

                    Two South Biscayne Boulevard
                    Suite 3500
                    Miami, Florida
                    Thursday, February 22, 2008
                    2:10 p.m.- 3:55 p.m.


              DEPOSITION OF GRISELLE CHERNYS

        Taken on behalf of the Defendants before
Jeanne L. Volk, Notary Public in and for the
State of Florida at Large, pursuant to Notice
of Taking Deposition in the above cause.

2

```
 1  APPEARANCES:
 2      GARY M. CARMAN, ESQ.
        of the firm of
 3      Gary M. Carman, P.A.
        1111 Brickell Avenue
 4      Suite 2050
        Miami, Florida 33131
 5      Attorneys for Plaintiff
 6      JENNIFER A. SCHWARTZ, ESQ.
        of the firm of
 7      Jackson Lewis, LLP
        Two South Biscayne Boulevard
 8      Suite 3500
        Miami, Florida 33131
 9      Attorneys for Defendants
10  ALSO PRESENT:
11      LEONARD CHERNYS
12
13                    I N D E X
14      Witness          Direct          Cross
15
    Griselle Chernys
16  (By Ms. Schwartz)      3, 98
    (By Mr. Carman)                        97
17
18
19              DEFENDANTS' EXHIBITS
20  NUMBER          DESCRIPTION        PAGE
21  Exhibit A      Email 3-3-06          42
22
23              CERTIFIED QUESTIONS
24          Page 7    Line 25
            Page 8    Line 11
25
```

3

1  Thereupon:

2                    GRISELLE CHERNYS

3  was called as a witness and, having been first

4  duly sworn and responding, "I do," was examined

5  and testified as follows:

6                    DIRECT EXAMINATION

7  BY MS. SCHWARTZ:

8       Q.    Please state your full name.

9       A.    Griselle Chernys.

10      Q.    Have you ever been known by any other

11 name?

12      A.    My maiden name, Hernandez.

13      Q.    Ms. Chernys, my name is Jennifer

14 Schwartz.  I'm an attorney with the law firm of

15 Jackson Lewis, and we represent Standard Pacific

16 Corp. and Standard Pacific of South Florida in the

17 lawsuit that your husband has brought, Leonard

18 Chernys.

19      A.    (Nods head.)

20      Q.    So in that capacity, I am going to be

21 asking some questions today to which you must

22 respond under oath.

23      A.    Okay.

24      Q.    You understand that you have just been

25 placed under oath; correct?

4

1      A.    Correct.

2      Q.    The court reporter is taking down

3   everything that we say, so we have to make sure

4   that we don't speak over each other and that we

5   have to speak clearly and your answers have to be

6   verbal, so if I ask you a question that calls for

7   a yes or no answer, you have to say yes or no,

8   because uh-huh and unh-unh look the same on the

9   transcript.

10          There may be times when you anticipate a

11   question I am going to ask you.  I just ask that

12   you wait until I have asked the complete question

13   so it's clear on the transcript, because the court

14   reporter also can't take us down speaking over

15   each other.

16      A.    (Nods head.)

17      Q.    If you don't understand a question, just

18   let me know and I will rephrase it.  If you don't

19   hear a question that I ask you, just let me know

20   and I will repeat it.

21          If you get tired and you want to take a

22   short break, just let me know and I will

23   accommodate that.  I just ask that you don't ask

24   to take a break while a question is pending.

25      A.    (Nods head.)

5

1      Q.   And there may be times during the

2  deposition that Mr. Carman will object, he will

3  say objection, form or something like that.  You

4  still must answer the question unless he

5  specifically instructs you not to.

6        Okay, if you answer a question, we will

7  presume that you have heard it, you have

8  understood it, and you have answered it

9  truthfully, fully and to the best of your ability.

10      Do you understand everything that I have

11  said?

12     A.   Yes, I do.

13     Q.   Do you need me or your attorney to

14  repeat any of these instructions?

15     A.   No, I just ask you that since I am not

16  used to doing this, if I say uh-huh or whatever,

17  you excuse me and then correct me, please.

18     Q.   Okay.

19     A.   Because, you know, it's a common English

20  modality to say uh-huh, you know.

21     Q.   Yes.  Do you suffer from any illness or

22  infirmity that will affect your ability to testify

23  truthfully today?

24     A.   No, I happen to be very healthy,

25  actually, I am thankful for that.

6

1      Q.   Are you taking any medication --

2      A.   No.

3      Q.   -- or drugs that will affect your

4   ability to testify truthfully today?

5      A.   No.

6      Q.   See, that's what I'm talking about, let

7   me finish asking the question --

8      A.   Perfect.

9      Q.   -- before you answer.

10          Did you speak with anyone about the

11   deposition you are giving today?

12     A.   Yes.

13     Q.   Who did you speak with?

14     A.   Gary Carman.

15     Q.   Did you speak with anybody else?

16     A.   No.

17     Q.   How many times have you met with

18   Mr. Carman?

19     A.   Counting today, probably two.

20     Q.   How long was your meeting with him

21   today?

22     A.   An hour.

23     Q.   When was your first meeting with him?

24     A.   Probably very early on when my husband

25   was thinking of making a claim for the money that

7

 1   is owed to him by Standard Pacific.  I visited

 2   Mr. Carman that first time with him because I felt

 3   it was something that affected our family so I

 4   should be there.

 5        Q.   Was there anybody else present during

 6   your meeting today?

 7        A.   My husband.

 8        Q.   What did you discuss during this

 9   meeting?

10            MR. CARMAN:  Objection to form, instruct

11        her not to answer, it's attorney-client

12        privilege.

13   BY MS. SCHWARTZ:

14        Q.   When did you retain Mr. Carman to

15   represent you?

16            MR. CARMAN:  Objection to form.  I have

17        been her counsel, and for the record, I do

18        represent her, I have represented her now for

19        probably close to 15 years.

20            MS. SCHWARTZ:  Okay.  Well, this case

21        hasn't been going on for 15 years.

22            MR. CARMAN:  And I represent her in this

23        case as well.

24   BY MS. SCHWARTZ:

25        Q.   Did you sign a representation agreement

8

1  with Mr. Carman for this case?

2          MR. CARMAN:  Same instruction.

3          MS. SCHWARTZ:  You are instructing her

4      not to answer --

5          MR. CARMAN:  Yes.

6          MS. SCHWARTZ:  -- if she signed a

7      representation agreement?

8          MR. CARMAN:  Absolutely.

9          MS. SCHWARTZ:  Okay, certify that.

10 BY MS. SCHWARTZ:

11     Q.    Have you paid Mr. Carman any monies to

12 represent you in this case?

13         MR. CARMAN:  Same instruction.

14         MS. SCHWARTZ:  Certify that.

15 BY MS. SCHWARTZ:

16     Q.    Have you spoken with anyone else about

17 the deposition you are giving today?

18     A.    No.

19     Q.    Did you review any documents in

20 preparation for your deposition today?

21     A.    Yes.

22     Q.    What documents did you review?

23     A.    I read my husband's depo.  I read Diana

24 Ibarria's -- it wasn't a deposition, okay, it was

25 another document that she filed, it's called a --

9

```
 1   what is it called, Gary?
 2            MR. CARMAN:  An Affidavit.
 3            THE WITNESS:  An Affidavit, I'm sorry, I
 4       forgot that word.  I think there was Hal's
 5       and Jim Carr's.
 6   BY MS. SCHWARTZ:
 7       Q.    You reviewed Hal's deposition
 8   transcript?
 9       A.    Yes.
10       Q.    And you reviewed Jim Carr's deposition
11   transcript?
12       A.    Yes.  Oh, and there was also another
13   Affidavit from the past president of Standard
14   Pacific nationally.
15       Q.    Michael Courtney?
16       A.    Courtney, yes.  That's the name.
17       Q.    Do you understand that you have been
18   named by your husband as a witness in this case?
19       A.    Yes, I do.
20       Q.    Do you know why you have been named as a
21   witness in this case?
22       A.    I believe that it's obviously, you know,
23   I am his spouse, so nobody knows probably closer
24   what he's been through better than I.  It's part
25   of our marriage.
```

10

1      Q.   Do you know what you will be called on

2  to testify about in trial?

3      A.   Repeat that?

4      Q.   Do you know what you will be called to

5  testify about at trial?

6      A.   I don't understand your question.

7      Q.   Well, you understand you have been

8  listed as a witness in the case; correct?

9      A.   I do.

10     Q.   And that means that you -- do you

11 understand that that means you will be called to

12 testify at the trial of this case?

13     A.   Yes.

14     Q.   Okay.  Do you know what you will be

15 called to testify about at trial?

16     A.   I will be called to testify about the

17 claim my husband has against Standard Pacific for

18 the money owed him, and the age discrimination and

19 abuse that he's been submitted to.

20     Q.   Okay.  We will talk about that a little

21 bit later.  Have you ever had your deposition

22 taken before?

23     A.   Only once before.

24     Q.   When was that?

25     A.   Many years ago.  I can't recall.  Many

11

```
 1   years.

 2        Q.    Was that in a lawsuit?

 3        A.    I worked for an employer that asked me

 4   to give a deposition on a Workers' Comp claim that

 5   an employee was trying claim that they felt the

 6   employee was not entitled to.

 7        Q.    Was that case pending in Florida?

 8        A.    It was.  The person worked to collect

 9   Workers' Comp, yes, I think.

10        Q.    And that was in the State of Florida?

11        A.    Yes, definitely.

12        Q.    What was the name of the employer you

13   worked for?

14        A.    Mount Sinai Medical Center.

15        Q.    What was your position there?

16        A.    I held numerous positions at

17   Mount Sinai, I had a long tenure there.  I don't

18   recall what my position was at that point, but it

19   was at least director.

20        Q.    Do you know what department you may have

21   been the director of?

22        A.    Physician Practices, maybe.  It had to

23   do with one of their employed physicians, an

24   employee.

25        Q.    How long did you work at Mount Sinai?
```

1      A.      Twenty years.

2      Q.      Do you recall the dates you worked

3   there?

4      A.      Sure.   Probably from 1980 until maybe

5   the year 2000.   Off and on, also, because when I

6   had my child, I took some time off and I worked

7   only as a consultant, but you know, whether I was

8   consulting or employed, I had a relationship with

9   them for 20 years.

10      Q.      What is your date of birth?

11      A.      May 18th, 1952.

12      Q.      Where were you born?

13      A.      I was born in Havana, Cuba.

14      Q.      Are you a U.S. citizen?

15      A.      Yes, I am.

16      Q.      Have you ever been arrested?

17      A.      No.

18      Q.      Where do you currently live?

19      A.      I live in 13244 Polo Club Road,

20   Apartment C109, Wellington, Florida, 33414.

21      Q.      Is that a condo?

22      A.      It is.

23      Q.      How long have you lived at this address?

24      A.      Not long.   We have owned the property

25   for awhile, but living in that property

13

1    permanently, I would say since December.

2         Q.   How long have you owned that property?

3         A.   Four or five years.

4         Q.   Do you and Mr. Chernys own that property

5    jointly?

6         A.   Yes, we do.

7         Q.   Where did you live prior to that?

8         A.   I lived at 10 Edgewater Drive,

9    Apartment 5H, Coral Gables, Florida, 33133.

10         Q.   How long did you live at that address?

11         A.   Two years.

12         Q.   Did you own or rent that?

13         A.   We owned.

14         Q.   You and Mr. Chernys owned that condo

15    jointly?

16         A.   Yes, we did.

17         Q.   Where did you live prior to the

18    Edgewater address?

19         A.   We lived in Bay Point, 641 Sabal Palm

20    Road, Miami, Florida, 33137.

21         Q.   Is that a house?

22         A.   Yes.

23         Q.   Did you and Mr. Chernys own that house?

24         A.   Yes.

25         Q.   Do you and Mr. Chernys still own that

14

1    house?

2        A.    No.

3        Q.    Why did you move to Wellington from

4    Miami?

5        A.    Because we had purchased the Edgewater

6    property as our dream home once our daughter had

7    gone to college, and because of the misfortune of

8    my husband and the way he was treated by Standard

9    Pacific, we had no choice but to sell that

10   property.  I am the sole wage earner now.

11       Q.    How much was the property sold for?

12             MR. CARMAN:  Objection to form.

13             THE WITNESS:  I don't recall exactly.  I

14       have been working very hard, and my husband

15       has been taking care of those issues.

16   BY MS. SCHWARTZ:

17       Q.    How much was it purchased for?

18             MR. CARMAN:  Same objection.

19             THE WITNESS:  I think we paid --

20             MR. CARMAN:  I don't want you to guess,

21       Mrs. Chernys.  If you know, you know.

22             THE WITNESS:  I don't recall.  If it's

23       something you really require, we can check,

24       but right now, I don't recall exactly.

25             It's been a lot of emotional turmoil, so

15

1        details escape my mind, and that specific

2        subject right now is very emotional for me.

3   BY MS. SCHWARTZ:

4        Q.   Ms. Chernys, one of the rules of the

5   deposition is that you can only speak when a

6   question is pending.

7        A.   Okay.

8        Q.   So just answer the questions that are

9   asked.

10       A.   Okay.

11       Q.   Thank you.  How much was the condo in

12  Wellington --

13            MR. CARMAN:  Objection to form.

14  BY MS. SCHWARTZ:

15       Q.   -- purchased for?

16       A.   $150,000.

17       Q.   What is your educational background?

18       A.   I have degrees in Education and in

19  Public Administration.

20       Q.   Where did you earn those degrees?

21       A.   In Miami, Florida.

22       Q.   At which institution?

23       A.   FIU, Miami-Dade Community College, Nova

24  Southeastern.

25       Q.   Which degree did you earn at Nova

16

```
 1  Southeastern?
 2       A.    Public Health.
 3       Q.    Is that a bachelor's degree?
 4       A.    Yes.
 5       Q.    What degree did you earn at FIU?
 6       A.    Education.
 7       Q.    Is that a bachelor's degree?
 8       A.    Yes.
 9       Q.    You are married to Leonard Chernys;
10  right?
11       A.    Yes, I am.
12       Q.    When did you meet your husband?
13            MR. CARMAN:  Objection to form.
14            THE WITNESS:  I met my husband, I don't
15  know, 25 years ago.  Count backward.
16  BY MS. SCHWARTZ:
17       Q.    When were you married?
18       A.    I think we were married in 1985,
19  January 1st, '85.
20       Q.    Does Mr. Chernys live with you?
21       A.    Yes, he does.
22       Q.    How long have you lived together?
23       A.    At least all the years that I am
24  married.
25       Q.    Does anyone else live with you?
```

17

1        A.    Presently, no.

2        Q.    Has anyone else lived with you in the

3   past three years?

4        A.    My daughter.

5        Q.    What is your daughter's name?

6        A.    Nicole Chernys.

7        Q.    Do you have any other children?

8        A.    I don't.

9        Q.    Does Mr. Chernys have any other

10  children?

11       A.    Yes, he does.

12       Q.    How many other children does he have?

13       A.    One daughter.

14       Q.    What's her name?

15       A.    Debra.

16       Q.    Where does Nicole currently live?

17       A.    Nicole lives in Coral Gables with

18  another roommate because she goes to the

19  University of Miami.

20       Q.    How old is she?

21       A.    She is 20 years old.

22       Q.    How old is Debra?

23       A.    Twenty-eight.  I'm not sure, I think

24  around that age.

25       Q.    Where does she live?

18

```
 1        A.    She lives in Aventura, Florida.

 2        Q.    Do you and your husband have a loving

 3   relationship?

 4        A.    Yes, we do.

 5              MR. CARMAN:  Objection to form.

 6   BY MS. SCHWARTZ:

 7        Q.    Would you characterize your relationship

 8   with your husband as a personally fulfilling

 9   relationship?

10              MR. CARMAN:  Objection to form.

11              THE WITNESS:  Yes, I do.

12   BY MS. SCHWARTZ:

13        Q.    Where are you currently employed?

14        A.    I am employed at HAA Preferred Partners.

15        Q.    What is your position there?

16        A.    I am the President and CEO of the

17   company.

18        Q.    Are you an owner of the company?

19        A.    No.

20        Q.    How long have you been employed by

21   HAA Preferred Partners?

22        A.    Seven years.

23        Q.    What does HAA Preferred Partners do?

24              MR. CARMAN:  Objection to form.

25              THE WITNESS:  HAA Preferred Partners is
```

19

```
 1        a third party administrator, Florida

 2        licensed, specializing in international

 3        claims, if you know what that is.

 4   BY MS. SCHWARTZ:

 5        Q.    I don't know what that is.  Can you

 6   explain that?

 7        A.    Yes, you know what a third party

 8   administrator is?

 9        Q.    Can you explain that?

10             MR. CARMAN:  Objection to form.

11             THE WITNESS:  We process claims,

12        insurance, health insurance claims, on behalf

13        of insurance companies.

14             My company specializes in insurance

15        companies from all over the world that may

16        not have offices here, and may have instances

17        of health claims that happen here, whether

18        you have executives that come here on

19        contracts, whether students that live here

20        studying and they are required to have

21        insurance, or whether it's people that come

22        into the U.S. for what is called in my

23        business destination medicine.

24   BY MS. SCHWARTZ:

25        Q.    Do you have any ownership interest in
```

20

1  HAA Preferred Partners?

2          MR. CARMAN:  Objection to form.

3          THE WITNESS:  No.

4  BY MS. SCHWARTZ:

5      Q.   Did you ever have any ownership interest

6  in that company?

7      A.   I did.

8      Q.   When did your owner interest end?

9          MR. CARMAN:  I am going to object to

10     form, and I don't think any of these

11     questions are relevant to the issues in this

12     case, so I am going to let her answer the

13     question, but as to her business and her

14     nature, that's not part of this case.

15         MS. SCHWARTZ:  Okay, I am just going to

16     ask that you not make any speaking

17     objections, Mr. Carman, just object to form.

18         MR. CARMAN:  I am going to do what I see

19     fit, ma'am.

20         MS. SCHWARTZ:  Okay, well -- all right,

21     I won't get into a conflict.

22         THE WITNESS:  Well, I was going to say

23     the same thing to you, that I don't see why

24     my personal business has any relevance to my

25     husband's situation.

21

1   BY MS. SCHWARTZ:

2       Q.   Okay.  When did your ownership interest

3   end in this company?

4       A.   August of this year.

5       Q.   August of 2007?

6       A.   Yes.

7       Q.   Why did you sell your ownership

8   interest?

9           MR. CARMAN:  I am objecting to the form

10          of the question, and instruct you not to

11          answer.  We are not here to answer questions

12          about your business.

13          MS. SCHWARTZ:  What is the basis of the

14          instruction not to answer?

15          MR. CARMAN:  Counsel, I have given you

16          my instruction and my reason.

17          MS. SCHWARTZ:  So the basis is you don't

18          think it's relevant?

19          MR. CARMAN:  Counsel, we are not going

20          to go into a debate, and I have given her the

21          instruction.

22          MS. SCHWARTZ:  I am not going into a

23          debate, I just want it on the record.

24          MR. CARMAN:  I'm not going to go on the

25          record with you.

22

1          MS. SCHWARTZ:  Well, I have to bring it
2       before the judge, so I have to put it on the
3       record.
4          MR. CARMAN:  Do what you want, I have
5       already instructed her.
6          MS. SCHWARTZ:  Okay, let the record
7       reflect that Mr. Carman is instructing the
8       witness not to answer based on relevance,
9       which is inappropriate under the rules.
10   BY MS. SCHWARTZ:
11      Q.   How many employees does HAA Preferred
12   Partners have?
13      A.   Sixty-two.
14      Q.   Did it have 62 employees when you were
15   an owner?
16      A.   It's grown from 50 to 62.
17      Q.   Were you involved in any of the hiring
18   decisions for the company when you were an owner?
19          MR. CARMAN:  Objection to form.
20          THE WITNESS:  There is a Human Resources
21       Department, and there are managers and
22       supervisors that work with the staff
23       directly.  My role is to oversee the entire
24       business, I'm the President and the CEO.
25

23

```
 1  BY MS. SCHWARTZ:
 2       Q.   What is your current salary there?
 3            MR. CARMAN:  Objection to form, instruct
 4       you not to answer.  It's confidential
 5       information.  We are not here taking her
 6       deposition for anything about salaries.
 7  BY MS. SCHWARTZ:
 8       Q.   Do you receive any benefits at
 9  HAA Preferred Partners?
10       A.   Yes, I receive benefits.
11       Q.   What kind of benefits do you receive?
12       A.   I receive health insurance and dental
13  insurance.
14       Q.   Is your husband on your health insurance
15  plan?
16       A.   Yes.  Actually, before my husband was
17  fired by Standard Pacific, I received benefits
18  through his company, and then subsequent to that,
19  I had to wait for open enrollment and enroll in
20  our plan.
21            MS. SCHWARTZ:  Move to strike as
22       nonresponsive.
23  BY MS. SCHWARTZ:
24       Q.   When did your husband go on your health
25  benefits plan?
```

24

```
 1        A.    I don't recall.  I can check if it's

 2   necessary, but I can't tell you.

 3        Q.    Will you check and let Mr. Carman know

 4   when your husband went on your health insurance

 5   plan?

 6             MR. CARMAN:  Just make a request and I

 7        will respond to your request for information.

 8   BY MS. SCHWARTZ:

 9        Q.    Where is HAA Preferred Partners located?

10        A.    703 Waterford Way, Miami, Florida,

11   33126.

12        Q.    Do you commute from Wellington every

13   day?

14        A.    Sometimes I commute from Wellington

15   every day, sometimes I stay close by in an

16   apartment unit that we own here in Miami,

17   depending what time I finish my shift at work.

18        Q.    Do you know what this lawsuit is about?

19        A.    I believe so.

20        Q.    What is it about?

21             MR. CARMAN:  Objection to form.

22             THE WITNESS:  This lawsuit is about my

23        husband's attempt to receive two and a half

24        percent of a retirement benefit that was

25        agreed by Standard Pacific to be provided to
```

25

1       him, and for an age discrimination treatment

2       and abuse that he received.

3 BY MS. SCHWARTZ:

4       Q.   How do you know this?

5       A.   Because I live with the man --

6       MR. CARMAN:  Objection to form.

7       THE WITNESS:  -- and I know what has

8       been done to him and what has been done to my

9       family.

10 BY MS. SCHWARTZ:

11       Q.   You stated a moment ago that this is

12 about age discrimination that you perceived, I

13 think that's the word that you used -- strike

14 that.

15       A.   That he was subjected to.

16       Q.   When was he subjected to this

17 discrimination, alleged discrimination?

18       A.   When he was terminated.

19       Q.   Did he tell you that he was subjected to

20 this alleged discrimination prior to his

21 termination?

22       MR. CARMAN:  Objection to form.

23       THE WITNESS:  Repeat that again.

24       MS. SCHWARTZ:  Can you read the question

25       back.

26

```
 1              (Thereupon, the portion referred to was
 2    read by the reporter as above recorded.)
 3              MR. CARMAN:  Same objection.
 4              THE WITNESS:  No, my husband is a real
 5         very trusting individual, but I can tell you
 6         that I have personally been exposed to the
 7         discrimination actions that he has been
 8         subjected to.
 9    BY MS. SCHWARTZ:
10         Q.   What do you mean by you have been
11    exposed to the discrimination actions?
12         A.   Yes, in conversations with Diana,
13    Ms. Diana Ibarria, she told me at a social event
14    how my husband was getting old, how she did not
15    want him around, how he was forgetting things, he
16    came back and repeated things back to her all the
17    time, and that, you know, she really felt he was
18    getting old, she didn't know how is it that you
19    deal with this.
20         Q.   When was that conversation?
21         A.   That conversation was after the last
22    Christmas party that we attended, which was in
23    2005, December.  I tried to be cordial --
24         Q.   Well, just answer the question.
25              MR. CARMAN:  Excuse me, are you
```

27

1    finished, Mrs. Chernys?

2         THE WITNESS:  No, I'm not finished.

3         MS. SCHWARTZ:  Well, my question was

4    when was your conversation.

5         MR. CARMAN:  Counsel, she can finish her

6    answer.

7         MS. SCHWARTZ:  She finished the answer.

8         MR. CARMAN:  No, she didn't, she just

9    said she didn't finish.

10        THE WITNESS:  I did not finish, you

11   interrupted me, and I would like to --

12        MS. SCHWARTZ:  Let's start over, for the

13   record.

14        MR. CARMAN:  No, I would like her to

15   finish her answer, Counsel.  Finish your

16   answer, ma'am.

17        THE WITNESS:  Yes.  In 2005 was the

18   first year Diana presided over the Christmas

19   party.  She stood in the microphone and she

20   thanked my husband for the great work he was

21   doing in building their new office.

22        MS. SCHWARTZ:  Okay, I am going to move

23   to strike as nonresponsive, because my

24   question was --

25        MR. CARMAN:  She can finish.

28

1        MS. SCHWARTZ:  -- let me get it on the

2   record.

3        MR. CARMAN:  Counsel, you don't get to

4   interrupt the witness.

5        MS. SCHWARTZ:  No, Gary, I am not going

6   to argue with you on the record.

7        MR. CARMAN:  You don't get to interrupt

8   the witness.

9        MS. SCHWARTZ:  I'm not arguing with the

10  witness.

11       MR. CARMAN:  You are.  She's not done

12  with her answer.

13       MS. SCHWARTZ:  I am going to repeat my

14  question, which was when was this

15  conversation.  She's going into a whole

16  colloquy that was not responsive.

17       MR. CARMAN:  She's not getting both of

18  us down.  You don't get to interrupt the

19  witness --

20       MS. SCHWARTZ:  I know she's not getting

21  both of us down.

22       MR. CARMAN:  -- if you don't like the

23  answer.

24       MS. SCHWARTZ:  That's not the answer.

25       MR. CARMAN:  That's too bad, she's going

29

1    to give you the answer because --

2         MS. SCHWARTZ:  Gary, you have been doing

3    this for 30 years, you know this is

4    inappropriate.

5         MR. CARMAN:  -- she's giving you the

6    answer -- wrong, no one interrupts the

7    witness when they are answering the question.

8         MS. SCHWARTZ:  Right, but you do know

9    that when they are not answering the

10   question --

11        MR. CARMAN:  Ma'am, make your objection

12   after she's answered the question.

13        MS. SCHWARTZ:  You are the one making

14   the objections, not the speaking objections.

15        MR. CARMAN:  No, ma'am, there is no

16   objection.

17        MS. SCHWARTZ:  Okay.

18        MR. CARMAN:  Let her finish her answer.

19   Just because you don't like it, it's your

20   problem.

21        MS. SCHWARTZ:  The answer was when.

22        MR. CARMAN:  Let her finish the answer.

23        MS. SCHWARTZ:  She answered when.

24        MR. CARMAN:  Ma'am, she's not done.

25        MS. SCHWARTZ:  You want her to give a

30

1    whole speaking -- it's inappropriate --

2        MR. CARMAN:  Ma'am, I don't want her to

3    do anything.  You asked the question.  She's

4    giving you the answer.  You don't like it,

5    that's your problem.  Finish your answer,

6    Mrs. Chernys.

7        MS. SCHWARTZ:  Okay, well, the answer

8    is over, Mrs. Chernys.

9        MR. CARMAN:  No, it's not over.

10       MS. SCHWARTZ:  The question was when.

11       MR. CARMAN:  Ma'am, we are just going to

12   leave the deposition and go see the judge.

13       MS. SCHWARTZ:  If you are going to do

14   that, I will move for sanctions.

15       MR. CARMAN:  Do it.

16       MS. SCHWARTZ:  You are going to have to

17   come back.

18       MR. CARMAN:  Move for sanctions.  You

19   can't interrupt a witness' answer and tell

20   her not to finish it.

21       MS. SCHWARTZ:  Anybody who reads this

22   transcript will see that she answered the

23   question.

24       MR. CARMAN:  No, she didn't.

25

31

1  BY MS. SCHWARTZ:

2      Q.   Okay, Ms. Chernys, go on and give me

3  your whole speech that you wanted to tell me, go

4  ahead.

5      A.   Excuse me.  I would appreciate if you

6  treat me with some respect.

7      Q.   I am treating you --

8      A.   Would you stop?  This is not a speech,

9  okay, I'm speaking to you --

10     Q.   No, this is a deposition, I ask the

11  questions, you give the answers, and it needs to

12  be clear for the record this is not a

13  conversation.

14     A.   I understand.

15         MR. CARMAN:  Don't interrupt her.

16         THE WITNESS:  But please, don't classify

17     my speaking to you, this is very difficult

18     for me and very emotional.

19  BY MS. SCHWARTZ:

20     Q.   Um-hum.

21     A.   Okay?  Don't classify it as a speech

22  because you are demeaning me as a person.

23         MS. SCHWARTZ:  Okay, I'm moving to

24     strike as nonresponsive.

25         MR. CARMAN:  Finish your -- ma'am --

32

```
 1   BY MS. SCHWARTZ:
 2        Q.    Have you had any conversations --
 3        A.    In 2005 at the Christmas party --
 4        Q.    No, I'm not going to let this happen.
 5             MR. CARMAN:  Ma'am, you can't stop her.
 6             MS. SCHWARTZ:  I'm sorry, this is --
 7             MR. CARMAN:  She's allowed to give you
 8   answers.
 9             MS. SCHWARTZ:  She answered the
10   question.
11             MR. CARMAN:  No, she didn't.
12             MS. SCHWARTZ:  Can you go back and
13   read --
14             MR. CARMAN:  We are not going to go
15   back, Jennifer, she's going to give you the
16   answer.
17             MS. SCHWARTZ:  This is the most absurd
18   thing I have ever had happen during a
19   deposition.
20             MR. CARMAN:  We are going to give you
21   the answer.
22             MS. SCHWARTZ:  She answered the
23   question.
24             THE WITNESS:  I would like --
25             MR. CARMAN:  No, she did not.
```

33

1      MS. SCHWARTZ:  Gary, the question was

2   when.

3      MR. CARMAN:  Jennifer --

4      MS. SCHWARTZ:  She answered when.

5      MR. CARMAN:  She did not finish her

6   answer.

7      MS. SCHWARTZ:  Okay, can you let me say

8   something?

9      MR. CARMAN:  No.  Let her finish her

10   answer, then you can say whatever you want.

11      MS. SCHWARTZ:  The question was when.

12      MR. CARMAN:  Let her finish her answer

13   and you can say what you want.

14  BY MS. SCHWARTZ:

15   Q.   Okay, finish your answer.

16   A.   Okay, she told me that, as I said

17  before, that he was old, that he was forgetting

18  things, and how do you deal with this at home

19  because I don't know how much longer I can put up

20  with it.

21      I told her, you know, I tried to be

22  courteous, and thank you for the comments that you

23  made about my husband, and I really have nothing

24  else to discuss with you, my husband is a good

25  man, he works very hard, he's a very capable

34

1    individual, and what you are saying is out of

2    place.  I said he likes -- I know him for a long

3    time, sometimes he likes to handle things by

4    asking again rather than being confrontational,

5    but it's not because he's forgetting things.

6           MS. SCHWARTZ:  Okay, move to strike as

7        nonresponsive.

8    BY MS. SCHWARTZ:

9        Q.   My question was, when did this

10   conversation with Ms. Ibarria occur, the date.

11       A.   I answered it already.  Didn't I answer

12   it already?  Didn't I give you a date?  Do you

13   want me to say it again, is that what you are

14   asking me?

15       Q.   Yes, approximately when.

16       A.   December of 2005.

17       Q.   Have you had any conversations about

18   this case with Elizabeth Burdette?

19       A.   With who?

20       Q.   Elizabeth Burdette.

21       A.   No, I don't know who Elizabeth Burdette

22   is.

23       Q.   Have you had any conversations about

24   this case with David Webber?

25       A.   No.

35

1     Q.   Your husband was working for Westbrooke

2  when you met him; correct?

3     A.   Yes.

4     Q.   Do you know if he worked with Diana

5  Ibarria at Westbrooke?

6     A.   I believe so.  At that point, I didn't

7  know anyone at Westbrooke, I'm not sure.

8     Q.   Do you know if he worked with Hal

9  Eisenacher at Westbrooke?

10    A.   When?  Are you asking me when I met him?

11    Q.   Yes.

12    A.   No, Hal came much later.  I was already

13  married to my husband when Hal came to work at

14  Westbrooke.  That I know.

15    Q.   Did your husband work with Jim Carr at

16  Westbrooke?

17    A.   Yes, he did.

18    Q.   Do you know how long your husband has

19  known Diana, Hal and Jim?

20    A.   I know Jim he's known since he went to

21  work at Westbrooke.  Hal he knows since Hal came

22  to Westbrooke.  I believe my husband was at

23  Westbrooke already when Hal came in the picture.

24  And Diana, I don't know exactly when about she

25  came, I don't know if she was there, at what point

36

1   in that period of time.

2         Q.    What did he tell you about Hal when you

3   met him?

4              MR. CARMAN:   Objection to form.

5              MS. SCHWARTZ:   Strike that.

6   BY MS. SCHWARTZ:

7         Q.    What did he tell you about Jim Carr when

8   you met him?

9              MR. CARMAN:   Objection to form.

10  BY MS. SCHWARTZ:

11        Q.    Your husband.

12        A.    My husband, about Jim Carr?

13        Q.    Yes.

14        A.    When I met my husband?  We didn't

15  really -- when I first met my husband, we didn't

16  really, did not very much talk about his work, we

17  were in the dating period.  I don't think that --

18        Q.    Were you married to Mr. Chernys when

19  Westbrooke was acquired by Standard Pacific?

20        A.    Yes, I have been married to Mr. Chernys

21  for 23 years.

22        Q.    What did he tell you about Standard

23  Pacific when he began working there?

24              MR. CARMAN:   Objection to form.

25              THE WITNESS:   When he began working --

37

1           MR. CARMAN:  I don't understand the

2       question.

3  BY MS. SCHWARTZ:

4       Q.   What did Mr. Chernys tell you about

5  Standard Pacific when he first started working

6  there?

7           MR. CARMAN:  Same objection.

8           THE WITNESS:  When Mr. Chernys started

9       working at Westbrooke, Standard Pacific was

10       not in the picture.

11  BY MS. SCHWARTZ:

12       Q.   Right.

13       A.   So this is why I'm confused about your

14  question.

15       Q.   Okay, that's what I want you to tell me

16  when you are confused so I can rephrase it.

17       A.   I did that.

18       Q.   And I will rephrase it.

19           Okay, after Standard Pacific acquired

20  Westbrooke, when your husband started working for

21  Standard Pacific, what did he tell you about the

22  company?

23           MR. CARMAN:  Objection to form.

24           THE WITNESS:  He actually told me that

25       Standard Pacific was a very good company, he

38

```
 1        had met two of the principals, and that they

 2        seemed very nice, very honorable, nice

 3        easy-going people.  I think one of them was

 4        this man Courtney, whatever, and there was

 5        somebody, some other top executive.

 6   BY MS. SCHWARTZ:

 7        Q.   What was his opinion of the company's --

 8   strike that.

 9             Did he enjoy working at Standard

10   Pacific?

11             MR. CARMAN:  Objection to form.

12             THE WITNESS:  He enjoyed working at

13        Standard Pacific, yes, he thought it was a

14        solid company.

15   BY MS. SCHWARTZ:

16        Q.   How do you know this?

17             MR. CARMAN:  Same objection.

18             THE WITNESS:  As I told you before, he

19        had mentioned to me that he enjoyed working

20        with the people and they seemed to be good

21        businessmen and it was a solid company, a

22        national company, reputable.

23   BY MS. SCHWARTZ:

24        Q.   Did he look forward to going to work

25   every day?
```

1          MR. CARMAN:  Objection to form.

2          THE WITNESS:  He did.

3    BY MS. SCHWARTZ:

4          Q.    What did he tell you he enjoyed the most

5    about the job?

6          A.    My husband has told me that he always

7    enjoyed and dreamed of being in construction since

8    he was ten.  We always used to joke as to how

9    fortunate he was, because it's very hard to, you

10   know, at such an early age know what you want to

11   do.

12          Actually, he has a friend from his

13   childhood that we see occasionally, and they joke

14   about the fact that he, who is an attorney today,

15   was going to -- they used to play as kids, he was

16   going to be an attorney, he was going to -- my

17   husband was going to build the houses, and he was

18   going to be the attorney that was going to handle

19   the paperwork, so that's how long my husband has

20   loved the construction business.

21          Q.    What did he tell you he enjoyed the most

22   about working at Standard Pacific?

23          MR. CARMAN:  Objection to form.

24          THE WITNESS:  We did not speak about

25      that level of detail.  I have my career, he

40

1       has his.  My career is very consuming, we are

2       both overachievers, so that level of detail

3       of his profession is not discussed at home.

4       He couldn't, I don't think he could tell you

5       about me, either.

6   BY MS. SCHWARTZ:

7       Q.   Do you know who was president at

8   Standard Pacific in 2006?

9       A.   Of Standard Pacific?

10      Q.   Yes.

11      A.   I don't know.

12      Q.   Before his termination from Standard

13  Pacific, what was your husband's opinion of Diana

14  Ibarria?

15           MR. CARMAN:  Objection to form.

16           THE WITNESS:  Very interesting, because

17      my husband always felt that the team he

18      worked with for a long time, which included

19      Diana, Jim and Hal, were like family to him.

20  BY MS. SCHWARTZ:

21      Q.   What was your husband's opinion of Mike

22  Courtney?

23      A.   I don't know.  We never discussed

24  Mr. Courtney.

25      Q.   While your husband was working for

41

1   Standard Pacific in 2006, did he ever tell you

2   that he was considering retiring?

3       A.   In 2006?

4       Q.   Yes.

5       A.   Not that he was considering retiring.

6   There were some conversations I think that where

7   someone had with him, Diana, about maybe retiring

8   at the end of 2006.

9       Q.   Were you a part of any of those

10  conversations?

11      A.   No, ma'am.

12      Q.   Do you have any personal knowledge

13  regarding any of those conversations?

14      A.   Very superficial.  My husband and I have

15  a rule, because we both have very intensive

16  careers, we say to each other about our work what

17  is essential, because our time together is very

18  valued and precious to us, we don't bring those

19  superficial tensions into the household.

20           Probably that's why we have surpassed

21  the average time a marriage lasts in this country.

22           MS. SCHWARTZ:  I am going to show you

23      what I am having marked as Defendants'

24      Exhibit A to the deposition.

25

42

1          (Thereupon, Defendants' Exhibit A was

2    marked for Identification.)

3    BY MS. SCHWARTZ:

4          Q.    Do you recognize this document

5    (handing)?

6          A.    I recognize it because it is from me.  I

7    don't recall it, but yes, I recognize it

8    obviously.  It's an email I sent my husband.

9          Q.    It's an email you sent on March 3, 2006

10   regarding retirement planning; correct?

11         A.    Yes.

12         Q.    In your email you wrote, quote, "Maybe

13   you should go to this."  Is that correct?

14         A.    Yes.

15         Q.    Why did you send this email to your

16   husband?

17         A.    I have been discussing retirement

18   programs with my husband since the day we got

19   married.

20         Q.    Twenty-five years ago?

21         A.    Twenty-five years ago, because, you

22   know, this is America, and this is corporate

23   America, you have to start saving early.

24              My husband is a very, very conservative

25   investor.  I am a much more aggressive investor.

43

1  This would have been one of probably 15 investors

2  and programs we have looked into, you know.  Still

3  my husband does not like the stock market, does

4  not like any type of investments except CD's and a

5  little bit of real estate, because he feels he

6  knows that business, so this was one of many,

7  probably.

8      Q.   Did you review this document before your

9  deposition today?

10     A.   No, ma'am.

11     Q.   Who is Dan Kushner?

12     A.   Dan Kushner is a friend and an

13 accountant that I use in my company.

14     Q.   Did your husband go to this retirement

15 planning seminar?

16     A.   No, he did not.

17     Q.   Did he go to any retirement planning

18 seminars after you sent this email?

19     A.   No.

20     Q.   Did he go to any retirement planning

21 seminars before you sent this email?

22     A.   We spoke throughout our 20-some years of

23 marriage, including I remember clearly year one

24 that we were married, to financial planners, but

25 never really have done anything other than the

44

1  401(k) that he had, and we did some IRA's and that

2  type of very, very conservative.

3      Q.    Between 2004 and 2006, did your husband

4  go to any retirement planning seminars?

5      A.    Not to my knowledge.

6      Q.    Between that same timeframe, did he meet

7  with any retirement planning specialists?

8      A.    Not that I know of.

9      Q.    What are your husband's current sources

10 of income?

11     A.    My work.  I believe it's his main source

12 of income.

13     Q.    Any other sources of income?

14     A.    Not that I know of.

15     Q.    Does he receive any interest income on

16 any savings accounts that you are aware of?

17         MR. CARMAN:  Objection to form.

18         THE WITNESS:  I believe we have a couple

19     of CD's, but no, I don't know exactly.

20 BY MS. SCHWARTZ:

21     Q.    What bank are those CD's at?

22     A.    We bank with Bank of America.

23     Q.    Do you know how much interest he was

24 paid on those CD's in 2007?

25     A.    I do not know.

45

1          Do you want this back?

2     Q.    You can give it to the court reporter.

3          What company or person does your husband

4    use to invest in these CD's?

5     A.    I don't know.

6     Q.    Does your husband own any property other

7    than the Wellington condo?

8          MR. CARMAN:   Objection to form.

9          THE WITNESS:   We own the property in the

10         Bahamas that I think he has informed you

11         about, the barn that we built in Wellington,

12         the apartment where we live as a permanent

13         residence now, and the apartment here in

14         Miami that is really our daughter's apartment

15         that we are staying at.

16   BY MS. SCHWARTZ:

17    Q.    You are staying in that apartment right

18   now?

19    A.    Sometimes I do, yes, sometimes.  I am

20   55-years-old.  Sometimes I really don't have the

21   energy at 10:00 at night to drive to Wellington.

22   My life has changed drastically for the worse.

23    Q.    Where in Miami is that apartment

24   located?

25    A.    Right here on 1000 Venetia.  I'm sure my

46

1   husband answered the same thing to you already.

2       Q.   Well, and he also --

3       A.   It's redundant.

4       Q.   How often do you use the Bahamas

5   property?

6       A.   Not as much as we had planned to use it.

7   Rarely.

8       Q.   When was your last trip there?

9       A.   Over a year ago.

10      Q.   In 2007?

11      A.   Yes.

12      Q.   Is the property currently rented?

13          MR. CARMAN:  Objection to form.

14          THE WITNESS:  The property is in a

15      rental pool and it gets rented as a hotel.

16  BY MS. SCHWARTZ:

17      Q.   Is it rented right now?

18      A.   I have no idea.  What is today, I have

19  no idea.  Like I said, if it's rented as a hotel,

20  it could rent for two nights, it could rent for

21  three nights, today I don't know.

22      Q.   How much rental income do you receive

23  when the property is rented?

24          MR. CARMAN:  Objection to form.

25          THE WITNESS:  I don't know either,

47

1      because it's seasonal and it varies year to

2      year.

3  BY MS. SCHWARTZ:

4      Q.    Do you know when it was last rented?

5      A.    I have no idea.

6      Q.    How many bedrooms is it?

7      A.    Two bedrooms.

8      Q.    Is it directly on the ocean?

9      A.    No, unfortunately not.

10      Q.    What is the name of the condo building?

11      A.    I think it's Grand Isle Villas or Grand

12  Isles Villas.  I don't know if there is an "S"

13  there or not.

14      Q.    Do you know the address?

15      A.    It's in Exuma, Georgetown, Exuma.  There

16  is no addresses in Exuma.  Too small.

17      Q.    Ms. Chernys, it may be difficult for the

18  court reporter to hear you if you are not sitting.

19      A.    I need to stretch a little.

20          MS. SCHWARTZ:  You want to take a break?

21          THE WITNESS:  Yes.

22          MR. CARMAN:  Why don't we take a break.

23          MS. SCHWARTZ:  Let's take a break for a

24      few minutes.

25

48

1          (Thereupon, a recess was taken, after

2     which the following proceedings were had:)

3     BY MS. SCHWARTZ:

4          Q.    Let's go back on the record.  Is there a

5     mortgage on the Bahamas condo?

6               MR. CARMAN:  Objection to form.

7               THE WITNESS:  Yes, there is.

8     BY MS. SCHWARTZ:

9          Q.    How much is the mortgage?

10         A.    I don't know.

11         Q.    How much are the monthly payments on the

12    mortgage?

13         A.    I don't know.

14         Q.    Who pays the mortgage, you or

15    Mr. Chernys?

16         A.    Mr. Chernys.  It's strange calling him

17    Mr. Chernys, so I will refer to him as Len if you

18    don't mind.

19         Q.    Whatever you are comfortable with.

20               Is there a company that rents the condo

21    out for you?

22         A.    Yes, there is.

23         Q.    What is the name of that company?

24         A.    Grand Isles.

25         Q.    Is that company's office also located in

49

1   Exuma?

2        A.    Yes, it is.

3        Q.    Who do you work with at the company to

4   rent the property?

5        A.    The rental pool.  There is a front desk.

6        Q.    How do they know when they are allowed

7   to rent the property out?

8             MR. CARMAN:  Objection to form.  What is

9        this relevant to, the reason why she's on a

10        witness list and what she's going to testify

11        in the court case for?

12             I'm a little lost as to what, Counsel,

13        your goal is here.  If it's to waste time,

14        then we are just going to have to cut it

15        short.  I will let you answer this question

16        and then I am going to limit you after that,

17        ma'am.

18             THE WITNESS:  They rent the property as

19        much as they can because these are the

20        instructions that we have given due to our

21        present situation that my husband is not

22        working.

23             The law in the Bahamas allows you to use

24        a property for 90 days, so we could have used

25        it for that, but we haven't exercised that.