50

1       Actually, we are in the list to rent the

2       property to the maximum until the property

3       sells, because the property is for sale.

4  BY MS. SCHWARTZ:

5       Q.   When was it listed for sale?

6       A.   Already quite a few months.

7       Q.  How much are you asking for it?

8       A.   I think probably the same -- I don't

9  know.  I really don't know.  I don't want to guess

10  because I do not know.

11       Q.  Are you asking more than a million

12  dollars?

13       MR. CARMAN:  Objection to form.

14       THE WITNESS:  I think so, because that's

15     what we paid for it.

16  BY MS. SCHWARTZ:

17       Q.   Is the barn in Wellington currently

18  rented?

19       A.   No.

20       Q.   When was it last rented?

21       MR. CARMAN:  Same objection.  And I am

22     going to start giving her the same

23     instructions, it's not relevant to the case.

24     It's strictly a waste of time.

25     MS. SCHWARTZ:  I will tell you why it's

51

1    relevant, if that will resolve the issue, if

2    you care.

3         MR. CARMAN:  Just say what you would

4    like.

5         MS. SCHWARTZ:  Okay, she's a witness in

6    the case.

7         MR. CARMAN:  But she's not here to

8    testify as to their house.

9         MS. SCHWARTZ:  I don't know what she's

10   here to testify.

11        MR. CARMAN:  Ask her.

12        MS. SCHWARTZ:  But I'm asking her

13   questions that were asked as part of

14   Mr. Chernys' deposition and he didn't know

15   the answer to them.  She's his wife, she's

16   the next logical person to ask, and she's a

17   witness in the case.

18        MR. CARMAN:  Well, I don't agree with

19   you.

20        MS. SCHWARTZ:  And it goes to her

21   damages claim.

22        MR. CARMAN:  No, it doesn't.  She

23   doesn't have a damages claim.

24        MS. SCHWARTZ:  I think it goes to her

25   damages claim.

52

1    BY MS. SCHWARTZ:

2       Q.    When was the barn last rented?

3         MR. CARMAN:   Same objection.

4         THE WITNESS:   Let's see, we are in 2008,

5      in 2006, the end of 2006.   It's a seasonal

6      rental, and it always loses money.

7    BY MS. SCHWARTZ:

8       Q.    How much was it rented for?

9         MR. CARMAN:   Objection to form.

10        THE WITNESS:   I do not remember.

11    BY MS. SCHWARTZ:

12       Q.    How long was it rented for?

13       A.    Well, you would have to understand the

14 horse business, and it would take me awhile to

15 explain it to you, but for the horse season in

16 Wellington, which is about four months.

17       Q.    Is the barn currently for sale?

18       A.    Yes, it is.

19       Q.    When was that listed for sale?

20       A.    Probably a few months after my husband

21 lost his job.

22       Q.    How much are you asking for it?

23         MR. CARMAN:   Objection to form.

24        THE WITNESS:   I don't know.   I don't

25      recall.

53

1  BY MS. SCHWARTZ:

2      Q.   Is it more than a million dollars?

3          MR. CARMAN:  Same objection.

4          THE WITNESS:  Yes, it is.

5  BY MS. SCHWARTZ:

6      Q.   Is there a mortgage on the barn?

7      A.   Yes, there is.

8      Q.   How much is the mortgage?

9      A.   I don't recall.  I can check if you need

10 to know.

11     Q.   Do you or your family use the barn in

12 Wellington?

13         MR. CARMAN:  Objection to form.

14         THE WITNESS:  Unfortunately not, because

15     right now we really cannot afford to have

16     horses there.  My daughter stays there in the

17     apartment sometimes, it makes her feel good.

18     That barn was supposed to be for her, and

19     she's been traumatized by all of this

20     experience.

21 BY MS. SCHWARTZ:

22     Q.   Is your condo in Miami Beach listed for

23 sale?

24     A.   Yes, it is.

25         MR. CARMAN:  Objection to form.

54

1  BY MS. SCHWARTZ:

2       Q.    When was that listed for sale?

3       A.    Around the same time as the barn after

4  my husband lost his job.

5       Q.    Within a few months?

6       A.    Yes.

7       Q.    Is there a mortgage on the condo?

8       A.    Yes, there is.

9       Q.    How much is the mortgage?

10      A.    I don't recall.

11      Q.    Does anyone other than you use the condo

12  on Miami Beach?

13      A.    Not on Miami Beach; first of all, it's

14  Miami.

15      Q.    On the Venetian Causeway?

16      A.    Yes, it's Miami.  No, just us.

17      Q.    Did your husband ever talk to you about

18  the elimination of his profit sharing at Standard

19  Pacific?

20           MR. CARMAN:  Objection to form.

21           THE WITNESS:  I really don't understand

22      your question, because my husband's profit

23      sharing, as far as I know, was not

24      eliminated.

25

55

1   BY MS. SCHWARTZ:

2        Q.   Okay, I will rephrase it.

3        But just for the record when I say

4   Standard Pacific, I'm referring to Standard

5   Pacific of South Florida.

6        A.   Okay.

7        Q.   Did your husband ever tell you that he

8   was informed his profit sharing at Standard

9   Pacific was being eliminated?

10        MR. CARMAN:  Objection to form.

11        THE WITNESS: Not exactly as you are

12       putting it.  My husband felt that he had a

13       profit sharing of two and a half percent of

14       profit until the year 2006, and then when

15       Diana became president and possibly because

16       of her strong dislike of my husband, she

17       started messing around with that to hurt him,

18       I think.

19   BY MS. SCHWARTZ:

20        Q.   My question was, did your husband tell

21   you that his profit sharing was being eliminated?

22        A.   No.

23        Q.   Before his termination, did he ever tell

24   you that he was looking to leave Standard Pacific

25   to do something else?

56

1          MR. CARMAN:  Objection to form.

2          THE WITNESS:  My husband had no plans to

3     leave Standard Pacific.  My husband loved

4     what he did.

5  BY MS. SCHWARTZ:

6     Q.   Did your husband tell you how the drop

7  in the real estate market affected Standard

8  Pacific of South Florida in 2006?

9          MR. CARMAN:  Objection to form.

10  BY MS. SCHWARTZ:

11     Q.   While he was working there?

12          MR. CARMAN:  Same objection.

13          THE WITNESS:  We never discussed

14     Standard Pacific specifically, and I think

15     that probably had to do with the fact that my

16     husband worked for Westbrooke many years

17     through other situations where the market did

18     badly, but Jim Carr always managed to do well

19     and even make money when other markets, other

20     areas of the market, so he probably did not

21     believe it affected him, especially when at

22     the beginning of 2006, Standard Pacific spent

23     a lot of money in the new office building and

24     new furniture and what appeared to be an

25     expansion in South Florida.

57

1    BY MS. SCHWARTZ:

2         Q.    Did he tell you about the reduction in

3    force at Standard Pacific in 2006?

4              MR. CARMAN:  Objection to form.

5              THE WITNESS:  No, we never discussed

6         that.

7    BY MS. SCHWARTZ:

8         Q.    Did he tell you that Standard Pacific

9    offered to hire him as a consultant?

10             MR. CARMAN:  Objection to form.

11             THE WITNESS:  We discussed the

12        consultant agreement at some point in 2006.

13   BY MS. SCHWARTZ:

14        Q.    What did he tell you about it?

15        A.    We very briefly discussed like I told

16   you only the essentials of what I needed to know,

17   because that is our agreement in the marriage,

18   that he had been offered this consultant

19   agreement, that he was not comfortable with some

20   of its terms, and that he felt that the consultant

21   agreement was unfair, but he had all the trust and

22   confidence in Diana and all the years of their

23   relationship that she was telling him the truth

24   that she wanted him to stay, and that she was

25   going to work things out so he could stay in a

58

1   position that was fair and equitable financially

2   for him.

3        Q.    What do you mean by that was your

4   agreement in the marriage?

5            MR. CARMAN:  Objection to form.

6            THE WITNESS:  My husband and I do not

7        discuss things about his work and do not

8        discuss things about my work unless it's

9        essential, unless they are key issues.

10           There is a lot of B.S. that goes on in

11       every office every day, and like I said, we

12       both have very, very challenging professions,

13       I'm a very aggressive business person, I'm an

14       overachiever and so is he, so at some point,

15       we need to relax.  We decided very, very

16       early on not to bring those things home.

17           The moment I got home, I would

18       disconnect myself and take care of our

19       daughter and our home and our social family

20       life, and that was the agreement.  The same

21       with him.  He also felt he worked in a family

22       environment, he felt that the people at

23       Westbrooke, including Diana Ibarria, were his

24       family, and he used to refer to them as such.

25       He was perfectly comfortable in that

59

1      environment, and as such, he never felt that

2      anything bad was going to happen to him.

3  BY MS. SCHWARTZ:

4      Q.    Did your husband tell you that he

5  rejected the offer for the consultancy position?

6           MR. CARMAN:  Objection to form.

7           THE WITNESS:  We did not discuss that.

8      I told him, you are a big boy, you do

9      whatever you need to do, you can negotiate

10     your agreement.  If you feel that you are

11     being treated fairly, then you should be able

12     to discuss it and, you know, deal with it.

13 BY MS. SCHWARTZ:

14     Q.    Did he tell you about his efforts to

15 negotiate the agreement?

16     A.    No.

17           MR. CARMAN:  Objection to form.

18           THE WITNESS:  But I do know because of

19     the one conversation there were some parts

20     about the agreement that bothered him, you

21     know, very much, and this is why I said,

22     well, you know, you need to sit down and

23     negotiate, just like any other contract.

24           You are an attorney, you know how that

25     goes.

60

1  BY MS. SCHWARTZ:

2      Q.    After you had that conversation with

3  your husband, when was the next time you talked

4  about the consultant agreement?

5          MR. CARMAN:   Objection to form.

6          THE WITNESS:   I don't recall speaking to

7      my husband about the consultant agreement

8      again, except one more time where he said

9      that Diana had made a counteroffer for much

10     more money to him and he was waiting to get a

11     revised copy, and I just said in passing,

12     "Yeah, you should get it on paper if it is

13     that they are going with paper this time,"

14     because all along he's had this agreement,

15     he's been paid his profit sharing without

16     really a contract or anything like that, so

17     we thought it was normal course of business

18     of corporate America, this is now a big

19     company, they wanted to go with paper.

20         He's a very trusting person, and like I

21     said, he's worked there for 28 years, neither

22     one of us thought anything of it.  I said,

23     "Yeah, you should then discuss it," and that

24     was the end of it.

25

61

1    BY MS. SCHWARTZ:

2        Q.    Did he tell you why he rejected it,

3    rejected the counteroffer?

4            MR. CARMAN:  Objection to form.

5            THE WITNESS:  Like I told you, there

6        were some terms in the agreement that he said

7        he was not comfortable with.  I don't know

8        what those terms were.  I'm not an attorney

9        and I didn't look at them.

10   BY MS. SCHWARTZ:

11       Q.    What happened between that conversation

12   and him deciding to file this lawsuit?

13           MR. CARMAN:  Objection to form.

14           THE WITNESS:  I don't know what happened

15       between this conversation and him deciding to

16       file the lawsuit, other than he was fired,

17       not even in person, not even with the dignity

18       that a 28-year-employee deserves of at least

19       having a face-to-face conversation like we

20       are having.

21           I can tell you, as a manager and as a

22       business person, I have never seen an

23       individual treated this way.  I don't treat

24       my housekeeper, nor my dog that way.

25

62

BY MS. SCHWARTZ:

    Q.   Do you think he was fired before or after he was offered the consultant position?

        MR. CARMAN:  Objection to form.

        THE WITNESS:  I think he was fired after the consultant agreement.  I believe very strongly that because he rejected the agreement and because he rejected to sign the clauses that he felt were not comfortable to him, as retaliation to him, he was fired.

        If you really want me to tell you what I believe, seems like this time you don't mind that I continue speaking beyond the question, I would tell you also that I very, very strongly believe, too, that this whole thing was a tactic not to pay him his two and a half percent in his last year.

BY MS. SCHWARTZ:

    Q.   Just so that I am clear, you think that he was fired after he was offered the consultant agreement in retaliation for not accepting the agreement?

    A.   The consultant agreement, correct, that's what I believe.

    Q.   Does your husband suffer from high blood

63

1  pressure or high blood sugar?

2      A.   My husband has deteriorated tremendously

3  since he was fired.

4      Q.   Ms. Chernys, my question is, does he

5  suffer from high blood pressure or high blood

6  sugar?

7          MR. CARMAN:  Objection to form.

8          THE WITNESS:  Subsequent to his

9      termination with Westbrooke, yes, he started

10     suffering from high blood pressure and

11     glucose.

12 BY MS. SCHWARTZ:

13     Q.   Did he have high blood pressure or

14 glucose problems before his termination from

15 Standard Pacific?

16     A.   No, ma'am.  He was on Lipitor for

17 cholesterol, but he was not on those medications.

18     Q.   Did you notice any changes in your

19 husband's behavior after his employment ended at

20 Standard Pacific?

21     A.   Definitely.

22     Q.   Okay.  What type of changes did you

23 notice?

24     A.   My husband shut down totally, almost

25 like -- and I'm not a doctor, but I have been in

64

1   healthcare for over 25 years, almost like he was

2   in shock, he was in total denial.

3           He would sit in front of the television

4   like a zombie.  It affected our personal life, and

5   tremendously affected our intimate sexual life.

6   He would just sit there for hours, he did not want

7   to leave the house.  I couldn't convince him to go

8   to a movie.  I couldn't convince him to go to a

9   restaurant.  I couldn't even convince him to go

10  downstairs to the gym and try to get some

11  exercise.

12      Q.   Has his behavior changed since he filed

13  this lawsuit against Standard Pacific?

14           MR. CARMAN:  Objection to form.

15           THE WITNESS:  I don't think that his

16      behavior has changed because he filed a

17      lawsuit.  I believe that my daughter, my

18      myself and the support group that he has in

19      his family has worked very, very hard, very

20      hard to bring him out of that depression, as

21      well as, you know, his doctor put him on

22      medication.

23           I convinced him to go to an M.D. that I

24      see that is also a holistic doctor.  He got

25      some supplements, she put him on an exercise

65

1      plan, so did Dr. Feldman.  I convinced him

2      that he needed to be stronger than this, that

3      these people that were doing this to him were

4      really not worth it, these people that he

5      thought were his family and his best friends,

6      and this is why, you know, this was such a

7      shock to him.

8  BY MS. SCHWARTZ:

9      Q.   Has he come out of his depression since

10  then?

11          MR. CARMAN:  Objection to form.

12          THE WITNESS:  I don't think totally.  I

13      think my husband has learned to cope with it.

14        My daughter was extremely affected by

15      the situation, okay, and my daughter, even I

16      didn't even say -- I'm sorry, this is very

17      emotional for me, so you have to give me a

18      moment because I don't want to start crying.

19  BY MS. SCHWARTZ:

20      Q.   Do you want to take a break?

21      A.   No, I want to continue because I don't

22  want to lose my trend of thought, I also have to

23  be stronger than this.

24      Q.   Who is the holistic doctor you referred

25  him to?

66

1    A.    Nancy Eklund.

2    Q.    Can you spell her last name?

3    A.    N-A-N-C-Y, Nancy, E-K-L-U-N-D, Eklund.

4    Q.    Where is she located?

5    A.    Kendall.

6    Q.    What kind of doctor is she?

7    A.    She's an M.D., with a subspecialty,

8  Board certified in holistic medicine.  It's a

9  recognized specialty these days.

10    Q.    You testified earlier that the doctor

11  put Mr. Chernys on medication, but it wasn't clear

12  to me if you were saying it was because of his

13  depression that he was on medication.

14    A.    He was on medication because of his high

15  blood pressure and the sugar, and actually he even

16  came home with a glucometer, which made me very,

17  very nervous, and this is why I pushed him to go

18  to Dr. Eklund to find natural ways.

19        My husband refused to go to a

20  psychiatrist, after very many tense conversations

21  we had about that, because he does not believe in

22  taking medicine, and this is why I took him to

23  Dr. Eklund because she attempted to, through

24  exercise and that type of thing, help his mental

25  condition.  You know, there is a belief that when

67

1    you exercise, the brain releases endorphins, which

2    make you feel better.

3         Q.   Is he still seeing Dr. Eklund?

4         A.   Yes, when he needs to.

5         Q.   When was the last time he saw

6    Dr. Eklund?

7         A.   I don't remember.

8         Q.   Has his condition improved since he's

9    been seeing her?

10        A.   Yes, my husband's condition has

11   improved.

12        Q.   Did your husband tell you that he was

13   upset after Diana Ibarria's deposition?

14             MR. CARMAN:  Objection to form.

15             THE WITNESS:  Yes.  My husband was

16        devastated, not upset.

17   BY MS. SCHWARTZ:

18        Q.   What did he tell you about that?

19        A.   That he could not believe that somebody

20   could be such a liar, such a hypocrite, and could

21   say the things that she said in that deposition

22   after for all of these years, up to and including

23   the last few months that he was at this company.

24             All she kept saying was how much she

25   needed him and she also expressed that to me on

68

1    one occasion, so we both really believed that to

2    be the case; and for her to be the co-worker and I

3    should say a friend, but more important not

4    professionally, she respected him and respected

5    his abilities, because she said to me at a wedding

6    of someone the year before his termination, of

7    someone from the company that she sat next to me,

8    of how she was so, so happy that he was there, how

9    she took the job as president because she did not

10   want someone from the outside taking it, and how

11   my husband had turned it down so she felt that to

12   keep it in group she needed to take it, but she

13   knows nothing about construction, as we all well

14   know, and without him she would be lost.

15       Q.    When was that conversation?

16       A.    Sometime, I guess -- I don't know,

17   exactly what time it was.  It was at the wedding

18   of somebody by the name of Mike that worked for

19   the company.  I don't know if it was in -- I think

20   it may have been in 2005.  Right after.

21       Q.    It was after Diana became president.

22       A.    Yes, sometime after that.

23       Q.    Did your husband tell you he was upset

24   after anyone else's depositions in this case?

25       A.    No.  I think he was heartbroken because

69

1   of Diana's lies and testimony.

2       Q.    How do you think this lawsuit has

3   affected him?

4           MR. CARMAN:   Objection to form.

5           THE WITNESS:   How has it has affected

6       him?   It has affected him tremendously, has

7       destroyed his self-esteem as a person.

8           Most important, I think it is -- as a

9       professional, I will tell you the way in

10      which the whole thing was handled so

11      unprofessionally by Diana, the fact that

12      behind his back, she was telling people all

13      of these horrible things about my husband

14      that we have found subsequently and since and

15      started happening a week before, how we have

16      gone places and ran into people, co-workers,

17      people that respected him that had heard he

18      had been fired and terminated and, you know,

19      because he wasn't doing his job.

20  BY MS. SCHWARTZ:

21      Q.    How do you know Diana has been saying

22  these things about Lenny?

23      A.    Well, about a week before, about a week

24  before his termination, we attended the Cystic

25  Fibrosis Foundation event that my husband and I

70

```
 1   have been co-chairing with Westbrooke as a sponsor
 2   for more than eleven years, I think.
 3              Diana did not go that day, interesting
 4   enough.  She claimed she had been involved in a
 5   car accident that precluded her from attending,
 6   even though she was the major sponsor and she was
 7   expected there to give a presentation, she was
 8   going to receive as every year recognition for
 9   being the major sponsor.  She didn't show her
10   face, I believe it was only because she did not
11   want to face my husband.
12              But that day, I saw all of these
13   Westbrooke employees, even people that I really
14   did not know because I only visited Westbrooke
15   from Christmas party to Christmas party, I have my
16   professional life, my husband has his professional
17   life, these people started coming to me and
18   telling me how sorry they were about what was
19   being done to my husband, how horrible things
20   Diana was saying about him, and they wanted me to
21   know how much they appreciated my husband, how
22   much they knew it was not true, and you know, to
23   try to comfort me, they said.
24              And I didn't know what was going on,
25   this was what is amazing, I said what are the
```

71

1  people telling me, they were speaking to me like I

2  was a widow, you know.  And I remember a couple of

3  them saying, well, you know Diana's mouth, you

4  know Diana has been known constantly since the

5  beginning for being a blabbermouth, you know

6  Diana, you know how Diana talks, you know that

7  Diana, quote, somebody said to me, "engages the

8  mouth before engaging the brain."

9      Q.    Who said these things to you at that

10 foundation?

11     A.    Different people, different employees of

12 Westbrooke that were there.

13     Q.    Can you give me their names?

14     A.    No, I don't recall their names.

15 Actually, there were a couple of people that I

16 didn't even know, they knew I was Lenny's wife and

17 I had not seen.

18     Q.    Do you recall the name of even one of

19 them?

20     A.    If I do, I will tell you, it's been

21 awhile.  And I was so shocked that I -- I didn't

22 know, I was very, very surprised.  Here I went to

23 my -- this event every year that was a fun event,

24 and these people are telling me these things.

25          Then when I finished and we left, I said

72

1    to my husband, "I have never been so humiliated in

2    my entire life," and I told him what was

3    happening.  And he said to me, "You should have

4    told me, we would have left."  And I said, "No, I

5    wouldn't let them get the best of me."  I said,

6    "Something is going on."  I said to him, "You need

7    to know that something is going on and you can't

8    trust Diana."  And that was the first time that we

9    realized that something was going on.

10          And the following week, she fired him

11   over the phone without having any consideration

12   even as to how she should behave as a CEO, because

13   I can tell you I'm a CEO of a company and you must

14   know how to be a CEO, how to give your place as a

15   CEO.

16        Q.    Going back to the people who spoke to

17   you at the event.

18        A.    Yes.

19        Q.    I know you don't recall their names.

20        A.    Yes.

21        Q.    Do you recall how many people spoke to

22   you about Lenny?

23        A.    Five or six, five or six people.

24        Q.    Do you recall how many of them were men?

25        A.    No, but I can tell you there was even

73

1   one of the subcontractors, okay, which is shameful

2   for Standard Pacific that this type of dirty

3   laundry has to go out into the community.

4       Q.   Can you describe any of them at all?

5       A.   No.

6       Q.   So that maybe I could eventually figure

7   out their identity?

8       A.   No.  I have to tell the truth, maybe I

9   have blocked that, it was such an unpleasant day.

10  I went into that party to have a good time and I

11  was totally humiliated, because my husband is a

12  good man and a capable man.

13      Q.   Did you tell Lenny who at that event,

14  who came up to you at the event?

15          MR. CARMAN:  Objection to form.

16          MS. SCHWARTZ:  Strike that.

17  BY MS. SCHWARTZ:

18      Q.   Did you tell Lenny who came up to you to

19  talk about Diana saying that?

20      A.   He asked me the same questions that you

21  did, and at that point I think I told him a couple

22  of people, or I described them physically.

23          But no, there was actually one person in

24  Sales that said to me not only Diana was the

25  person that was maliciously destroying him, but

74

1    the director of Sales, a woman that I don't even

2    know also, they were on this campaign, and you

3    know political campaigns work.

4         Q.   Now, at the time of this Cystic Fibrosis

5    event, is it your testimony that Lenny did not

6    know anything about the fact that he was going to

7    be terminated from the company?

8              MR. CARMAN:  Objection to form.

9              THE WITNESS:  That is correct.  Not only

10             that, but most important, my husband did not

11             know that -- he was being told to his face

12             you are wanted, let's work on a way that you

13             can stay here, whether it's a new employee

14             arrangement, whether it's this consultant

15             contract, and you are wanted, you are wanted,

16             and behind his back, and the reason if we go

17             back to why -- you asked me, the point of

18             this question was initially why was my

19             husband so devastated about Diana's

20             testimony, and this, I'm just using this as

21             an example as to why he was so devastated,

22             because he realized that he was being told

23             something to his face, and behind his back

24             the wheels were in motion to, you know,

25             destroy his person, his character, his

75

 1    career.

 2   BY MS. SCHWARTZ:

 3       Q.   Aside from the Cystic Fibrosis event,

 4   have there been any other occasions when people

 5   came up to you and said something that Diane had

 6   told them?

 7       A.   Right after my husband was terminated,

 8   had to be in November because we went to vote, we

 9   went to the Pinecrest office to vote, and he ran

10   into a subcontractor.  When they said hello, the

11   person said to him, also, "Oh, I heard you were

12   terminated, and the horrible things that they are

13   saying about you, how can you allow that?  I mean,

14   I know they are not true, Len."

15       Q.   Who was that?

16       A.   I don't know the man.  I tell you, I

17   don't know.  This was somebody that, you know, I

18   was with my husband and I just was just quiet, my

19   husband was --

20       Q.   Do you know what --

21       A.   -- no, I did not want to --

22       Q.   I have to ask the whole question.

23       A.   I understand, but let me finish, okay.

24            My husband at that point was very, very

25   depressed and very upset, so I did not discuss it

76

1   with him, I didn't ask any questions, I moved -- I

2   didn't want to do a lot.

3       Q.    Do you know what company the

4   subcontractor worked for?

5       A.    No, ma'am.

6       Q.    What were the terrible things that he

7   said were being said about him?

8       A.    That Diana was telling everybody that my

9   husband was terminated because he was not good at

10  his job, he was unable to perform his job, that he

11  was getting, quote, senile, all of those types of

12  things derogatory to my husband's person, which I

13  do not understand how can an employer terminate --

14  I have had to terminate people in my career, it's

15  normal when you run a business, but you have to do

16  it with dignity, okay, and especially when

17  somebody has worked for you for 28 years, this is

18  why I personally am trying to figure out what is

19  it that bothers her about my husband to have to do

20  this in this form.

21          MR. CARMAN:   I need to take a break for

22      a minute.   Take a five minute break.

23          (Thereupon, a recess was taken, after

24  which the following proceedings were had:)

25

77

BY MS. SCHWARTZ:

Q.    Other than the Cystic Fibrosis event and
the voting poles event in November of 2006, were
there any other occasions when somebody came up to
you and your husband and said anything about Diana
Ibarria talking about him?

A.    My daughter, unfortunately.

Q.    Diana Ibarria -- oh.

A.    My daughter, yes, unfortunately, my
daughter made comments to me because she goes to
the same school as Jim Carr's daughter, that she
had heard that her father had been fired through
the daughter of another builder that also goes to
the school, that her father had been fired, and my
daughter was devastated.

My daughter didn't know what was
happening, she was very nervous and upset about
it.  She was back in Miami after being away her
first year in college in New York.  We had an
agreement with her that if she did well in school
the first year, she needed to take a sabatical
from her writing, she could come back and she
could write.

My daughter was very, very nervous
because she had always known us to be hard working

78

1   people and both of us to be good providers, she

2   was very upset seeing my husband so depressed, and

3   she's young, so she had to go on medication and

4   she had to see a psychologist for depression.

5        Q.   Did Diana Ibarria say anything to your

6   daughter about your husband?

7        A.   No, she did not, but my daughter heard

8   through kids of people that had heard not about

9   Diana specifically, but the way in which my

10  husband had been quote, fired, from a job, rather

11  than, you know, retired properly from a job.

12            And of course, you know, I'm not saying

13  Diana said anything to my daughter, but Diana is

14  responsible for the actions of terminating my

15  husband in the manner in which he was terminated.

16       Q.   Okay, my question is, did you hear from

17  anybody else that Diana Ibarria --

18       A.   No.

19       Q.   Let me finish the question for the

20  record.

21       A.   Yes, ma'am.

22       Q.   Did you hear from anybody else that

23  Diana Ibarria had said something about your

24  husband that was negative to them after your

25  husband's termination?

79

1    A.    No, I have not.

2    Q.    And you cannot recall names of any of

3  the people who made --

4    A.    No.

5    Q.    -- any comments at the Cystic Fibrosis

6  event; correct?

7    A.    No.

8    Q.    You cannot recall the names of the

9  contractor at the election pole?

10   A.    I don't even know that man.  That man

11 approached my husband to say hello.

12   Q.    What are your husband's hobbies and

13 interests?

14   A.    Well, presently my husband makes an

15 effort to go for walks and tries to do some

16 physical exercise to ease his mind and elevate his

17 mood.  He rarely plays tennis any more, which he

18 used to love.  Occasionally we will do yoga, but

19 primarily right now he goes for walks every day.

20   Q.    Do you and your husband spend time with

21 your daughter and his other daughter as a family?

22   A.    Of course.

23   Q.    What type of things do you do together

24 as a family?

25   A.    We have dinners at home, holidays, the

80

1   horse shows.  Len's daughter has a baby, a

2   two-year-old child, so the usual thing you do with

3   two-year-olds, go to the park, you play with them.

4        Q.    Does your husband take his grandchild to

5   the park?

6        A.    He does spend time with his grandchild,

7   yes.

8        Q.    How often do they do that?

9             MR. CARMAN:  Objection to form.

10             THE WITNESS:  Not often enough, I would

11        tell you, because of the distance now, we

12        unfortunately have had to more permanently

13        move to Wellington where we can afford

14        housing more comfortably, and they live here

15        in Aventura, but we used to see them every

16        other weekend more or less.

17   BY MS. SCHWARTZ:

18        Q.    Do you see them now every other weekend?

19        A.    No, we see them now about once a month.

20        Q.    Have you gone on any vacations together?

21        A.    No, unfortunately not.  Right after my

22   husband was fired, he took a trip with me.  I was

23   going to a conference and he had planned to go on

24   that trip with me, and I had to force him to come

25   with me, just because I wanted him to get out of

81

1  the house and I did not want him to stay behind

2  alone, and I needed to go because it was a

3  business conference.

4       Q.   Where was that conference?

5       A.   In Prague.  I had bought a ticket for

6  him with I think American Express points and, you

7  know, the hotel was paid by my employer, so

8  contrary to what would happen in the past if he

9  went to any social event with me where during the

10  day when I was at the conference, he would go out

11  and he would scout so when I have free time, we

12  could do things together.  Very much to my

13  surprise and my disturbance, actually, I would

14  come back from the conference 4 and 5 in the

15  afternoon, and he had not even left the room, so.

16       Q.   Do you have any vacations planned --

17       A.   No.

18       Q.   -- in the future?

19       A.   No.

20       Q.   Do you know if your husband has

21  maintained any contact with any of his former

22  co-workers in Standard Pacific?

23            MR. CARMAN:  Objection to form.

24            THE WITNESS:  I don't know exactly, no.

25       I cannot tell you.  I go to work very early,

82

1      and unfortunately these days, I come home

2      very late.

3  BY MS. SCHWARTZ:

4      Q.    Are there any hobbies that your husband

5  cannot do now that he used to do before his

6  employment at Standard Pacific ended?

7      A.    I can tell you that he used to love to

8  go to yoga classes, and when we moved to

9  Wellington, because it's such a small community,

10  small luxuries like that are much more costly, so

11  he has chosen not to.  He feels, I think he feels

12  very self-conscious that I'm the only one working,

13  and he's very, very thrifty about his lifestyle;

14  the same thing with tennis.

15      Q.    What do you mean the same thing with

16  tennis?

17      A.    He doesn't really go to play tennis any

18  more, because if he takes the tennis lesson or

19  tries to hit with the tennis pro, it costs money.

20  He's not such a good tennis player as to go to

21  play with somebody else, they would reject him

22  probably as a partner, so he tries to hit with the

23  pro.

24          MR. CARMAN:   I don't play good either.

25          THE WITNESS:   Sorry about that, guy.

83

BY MS. SCHWARTZ:

    Q.   Did he play tennis more frequently before his termination from Standard Pacific?

    A.   He would try to hit with a pro, you know, help his skills, and it helped, you know. Also, I think his stress.

    Q.   How often did he hit with the tennis pro back then?

    A.   Once every couple of weeks.

    Q.   How often does he hit with a tennis pro now?

    A.   Zero times.

    Q.   Is there anything other than hobbies that your husband cannot do now that he used to do before his employment ended?

    A.   Well, he gave up our dream home, the apartment we moved to. We don't travel, we haven't gone to the apartment in the Bahamas as much as we thought we would. We hardly go out to dinners any more. We try to sometimes, you know, eat in or we eat -- you know, but if we eat, we eat in more affordable places.

    Q.   Why don't you go to the Bahamas as much as you thought you would?

    A.   The cost.

84

1       Q.    Your husband is not currently employed

2  anywhere; correct?

3       A.    No, he's not, unfortunately.

4       Q.    What does he do on a daily basis?

5       A.    He looks for jobs, he looks in the

6  Internet, he looks in the Palm Beach newspaper, he

7  looks in the Miami Herald.

8             He talks to people that he knows about

9  the possibility of employment.  He looks about the

10 possibilities in the market for any type of work,

11 including the possibility of building barns,

12 anything that is in his field, which is what he

13 knows what to do.

14      Q.    What does he do when he's not looking

15 for work?

16      A.    Takes --

17            MR. CARMAN:  Objection to form.

18            THE WITNESS:  Takes care of things in

19      the house, basically.  He helps me, he takes

20      care of the bills, the cleaning, he's a good

21      house-husband.

22 BY MS. SCHWARTZ:

23      Q.    What is a typical day like for him --

24      A.    I have no idea.

25      Q.    -- if there is a typical one in this

85

1   case?

2       A.   I have no idea because I'm not at home.

3       Q.   He doesn't tell you what he does during

4   the day when you come home from work?

5       A.   I usually don't ask, and I don't leave a

6   camera to observe him.

7       Q.   Well, you testified earlier that he

8   spends hours, he did spend hours sitting on the

9   couch watching TV because of his depression.  Now

10  you are telling me that you don't know what he

11  does during the day?

12          MR. CARMAN:  Objection to form.

13          THE WITNESS:  You asked me what happened

14      after his termination.  That was then.  I am

15      telling you what he does now.

16          I also told you clearly and specific,

17      that through the efforts of the family and

18      the support system that my daughters and I

19      have provided to him, he is doing better.

20      Because he's doing better, he can start

21      looking for a job and he's gained some of his

22      self-esteem back.

23          I don't see what is the inconsistency in

24      my response that you are trying to -- is this

25      a trick question or --

86

1  BY MS. SCHWARTZ:

2      Q.   No, I was just asking you what he does

3  on a daily basis.

4      A.   Okay.

5      Q.   So you don't know what he does on a

6  daily basis.

7           MR. CARMAN:  Objection to form, it's

8       been asked and answered now three times.

9           THE WITNESS:  I already answered you

10      what he does on a daily basis.  I told you he

11      looks for work, and other than that, he has

12      been looking for work diligently.  My husband

13      is a working person.

14  BY MS. SCHWARTZ:

15      Q.   How long after your husband's employment

16  ended at Standard Pacific did he start looking for

17  another job?

18           MR. CARMAN:  Objection to form.

19           THE WITNESS:  I don't remember.

20  BY MS. SCHWARTZ:

21      Q.   Did you help him or have you been

22  helping him to find a job?

23      A.   I have been helping him with leads,

24  anything that I see that has to do with

25  construction, domestically, internationally,

87

1   because I know that's what he loves to do.

2          I cut out pages of companies that I see,

3   introduced him to Career Builder.  You have to

4   understand, my husband has not been in the

5   marketplace for 28 years.  I help him put together

6   a resume.  I show him how to use resumes.com.  I

7   have taught him where to look at monster.com.

8          I told him a couple of headhunters that

9   I know just because I recruit people for the

10  company that had been used by my company that he

11  should contact.

12      Q.   What headhunters did you recommend?

13      A.   I don't know who has he contacted, but

14  there were a series of them.  I told him I didn't

15  know if they were in construction or not because

16  we are totally different industries, but there is

17  Haft is one of them, there is one company known as

18  Haft and Associates, something like that, I don't

19  recall exactly the name.  I asked the HR

20  Department at the office who do you use, you know,

21  there were a series of names.

22      Q.   Haft is the only one that you remember?

23      A.   That I remember, yes.  I told him also

24  where to research to find names of headhunters.

25      Q.   Where did you tell him to research?

88

```
 1        A.    The Internet.

 2        Q.    Do you know where he has applied for

 3   jobs?

 4        A.    I know he has a file with a whole bunch

 5   of applications.

 6        Q.    Do you know where he has applied for any

 7   jobs?

 8             MR. CARMAN:  Objection to form.

 9             THE WITNESS:  Specifically where he has

10        applied, I don't know, but I know he's

11        applied to many places.

12   BY MS. SCHWARTZ:

13        Q.    Was he offered any jobs that he could

14   find?

15        A.    No.

16        Q.    Is he working on any opportunities now?

17        A.    He's trying to find opportunities, but

18   he's not working on any opportunities, he doesn't

19   have any signed contracts to do any work for

20   anyone.

21        Q.    Did he do any work for your company or

22   for your former company, HAA Preferred Partners?

23        A.    When my husband was into what I consider

24   to be shock or severe depression, to get him out

25   of the house, I was in the process of building a
```

89

1  space to move to 703 Waterford.

2          I did not want to leave him home alone,

3  so I convinced him to come and help me deal with

4  the building, which is a massive, you know,

5  undertaking, it's a very bureaucratic process, and

6  I would make him come to the office every day,

7  deal with the building of the space, and help me

8  with that, as a means of getting him out of the

9  house and helping him build his self-esteem, I

10  thought that that will help him realize that he is

11  a capable individual and that, you know, he had

12  just been done wrong by malicious people.

13      Q.   What year was this or do you recall when

14  he was working for your company?

15      A.   Yes, I think we -- he was terminated in

16  October, I think, and I think we started working

17  in, maybe we were already working on that space,

18  it was already in progress, I think after that in

19  November or so he started helping me, and finally

20  we moved the office into a new space sometime in

21  December.

22          I felt that since he had recently done

23  the same type of work for Westbrooke for the new

24  office, you know, it would be something that will

25  help him gain some of his self-esteem, but most

90

1   important I didn't want to leave him at home

2   alone.

3       Q.   What type of job was he responsible for

4   when he was working or HAA Preferred Partners?

5       A.   He was not working, ma'am, for HAA

6   Preferred Partners, you are putting it in a way

7   that he was employed.  That is not the right

8   phrasing.  He was coming into the office on a

9   voluntary basis helping me deal with the

10  subcontractors, with the building, is this being

11  done wrong, is this wall finished properly.

12          He does not have any duties assigned to

13  him, he would just come in and I would call him

14  and say what do you think, is this right, is this

15  wrong, you know, it's oversee that the things were

16  done on a timely basis, and dealing with the

17  builder that was doing the space.

18      Q.   Was he paid for any of his time?

19      A.   No, he was not paid for his time.  Like

20  I said, he was not employed by HAA.

21      Q.   Other than Dr. Feldman and the holistic

22  doctor you mentioned earlier, has your husband

23  seen any other healthcare providers since his

24  position ended?

25          MR. CARMAN:  Objection to form.

91

1          THE WITNESS:  Not that I recall.

2          Presently, I know Dr. Feldman sent him

3     to a course on nutrition and counseling for

4     diabetic, borderline diabetic people, how to

5     eat, at Baptist Hospital, which is where he

6     practices and he's associated with, but not

7     to my recollection, no.

8          MS. SCHWARTZ:  Okay.  Let's just take a

9     two minute break, I think I'm done.  I just

10     want to go over something.

11          MR. CARMAN:  Okay.

12          (Thereupon, a recess was taken, after

13  which the following proceedings were had:)

14  BY MS. SCHWARTZ:

15     Q.   I asked you this earlier in the

16  deposition and we switched topics.

17     A.   Okay.

18     Q.   Do you know what you will be called to

19  testify about at the trial of this case?

20          MR. CARMAN:  Objection to form.

21          THE WITNESS:  I thought I answered the

22     question, but I will be glad to answer again.

23          I think that I will be, I believe I will

24     be called to testify about the wrongdoings of

25     Standard Pacific to my husband, both in age

92

```
 1        discrimination and by breaking the agreement
 2        they had with him for his retirement
 3        pseudo-pension plan that entitled him to two
 4        and a half percent of the company's earnings
 5        in the year 2006.
 6   BY MS. SCHWARTZ:
 7        Q.   What facts do you have that the company
 8   broke an agreement with your husband for the two
 9   and a half percent retirement plan?
10             MR. CARMAN:   Objection to form.
11        Anything that you and I have talked about is
12        privileged, anything Melanie and Damian have
13·       talked about with you is privileged, and I
14        don't want you to disclose that, and that
15        question is so broad, you can answer it if
16        you can.
17             THE WITNESS:·  The many conversations
18        that I know took place between my husband and
19        the company in several occasions relating to
20        that matter, really, and I really prefer not
21        to say too many more details.
22   BY MS. SCHWARTZ:
23        Q.   What conversations are you referring to
24   about between your husband and the company?
25        A.   My first with Jim Carr, and subsequent
```

93

1   to that with Hal, and this is why my husband never

2   worried about his job security or career.

3        Q.   Were you a part of any of those

4   conversations with your husband and Jim?

5        A.   I was not a part of any of those

6   conversations at all, no, but --

7        Q.   Do you have any personal knowledge

8   regarding --

9             MR. CARMAN:  Excuse me, she isn't done.

10  BY MS. SCHWARTZ:

11       Q.   Do you have any personal knowledge

12  regarding any of those conversations?

13            MR. CARMAN:  Griselle, if you want to

14       finish your answer, please do.

15            THE WITNESS:  My husband had told me,

16       like I told you our relationship covers key

17       points in his career, those were key points

18       that he did tell me on several occasions.  He

19       would say to me that he knew he had a career

20       path established that will carry a retirement

21       package.

22  BY MS. SCHWARTZ:

23       Q.   Were you given -- strike that.

24            Are you referring to any specific

25  conversation between your husband and Jim Carr?

94

1      A.   I am not referring to a specific

2 conversation, no.

3      Q.   Are you referring to any specific

4 conversations between your husband and Hal?

5      A.   No.

6      Q.   What do you mean when you said -- what

7 did you mean by conversations that occurred in

8 several occasions?

9      A.   I believe that two or three times, my

10 husband mentioned to me that it had been referred

11 to him by conversations with Jim Carr and then

12 subsequent with Hal, that he will be entitled to

13 this profit sharing, and that, you know, that was

14 his, quote, retirement egg, per se.

15      Q.   Aside from your husband told you, do you

16 have any personal knowledge regarding those

17 conversations?

18      A.   No.

19           MR. CARMAN:   Objection to form.

20 BY MS. SCHWARTZ:

21      Q.   What do you expect to testify -- strike

22 that.

23           Other than these conversations that your

24 husband spoke to you about with Jim and Hal, is

25 there anything else that you plan to tell the jury

95

1   about the breach of agreement or breach of

2   contract claim?

3           MR. CARMAN:  Objection to form.

4           THE WITNESS:  Well, to me as a business

5       person, he received a two and a half percent

6       consistently for two or three years in a row,

7       and to me, that constitutes the fact that he

8       was getting it.  He had told me before that

9       he was entitled to receive that two and a

10      half percent for 2006, and that is really

11      what I intend to testify.

12  BY MS. SCHWARTZ:

13      Q.   Did anyone from Standard Pacific tell

14  you that your husband was entitled to the two and

15  a half percent for 2006?

16      A.   No one from Standard Pacific would have

17  said that to me because you, as a lawyer, know

18  that to give even me, as a wife, my husband's

19  employment details, up to and including his

20  evaluations and that type of thing, would be

21  illegal.

22      Q.   So you never discussed -- or strike

23  that.

24           Did you ever discuss his profit sharing

25  with anybody from Standard Pacific?

96

1      A.    Why would they do that with me?

2      Q.    Is that a no?

3      A.    No.

4            MR. CARMAN:  Objection to form.

5            THE WITNESS:  There would be no reason

6      for them to discuss it with me.  I'm not the

7      person entitled to the profit sharing, ma'am.

8  BY MS. SCHWARTZ:

9      Q.    What facts do you have to support your

10 husband's age discrimination claim?

11     A.    I already expressed those.

12           MR. CARMAN:  Objection to form, asked

13     and answered.

14 BY MS. SCHWARTZ:

15     Q.    Other than the conversation you had with

16 Diana that you told me about, and the comments

17 that people made to you about Diana at the 2006

18 November poles, and the Cystic Fibrosis event, is

19 there anything else that you didn't tell me to

20 support the age discrimination claim?

21     A.    Not that I recall right now.

22     Q.    Do you need some time to think about it?

23     A.    Maybe I will remember something days

24 from now, but right now I don't.  Maybe there is

25 other things.  Like I told you, this has been a

97

1   very, very emotional period for me as well, I have

2   had to be very, very strong.

3       Q.   Well, unfortunately, I only have this

4   chance to take your deposition, so if you need to

5   take a break to think about it --

6       A.   No.

7       Q.   -- to make sure you have told me

8   everything that you know.

9       A.   I have told you everything I know today.

10          MS. SCHWARTZ:  Okay.  That's fair.  All

11      right, well, I have no further questions.

12              CROSS-EXAMINATION

13  BY MR. CARMAN:

14      Q.   Mrs. Chernys, I have a question.  You

15  had a conversation with Mr. Carr at the barn after

16  Mr. Chernys was let go; is that correct?

17      A.   That is correct, yes.

18      Q.   Would you tell me what happened in that

19  conversation?

20      A.   Jim, his wife and his daughter came to

21  visit us at the barn, and Jim asked me, "Where is

22  Lenny?"  And I said, "Well, Lenny is around doing

23  errands on the barn."  And I said but -- he said,

24  "Oh, I want to go say hello to him."

25          I said, "I have to warn you that

98

1 │ Standard Pacific, you are not going to find him in

2 │ the best of moods, because Standard Pacific just

3 │ terminated him."  I think it was like the week

4 │ before, or a couple of weeks before.

5 │           And he acted very surprised, and he

6 │ said, "What?  How can that be possible?"  And I

7 │ said, "Yep, they put him out in the street, and

8 │ without even severance packages, due to supposedly

9 │ a reduction in staff, like other people, you know,

10 │ just put him out in the street like a dog."  And

11 │ he said, "That's not possible, he's entitled to

12 │ his profit sharing, what about his profit

13 │ sharing?"

14 │           And I said, "Well, they have told him

15 │ he's not entitled to anything."

16 │           MR. CARMAN:  Thank you.  Nothing

17 │     further.

18 │                REDIRECT EXAMINATION

19 │ BY MS. SCHWARTZ:

20 │     Q.   Was your husband terminated as part of

21 │ the reduction in force that you were just

22 │ referring to?

23 │           MR. CARMAN:  Objection to form.

24 │           THE WITNESS:  He was told that he was,

25 │     that's what he was told by, you know, the

99

1    company.

2  BY MS. SCHWARTZ:

3    Q.   Do you know who at the company told him

4  that?

5    A.   Diana.

6    Q.   Was anybody present during this

7  conversation between you and Jim Carr?

8    A.   Just Jim and I.

9      MS. SCHWARTZ:  Thank you.  I have no

10    further questions.

11      MR. CARMAN:  We would like to read it.

12    Would you please notify us and we will be

13    happy to, and we will take a copy, please.

14      THE REPORTER:  Do you want a mini and

15    ASCII, also?

16      MR. CARMAN:  Yes, a mini and ASCII.

17      THE REPORTER:  Do you want this

18    transcribed?

19      MS. SCHWARTZ:  Yes, mini and ASCII.

20      (Thereupon, the taking of the

21  deposition was adjourned at 3:55 p.m.)

22

23

24

25