UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-21605-CIV-LENARD/GARBER

**LEONARD CHERNYS**,

    Plaintiff,

vs.

**STANDARD PACIFIC OF SOUTH FLORIDA, G.P. INC., and STANDARD PACIFIC CORP.,**

    Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (D.E. 156)**

**THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment ("Motion," D.E. 156), filed on March 6, 2009. On March 30, 2009, Plaintiff filed his Response in Opposition to Defendants' Motion ("Response," D.E. 161) and Defendants filed their Reply ("Reply," D.E. 164) on April 9, 2009.[1] Having reviewed Defendants' Motion, the Response, the Reply, and the record, the Court finds as follows.

    **I.**    **Background**

This case involves a lawsuit by a former employee of Defendant Standard Pacific of South Florida, G.P. Inc. ("SPSF"), for age discrimination and breach of an oral contract to

---

    [1]    Defendants also filed a Notice of Supplemental Authority ("Defendants' Supplemental Authority," D.E. 184) on September 16, 2009, discussing the recent U.S. Supreme Court decision in Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009).

pay profit sharing for the year 2006. In 2002, Plaintiff Leonard Chernys ("Chernys") was employed as Senior Vice President of Operations for Westbrooke Homes ("Westbrooke"), a real estate developer in South Florida. Westbrooke built and sold residential homes and Chernys was responsible for purchasing and construction. (Deposition of Leonard Chernys ("Pl. Dep."), D.E. 64-1 at 29-31.) Chernys had worked for Westbrooke since 1978, when he was hired by Westbrooke's owner, James Carr ("Carr"). After a series of acquisitions, Westbrooke was purchased in April 2002 by a California real estate developer, Defendant Standard Pacific Corp. ("Standard Pacific"), and ultimately renamed Standard Pacific of South Florida, G.P. Inc. After the acquisition, Chernys remained employed by SPSF and took the title of Senior Vice President of Operations. Chernys would work for SPSF until his termination on October 6, 2006. The Parties' dispute centers on the circumstances surrounding his termination and an alleged oral contract made between Chernys and SPSF in 2004.

In August 2004, Standard Pacific's president, Michael Cortney ("Cortney"), met with Carr, at the time a consultant for SPSF, to discuss Chernys's position with the company. (Pl. Statement of Facts ("Pl. SOF"), D.E. 162 at ¶ 11.) Prior to the meeting, there had been a "consensus" among Cortney, Carr, and Hal Eisenacher ("Eisenacher"), SPSF's president at the time, that Chernys was unable to adapt to the change in management and a change in role was necessary. (Deposition of James Carr ("Carr Dep."), D.E. 64-6 at 55-58.) Carr testified that Standard Pacific's way of doing business was "radically different" than Westbrooke's

2

prior operations and both Eisenacher and Carr believed Chernys "was unable to change the way he did business." (Id. at 55.) According to Chernys, it was at this meeting that Cortney and Carr negotiated a "soft landing" for Chernys whereby Chernys was to receive 2.5% of the company's pre-tax profits for two years in exchange for his retirement at the end of 2006. (Pl. SOF at ¶¶ 14-15.) Carr testified that although the agreement was for "two years," individual years were not specified and the profit sharing distributions had not yet been made for 2004. (Carr Dep. at 74 ("No individual year was discussed. The conversation was two years.").)

Carr eventually conveyed this agreement to Chernys in August or September of 2004, explaining to Chernys the circumstances surrounding the meeting and his opinion that it was time for Chernys to retire. (Pl. Dep. at 57-58.) According to Chernys, he reluctantly accepted the agreement despite his desire to continue working. (Pl. Dep. at 60.) Both Carr and Chernys testified that their relationship suffered as a result of the agreement and the two did not speak to each other for over a year. (Id. at 62-63; Carr Dep. at 79-80.) Ultimately, Chernys believed this agreement provided him with profit sharing for the years 2005 and 2006. (Def. Statement of Undisputed Facts ("Def. SOF"), D.E. 157 at ¶ 35.) While Carr also believed the agreement would provide Chernys with profit sharing for 2006, Cortney disputes that such an arrangement was made and contends he would have lacked authority to make such an arrangement. (Id. at ¶¶ 33-34.) Chernys received profit sharing for 2004 and 2005, but not 2006. (Pl. SOF at ¶¶ 23, 26; id. at ¶ 43 (stating Chernys received $420,129.16 in

3

profit sharing for 2004 and $1,131,513.30 in profit sharing for 2005).)

In 2004, SPSF also changed Chernys's position to Senior Vice President of Product Development. As a result, Chernys's responsibilities in construction and purchasing were given to two younger employees--Henry Laureiro and Freddy Marante--and Chernys was moved out of the Construction department and into a new department comprising only himself. (Pl. SOF at ¶¶ 17-18.) Defendants assert Chernys was moved because of a failure to adapt to new management and because he had become a "disruptive force in the workplace." (Def. SOF at ¶ 20.) Chernys contends his change in position was motivated by Defendants' desire to promote "young talent." (Pl. SOF at ¶¶ 16-18.) In December 2004, Eisenacher resigned as SPSF President and he was replaced by Diana Ibarria ("Ibarria"). (Def. SOF at ¶ 44.) In 2006, Ibarria informed Chernys that he would not receive profit sharing for that year but that she wished he would continue to work for SPSF. (Id. at ¶ 52; Pl. SOF at ¶ 26; Pl. Dep. at 71.) However, in early 2006, the real estate market in South Florida began to decline and SPSF decided to implement a RIF taking into account the needs of each department. (Def. SOF ¶¶ 58-59, 62.) Ibarria selected Chernys for the RIF and informed him on September 8, 2006, that he would be terminated. (Id. at ¶¶ 60, 73.) Ibarria alone made the decision to terminate Chernys and neither Carr nor Eisenacher were involved. (Pl. SOF at ¶ 28; id. at ¶ 80.) According to Ibarria, she decided to eliminate Chernys because the market decline meant a lack of demand for new products. (Def. SOF at ¶ 66.) She also did not consider Chernys for his old position since she thought that person was doing a very

good job.  (Id. at ¶ 77; Deposition of Diana Ibarria ("Ibarria Dep."), D.E. 64-5 at 239.)

On November 22, 2006, Chernys filed the instant lawsuit in state court.  Plaintiff's Second Amended Complaint ("Complaint") alleges Defendants breached an oral contract to pay Chernys profit sharing for 2006 in exchange for his early retirement (Count I) and Defendants discriminated against Chernys on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Section 760.01 of the Florida Civil Rights Act ("FCRA") (Counts II and III).

## II.   Standard of Review

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324; see also FED. R. CIV. P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Id. at 587. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Id.

### III. Discussion

#### A. Breach of Contract

Defendants' Motion raises three grounds for summary judgment as to Chernys's breach of contract claim: (1) no enforceable contract exists as there was no meeting of the minds as to several crucial terms of the contract such as length; (2) because the oral contract could not have been completed within one year it is barred by the statute of frauds; and (3) insofar as Chernys alleges the profit sharing agreement was in exchange for past performance, the contract fails for lack of consideration. (Motion at 1-2.) As the Court finds Defendants' statute of frauds argument to be dispositive of Chernys's breach of contract claim, the Court need not consider the additional defenses raised by Defendants.

Section 725.01 of the Florida Statutes codifies the statute of frauds and provides that:

> No action shall be brought whereby to charge any executor or administrator upon any special promise to answer or pay any debt or damages out of her or his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person or to charge any person upon any agreement made upon consideration of marriage, or upon any contract for the sale of lands, tenements or hereditaments, or of any uncertain interest in or concerning them, or for any lease thereof for a period longer than 1 year, or upon any agreement that is not to be performed within the space of 1 year from the making thereof, . . . , unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

FLA. STAT. § 725.01 (2009). Discussing the statute of frauds, the Florida Supreme Court has warned:

> The statute of frauds grew out of a purpose to intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos. To accomplish this, the statute requires that all actions based on agreements for longer than one year must depend on a written statement or memorandum, signed by the party to be charged. The statute should be strictly

7

>   construed to prevent the fraud it was designed to correct, and so long as it can be made to effectuate this purpose, courts should be reluctant to take cases from its protection.

Yates v. Ball, 132 Fla. 132, 138 (1937). Accordingly, the statute of frauds renders unenforceable those contracts where it is apparent, from the purpose of the contract and the surrounding circumstances, that the understanding of the parties was that the agreement was not to be performed within a year from the time it was made. See Dwight v. Tobin, 947 F.2d 455, 459 (11th Cir. 1991); Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters N. Am., Inc., 2008 WL 786319 at *4 (M.D. Fla. 2008); Yates, 132 Fla. at 139.

Upon examination, the August 2004 oral agreement is unenforceable under the statute of frauds because it could not have been completed until profits for the year 2006 were determined. It is undisputed that no written agreement exists regarding the August 2004 discussion between Cortney and Carr. Moreover, Chernys acknowledged at his deposition that year-end profits for 2006 could not have been established in August 2004 and he had always received profit sharing based on year-end closing numbers and not projections. (See Pl. Dep. at 80.) Thus, it is clear that both the object of the alleged agreement, a promise to pay Chernys profit sharing more than two years after the date of the agreement, and the circumstances surrounding the agreement, indicate the parties could not have understood the agreement to have been performed within one year from the time it was made. Since the August 2004 agreement is not susceptible to performance within one year, it is unenforceable unless an equitable exception removes it from the statute of frauds.

Citing several Florida appellate court decisions, Chernys argues that full performance removes the oral agreement from the statute of frauds and Chernys fully performed his obligations under the agreement. (Response at 8 (citing Moneyhun v. Vital Indus., Inc., 611 So.2d 1316, 1319 (Fla. 1st DCA 1993); AV-MED, Inc. v. French, 458 So.2d 67, 69 (Fla. 3d DCA 1984); Hiatt v. Vaughn, 430 So.2d 597, 598 (Fla. 4th DCA 1983); Vendretti-Siravo v. City of Hollywood, 418 So.2d 1251, 1253 (Fla. 4th DCA 1982); Gerry v. Antonio, 409 So.2d 1181, 1183 (Fla. 4th DCA 1982); Dionne v. Columbus Mills, Inc., 311 So.2d 681, 683 (Fla. 2d DCA 1975)).) These courts have either held that partial or full performance by one party of an oral contract will remove the contract from the statute of frauds. Chernys argues that he fully complied with the agreement by providing valuable service and assistance during SPSF's transition and in developing new products. (Response at 8.)

Defendants respond that the doctrines of full and partial performance are equitable doctrines unavailable in actions for damages at law. (Reply at 5.) In support, Defendants cite several Florida appellate court decisions and one decision from the Eleventh Circuit. (See id. (citing Dwight, 947 F.2d at 459; Elsberry v. Sexton, 54 So. 592 (Fla. 1911); Harrison v. Pritchett, 682 So.2d 650, 651-52 (Fla. 1st DCA 1996); Collier v. Brooks, 632 So.2d 149, 152 (Fla. 1st DCA 1994)).) In contrast to the opinions cited by Chernys, these cases stand for the proposition that "while the courts may use the doctrine of part performance to remove a contract from the statute of frauds for the purpose of granting specific performance or other equitable relief, the doctrine is not available in an action solely for damages at law." Dwight,

9

947 F.2d at 459. Chernys's Second Amended Complaint seeks monetary damages for the alleged breach of contract. (Complaint at 6.) As a result, Defendants argue the full and partial performance exceptions are inapplicable here.

The Court finds the Eleventh Circuit's discussion of the doctrine in Dwight most persuasive. In Dwight, the district court found that although the statute of frauds applied to an oral partnership agreement, the doctrine of part performance removed the statute of frauds barrier. Dwight, 947 F.2d at 458. In reversing the district court's decision, the Eleventh Circuit found that the Florida Supreme Court's ruling in Elsberry, "unequivocally held that part performance is an equitable doctrine only and is not available in actions for damages at law." Id. at 459. In discussing the state of the law on the full performance exception, the court in Dwight went on to state, "[w]hile Dwight cites a handful of case in which Florida District Courts of Appeal have failed to apply this rule, we do not believe that these cases signal a change in the otherwise settled law of the state." Id. (finding these cases neither specifically considered nor rejected the rule limiting the part performance doctrine to cases in equity and the courts may not have been aware of such rule) (internal citations omitted). Accordingly, the Eleventh Circuit stated that "[u]ntil the Florida Supreme Court shows some definitive indication that it intends to change the rule limiting partial performance to actions in equity, we must follow this rule." Id. at 460. As this Court is similarly constrained, the rule limiting the doctrine of partial or full performance to cases in equity must be applied and the August 2004 oral agreement is barred by the statute of frauds.

### B. Age Discrimination

Defendants' Motion seeks summary judgment as to Chernys's age discrimination claims on the grounds that he has not demonstrated a *prima facie* case of discrimination and cannot show that the company's stated reason for his termination, an office-wide reduction in force ("RIF") in light of the failing real estate market, was pretextual. (Motion at 2.) Chernys contends he has demonstrated both direct and circumstantial evidence of age discrimination. (Response at 11-18.) As courts analyze FCRA claims under the same legal standards developed for ADEA and Title VII claims, the Court discusses both counts of age discrimination under the same standard.[2] See Zaben v. Air Prods. & Chems. Inc., 129 F.3d 1453, 1455 n.2 (11th Cir. 1997).

Section 623(a)(1) of the ADEA provides that it is unlawful for an employer, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." In Gross v. FBL Financial Services, Inc., the Supreme Court emphasized that ADEA plaintiffs bear the burden of demonstrating that age was the "'but for' cause of their employer's adverse action." 129 S.Ct. 2343, 2351 n.4 (2009); see also Geiger v. Tower Auto., 2009 WL 2836538 at *4 (6th Cir. Sept. 4, 2009); Cormack v. N. Broward Hosp. Dist., 2009 WL 2731274 at *3 (S.D. Fla. Aug. 29, 2009). ADEA

---

[2]   The FCRA provides that "[t]he general purposes of the Florida Civil Rights Act of 1992 are to secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, national origin, age, handicap, or marital status . . . ." FLA. STAT. 760.01(2).

11

plaintiffs may meet this burden either through demonstrating the existence of either "direct" or "circumstantial" evidence of discrimination.

In the Eleventh Circuit, "direct evidence" is defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1358 (11th Cir. 1999)). It constitutes evidence that "proves the existence of a fact without inference or presumption." Wilson, 376 F.3d at 1086 (quoting Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)). Cases involving direct evidence are rare and "'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." Id. (quoting Rojas v. Florida, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)); see e.g., Van Voorhis v. Hillsborough County Bd. of Comm'rs., 512 F.3d 1296, 1300 (11th Cir. 2008) (finding direct evidence where the decision-maker stated he "didn't want to hire any old pilots"). Direct evidence exists where a statement is made by a decision-maker, specifically relates to the challenged employment decision, and reveals blatant discriminatory animus. Chambers v. Walt Disney World, Co., 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

Chernys offers as "direct" evidence of discrimination Carr's testimony that a consensus existed that Chernys's role needed to be changed. Specifically, Chernys points

to the following passage from Carr's deposition:

> Q: Did you take part in the decision to change his position?
> A: Yes.
> Q: Tell me what your role was.
> A: I worked with Mr. Cortney and Mr. Eisenacher. There was a consensus.
> Q: When you say there was a consensus, what was the consensus on?
> A: The consensus was to change his role.
> Q: Why did the company want to change his role?
> A: It was what I said, an old dog learning new tricks. He wasn't learning them quick enough.

(Response at 12-13; Carr Dep. at 58.)[3] Carr's statements require the fact-finder to infer that the consensus to change Chernys's role was related to Chernys's age and his termination, which occurred approximately two years after the meeting. Carr's testimony contains no blatant discriminatory animus. His testimony regarding the meeting also fails to establish any connection between this meeting and his termination, or Ibarria who was the person ultimately responsible for terminating him. As a result, while Carr's testimony regarding Defendants' desire to change Chernys's role is potentially probative as circumstantial evidence of age discrimination, it falls well short of constituting "direct" evidence of discrimination.

---

[3] Defendants' second motion in limine, referred to Magistrate Judge Garber on July 2, 2008, in part, sought to exclude Carr's language regarding "old dog learning new tricks." On October 24, 2008, the Magistrate Judge issued an order granting in part and denying in part Defendants' motion in limine, finding "[t]he language is Carr's attempt to describe Chernys' adaptability and explain Standard Pacific's reason for changing Chernys position. It was never used by an agent of Standard Pacific, and Standard Pacific should not be damaged by a third-party's idiosyncratic word selection. Moreover, the danger the language will cause unfair prejudice clearly outweighs its probative value." (D.E. 135 at 5.)

Chernys also offers as direct evidence Carr's testimony regarding Eisenacher's desire to move Chernys to make way for "good young talent" and the fact that Chernys was the only person reorganized out of the construction department and into his own department. Discussing his conversations with Eisenacher, Carr testified:

Q: What did Hal say?
A: That he wanted to reorganize. You know, the other issue is there is some good young talent, Henry Lararraro, who moved up and directly ran the field. He was a great younger guy. You have young talent. You have to move them up or lose them. So Hal was balancing that also.

(Carr Dep. at 60.) As with Carr's testimony that a consensus existed to change Chernys's role, this testimony is circumstantial evidence of age discrimination. It requires the fact-finder to infer that Eisenacher's statements about wanting to promote and retain young talent was connected with Ibarria's later decision to terminate Chernys. There are no blatant remarks indicating discriminatory animus and it lacks an obvious connection to the adverse employment action suffered by Chernys. As a result, this portion of Carr's testimony and evidence regarding Chernys's change in title is not direct evidence of discrimination.

Finally, Chernys offers as direct evidence several statements allegedly made by Ibarria to Carr and Chernys's wife. Ibarria's assistant, Elizabeth Burdette ("Burdette"), overheard Ibarria tell Carr something to the effect of "[y]ou have to do something about Lenny. He's getting senile, and I'm getting sick and tired of dealing with him." (Response at 14; Deposition of Elizabeth Burdette ("Burdette Dep."), D.E. 86-2 at 54.) Burdette overheard the statements while standing outside Ibarria's office. (Burdette Dep. at 53-54.) Ibarria was

14

on the phone with Carr, who at the time was acting as a consultant for SPSF. (Id.) Defendants argue that the conversation had to have occurred prior to December 2004, since Burdette testified that Carr was a consultant at the time, and thus too remote from the challenged employment action. (Reply at 8-9.) Defendants also argue Burdette's statements are inherently unreliable and constitute inadmissible hearsay.[4] (Id. at 8.) Unlike Carr's testimony, this evidence is arguably quite probative of a discriminatory animus and the statements come directly from Ibarria, the person responsible for terminating Chernys. The timing of the statement, however, casts some doubt as to any connection with the decision to terminate Chernys. Also, because the nature and circumstances of the phone conversation with Carr are relatively unknown, Ibarria's statements require the fact-finder to infer or presume that her statements are indicative of her motivations for firing Chernys nearly two years later. As such, Burdette's testimony is not direct evidence of discrimination.

Ibarria also allegedly made several statements evidencing discriminatory animus to Chernys's wife. Grisele Chernys testified that Ibarria once told her at a social function "how my husband was getting old, how she did not want him around, how he was forgetting things, he came back and repeated things back to her all the time, and that, you know, she really felt he was getting old, she didn't know how is it that you deal with this." (Response at 15;

---

[4] The Court finds the statements admissible as non-hearsay under Rule 801(d)(2) of the Federal Rules of Civil Procedure. The Parties focus on whether or not Burdette was Ibarria's agent, acting within the scope of employment, is misplaced as Burdette did not make the statements at issue. Burdette would presumably testify at trial regarding admissions made by Ibarria, who at the time would have been acting on behalf of Defendants and in discussing Chernys with Carr, would have been acting within the scope of her employment.

Deposition of Grisele Chernys ("Grisele Chernys Dep."), D.E. 86-7 at 26.) Grisele Chernys testified that this conversation took place at a company party in December 2005. (Grisele Chernys Dep. at 26, 32.) Chernys argues Grisele's testimony is direct evidence of Ibarria's true motivations. (Response at 15.) Defendants argue Grisele Chernys's testimony is unreliable as she also testified that Ibarria "subsequently told her at 'Mike's' wedding in June 2006 'how much Ibarria needed him,' 'how she was so, so happy that Plaintiff was at SPSF, . . . and without him she'd be lost.'" (Reply at 9.) Defendants also argue her testimony does not specifically relate to the challenged employment decision. The Court finds that this evidence, although supportive of an inference of discriminatory animus, does not rise to the level of direct evidence as it does not clearly relate to the decision to terminate Chernys. The statements occurred at a social event approximately nine months to a year before Chernys was terminated. While the statements allow inferences of discriminatory animus, they fail to rise to the level of direct evidence. Having failed to demonstrate any direct evidence of discrimination, the Court must now examine whether Chernys offers sufficient circumstantial evidence of age discrimination to survive summary judgment.

The Eleventh Circuit has adopted a variation of the burden-shifting evidentiary framework developed for Title VII cases in McDonnell Douglas v. Green, 411 U.S. 792 (1973), for use in ADEA cases.[5] See e.g., Wilson, 376 F.3d at 1087; Benson v. Tocco, Inc.,

---

[5] In Gross, the Supreme Court explicitly left open the question of whether or not such a framework is in fact appropriate for ADEA cases. 129 S.Ct. at 2349 n.2 ("And the Court has not definitively decided whether the evidentiary framework of McDonnell Douglas Corp. v. Green, utilized in Title VII cases is appropriate in the ADEA context.")

113 F.3d 1203, 1207 (11th Cir. 1997). Under the McDonnell Douglas framework, "the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally." Wilson, 376 F.3d at 1087. Where the alleged discrimination occurs as part of a RIF and the plaintiff's position is eliminated entirely, "the plaintiff establishes a *prima facie* case by demonstrating (1) that he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for his current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision." Benson, 113 F.3d at 1208. As the Parties do not dispute that Chernys's claims satisfy the first two prongs,[6] the Court must consider whether Chernys meets this minimal burden by offering sufficient evidence to permit an inference of discrimination. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) ("Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."); Benson, 113 F.3d at 1207 ("At the summary judgment stage, our inquiry is whether an ordinary person could reasonably infer discrimination if the facts presented remain unrebutted.") (citing Alphin v. Sears Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir. 1991)).

Chernys offers a variety of evidence that could allow a reasonable fact-finder to infer

---

[6] Defendants address only the final prong of the test as Chernys was clearly within the ADEA's protected class of persons over forty years of age and was qualified for his then-current position.

17

he was deliberately transferred out of his old position of Senior VP of Construction in order to promote younger employees and eventually terminate him.  As discussed above, Carr testified that Eisenacher, President of SPSF at the time Chernys's position was changed, was concerned with retaining several younger employees.  There is also evidence in the record that at least one of these younger employees, Henry Laureiro, was given Chernys's former responsibilities in construction and purchasing.  (Deposition of Bruce Dickson ("Bruce Dickson Dep."), D.E. 86-6 at 43.)  In contrast, the position Chernys assumed was newly created for him.  (Id.)  Similarly, Chernys offers evidence that Standard Pacific's president met with Carr in 2004 in an effort to obtain Chernys's early retirement.  While occurring prior to Chernys's actual termination, this evidence could cause rational jurors to infer the decision to change Chernys's title was in fact related to his eventual termination.

   Chernys also offers evidence that those responsible for terminating him and eliminating his position, may have expressed discriminatory animus and frustration with Chernys's age.  Burdette's testimony could lead a reasonable fact-finder to infer Ibarria selected Chernys for termination because of his age.  Ibarria also testified that she chose to let Chernys go without considering whether or not he might be reassigned to any other positions within the company. (Ibarria Dep. at 239-40.)  A reasonable fact-finder could find this odd in light of Chernys's experience and contributions to the company.  A reasonable fact-finder could also infer discriminatory animus when considering Burdette's testimony in light of Grisele Chernys's corroborating testimony to the effect that Ibarria viewed Chernys

18

as being forgetful. In sum, Chernys has offered sufficient evidence to establish a *prima facie* case of age discrimination.

As Chernys has met his burden of establishing a *prima facie* case of age discrimination, the next component of the McDonnell Douglas framework shifts the burden to the defendants to "proffer legitimate, nondiscriminatory reasons for its employment decision." Damon, 196 F.3d at 1361. If the defendants are able to articulate legitimate, nondiscriminatory reasons for the adverse employment action, the plaintiff "then bears the ultimate burden of proving them to be a pretext for age discrimination." Id. Evidence initially offered by the plaintiff as part of its *prima facie* case may also serve to establish pretext. Wilson, 376 F.3d at 1088. Moreover, "a plaintiff is entitled to survive summary judgment, 'if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action.'" Benson, 113 F.3d at 1207 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997)).

Defendants proffer that Chernys was let go as a result of changing market conditions and the reduced demand for new housing products. Chernys does not dispute that Defendants implemented a company-wide RIF in 2006 and that, in appropriate circumstances, such an action may constitute a legitimate reason for termination. (Response at 17.) Instead, Chernys believes that all of the circumstantial evidence presented--including the 2004 meeting between Carr and Cortney to discuss his early retirement, the decision to

19

change his position and move him to his own department within SPSF, evidence of Eisenacher's desire to promote and retain younger employees, and Ibarria's statements indicating possible discriminatory animus--successfully demonstrate a genuine issue of material fact as to whether Defendants' proffered reasons are pretextual. The Court agrees. Chernys has offered a variety of evidence that could lead a reasonable fact-finder to infer Chernys was terminated due to age and that the reason offered--the 2006 RIF--may have been pretext. Defendants' reliance on employment statistics are similarly unable to demonstrate the lack of any genuine issues of material fact.[7] Accordingly it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (D.E. 156) is **GRANTED** as to Count I of the Complaint and **DENIED** as to Counts II and III of the Complaint.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 10th day of February, 2010.

JOAN A. LENARD
**UNITED STATES DISTRICT JUDGE**

---

[7] Defendants argue that since the percentage of employees over the age of forty remained the same after the RIF--and the employees over the age of sixty actually slightly increased--this is additional proof that age was not a factor in Chernys's termination. Nonetheless, where a defendant offers statistics to rebut a charge of pretext, such statistics without any analytical foundation "are virtually meaningless." Wilson, 376 F.3d at 1089. The Court finds the relatively meager statistics offered by Defendants are unable to establish a lack of genuine issues of material fact as to the issue of pretext in this case.